**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PARK NATIONAL CORPORATION** | ) | |
| **50 N. 3rd Street** | ) | **CASE NO. _____** |
| **Newark, OH 43055,** | ) | |
| | ) | **JUDGE: _____** |
| **Plaintiff,** | ) | |
| | ) | **(JURY DEMAND ENDORSED HEREON)** |
| **v.** | ) | |
| | ) | |
| **HCC LIFE INSURANCE COMPANY, n/k/a** | ) | |
| **TOKIO MARINE HCC** | ) | |
| **225 TownPark Drive, Suite 350** | ) | |
| **Kennesaw, GA 30144,** | ) | **COMPLAINT** |
| | ) | |
| **Defendant.** | ) | |

## BACKGROUND

1. This is a 28 U.S.C. §1332 diversity-based federal civil action by Park National Corporation (which funds and sponsors a self-insured employee welfare benefit plan) against a stop loss insurance carrier that has breached, and continues to breach a Contract providing for the reimbursement of stop loss insurance monies and benefits. The employer, Park National Corporation, the mutually agreed-upon benefit Plan Utilization Review Vendor (InVentive Medical Management), and the benefit Plan's third-party administrator (Medical Benefits Administrators, Inc.), all agree and concur that the stop loss benefits sought in the Complaint are due and owing to Park National Corporation.

## VENUE AND JURISDICTION

2. Jurisdiction property exists with this Court under 28 U.S.C. § 1332 in that Plaintiff Park National Corporation and Defendant Tokio Marine HCC, f/k/a HCC Life Insurance Company are citizens of different states and the amount in controversy exceeds Seventy

Five Thousand Dollars ($75,000.00), exclusive of interest and costs. This action is properly venued in this Court because Plaintiff Park National Corporation maintains its principal place of business in Newark, Licking County, Ohio; because the Contract at issue was entered into and executed in Newark, Licking County, Ohio; and because the underlying events giving rise to the breach by Defendant Tokio Marine HCC, f/k/a HCC Life Insurance Company occurred in Newark, Licking County, Ohio.

### COMMON ALLEGATIONS

3. Park National Corporation ("Park National Corp." or "Plaintiff") is a Delaware corporation having its principal place of business at 50 N. 3rd Street, Newark, Ohio 43055. Park National Corp. does business as, *inter alia*, Park National Bank, Century National Bank, Fairfield National Bank, Farmers Bank, First-Knox National Bank, Richland Bank, Second National Bank, Security National Bank, United Bank, and Unity National Bank. All of the above-mentioned community banks have their principal places of business within the State of Ohio.

4. HCC Life Insurance Company, n/k/a Tokio Marine HCC ("HCC Life Insurance" or "Defendant") is an Indiana-incorporated insurance company that makes available, and offers stop loss insurance benefits and coverages to self-insured welfare benefit plans. HCC Life Insurance maintains its principal place of business at 225 TownPark Drive, Suite 350, Kennesaw, GA 30144. The Ohio registered agent for service of process for HCC Life Insurance is National Registered Agents, Inc., 4400 Easton Commons Way, Suite 125, Columbus, OH 43219.

5. The Park National Corporation Employee Health Benefit Plan – Wellness Plan ("the Plan") is a self-funded employer welfare benefit plan that provides, and makes available hospitalization, medical, surgical, and prescription drug benefits for enrolled employee-participants, spouses, and eligible dependents of employees of Park National Corp. and the community banks listed in paragraph 3 of the Complaint. The Park National Corporation Employee Health Benefit Plan – Wellness Plan is sponsored and funded by Park National Corp., and is the vehicle by which Park National Corp. makes available welfare benefits to employees, spouses and eligible dependents, and remits payments to medical service providers of such persons.

6. Effective October 1, 2013 through September 30, 2014, Park National Corp. entered into, and had in place stop loss insurance for the Park National Corporation Employee Health Benefit Plan – Wellness Plan, and the some 1,260 participants, spouses and eligible dependents enrolled in the Plan. The stop loss insurance Contract with HCC Life Insurance provided for a Two Hundred Thousand Dollars ($200,000.00) deductible per Covered Person, after which stop loss reimbursement would be at one-hundred percent (100%). The stop loss insurance maintained between Park National Corp. and HCC Life Insurance was comprised of the Application; the HCC Life Insurance Stop Loss Policy; and the Park National Corporation Employee Health Benefit Plan – Wellness Plan, all of which comprised and constituted the "Contract" per the defined terms of the HCC Life Insurance Company stop loss insurance policy. A complete and accurate copy of the HCC Life Insurance/Park National Corp. stop loss insurance application is attached hereto, and incorporated herein as Exhibit "A". A complete and accurate copy of the HCC Life

Insurance/Park National Corp. stop loss insurance policy and accompanying endorsements is attached hereto, and incorporated herein as Exhibit "B". A complete and accurate copy of the HCC Life Insurance/Park National Corp. Employee Health Benefit Plan – Wellness Plan is attached hereto, and incorporated herein as Exhibit "C". At all times material herein, Park National Corp. remitted the requisite premiums and fulfilled all conditions of the "Contract" so as to maintain its stop loss insurance policy and coverages.

7. The HCC Life Insurance/Park National Corp. stop loss insurance policy required that HCC Life Insurance and Park National Corp. mutually agree on a Utilization Review Vendor, and for purposes of the "Contract", HCC Life Insurance and Park National Corp. selected InVentive Medical Management as the Utilization Review Vendor.

8. The HCC Life Insurance/Park National Corp. stop loss insurance policy required HCC Life Insurance and Park National Corp. to mutually agree upon a "Plan Supervisor" to serve as the third-party administrator of the Plan. Under the "Contract", HCC Life Insurance and Park National Corp. selected Medical Benefits Administrators, Inc. as the Plan Supervisor for the Plan and the stop loss insurance policy.

9. The HCC Life Insurance/Park National Corp. stop loss insurance policy provided, *inter alia*:

> **NON-PARTICIPATING INSURANCE**
> **This is a reimbursement policy. You, or Your Plan Supervisor, are responsible for making benefit determinations under Your Employee Benefit Plan. We have no duty or authority to administer, settle, adjust, or provide advice regarding claims filed under Your Employee Benefit Plan.**

10. The Park National Corp. Employee Health Benefit Plan – Wellness Plan provided, *inter alia*:

**4.8 PLAN ADMINISTRATOR DISCRETION**
Nothing in this Plan precludes the Plan Administrator from exercising full discretionary authority and responsibility with respect to all aspects of Plan administration and interpretation. The Plan Administrator shall have all powers necessary to carry out the purposes of the Plan, including supplying any omissions in accordance with the intent of the Plan and deciding all questions concerning eligibility for participation in the Plan and concerning the amount of benefits payable to a Covered Person.

11. On March 8, 2014, Park National Bank employee Ms. April Prather gave birth, prematurely, to baby Micah Prather at Cincinnati Children's Hospital. At all times material herein, April Prather and Micah Prather were eligible "Covered Persons" under the "Contract" and the Plan.

12. Baby Micah Prather underwent multiple surgeries and other life-saving medical procedures and treatment in Level IV and Level III neonatal care at Cincinnati Children's Hospital while the HCC Life Insurance/Park National Corp. stop loss insurance policy and the "Contract" was in force and effect. While receiving Level IV and Level III neonatal intensive care treatment at Cincinnati Children's Hospital, Utilization Review Vendor InVentive Medical Management issued at least three "medical necessity" written determinations wherein InVentive Medical Management held and determined that all of the care and treatment afforded to baby Micah Prather was appropriate, and that all of the itemized bills were similarly appropriate and "customary and reasonable" for a critically-ill newborn infant with multiple life-threatening issues. Plan Supervisor Medical Benefits Administrators, Inc. also reviewed, analyzed and considered the care, treatment and service invoices for baby Micah Prather, and similarly held and determined that all were medically necessary, and customary and reasonable.

13. Notwithstanding the covered care and treatment rendered to baby Micah Prather, and notwithstanding the assessments and determinations by InVentive Medical Management and Medical Benefits Administrators, Inc., HCC Life Insurance rejected, and refused to reimburse Park National Corp. Two Hundred Sixty Six Thousand Nine Hundred Sixty Six Dollars and Forty-Two Cents ($266,966.42) in covered and invoiced expenses that were paid, and payable under the Plan and the "Contract". Park National Corp., through the Plan, remitted the $266,966.42 sum to the Cincinnati Children's Hospital. The $266,966.42 remitted by Park National Corp. through the Plan to the Cincinnati Children's Hospital was an amount that remained after the Contract's and the stop loss insurance's deductible had been met and satisfied.

14. On December 8, 2014, HCC Life Insurance hired and paid Norman S. Kato, M.D. to author a clinical review of the care, treatment and services rendered to baby Micah Prather, and the accompanying invoiced charges. Dr. Kato's clinical review continued to insist that $266,966.42 in charges for the care and treatment of baby Micah Prather were not "medically necessary" and therefore not reimbursable to Park National Corp. Dr. Kato's clinical review referenced care and treatment rendered at Children's Hospital Medical Center in Chicago, Illinois and was predicated solely on the "medical necessity" of the covered and invoiced expenses, and not whether such expenses were "customary and reasonable". Furthermore, Dr. Kato's clinical review quoted and invoked language from the non-existent, inoperable First Knox National Bank Medicare Supplemental Plan Summary Plan Description, whereas Ms. April Prather, and baby Micah Prather were covered under the separate Plan. The inoperable, non-existent First Knox National Bank

Medicare Supplemental Plan was at one time available for retirees of the First Knox National Bank. Neither Ms. April Prather nor her baby Micah Prather were retirees of the First Knox National Bank.

15. Medical Benefits Administrators, Inc., on behalf of Park National Corp., administratively appealed HCC Life Insurance's adverse reimbursement determination on January 21, 2015. On January 22, 2015, HCC Life Insurance rejected the filed administrative appeal, this time claiming and asserting that the charges for the care and treatment of baby Micah Prather were not "usual, reasonable, and customary". HCC Life Insurance's rejection of the filed administrative appeal asserted that it was based on "…the report completed by Avandè and Dr. Norman S. Kato, M.D."

16. Park National Corp. has exhausted all administrative avenues of relief as a perquisite to this suit and action.

## COUNT I – BREACH OF CONTRACT

17. Plaintiff restates and reavers its claims and allegations set forth in paragraphs 1-16 of this, its Complaint.

18. By and through the above-described actions, HCC Life Insurance has breached, and continues to breach the "Contract" and stop loss insurance policy that HCC Life Insurance entered into with Park National Corp. HCC Life Insurance's breach, and continued breach, has caused Park National Corp. to suffer and experience monetary damages in the amount of Two Hundred Sixty Six Thousand Nine Hundred Sixty Six Dollars and Forty Two Cents ($266,966.42), plus interest, for which Park National Corp. is entitled to relief from this Court.

### COUNT II – DECLARATORY JUDGMENT

19. Plaintiff restates and reavers its claims and allegations set forth in paragraphs 1-18 of this, its Complaint.

20. There exists and actual, and justiciable controversy between HCC Life Insurance and Park National Corp., for which Park National Corp. is entitled to declaratory relief by this Court defining the rights, obligations and available relief as between HCC Life Insurance and Park National Corp. Park National Corp. is entitled to a declaratory judgment that the "Contract" and the stop loss insurance policy requires HCC Life Insurance to fully reimburse Park National Corp.

### COUNT III – INJUNCTION

21.  Plaintiff restates and reavers its claims and allegations set forth in paragraphs 1-20 of this, its Complaint.

22. HCC Life Insurance Company has failed, and continues to fail to follow and adhere to the "Contract" and the stop loss insurance policy.

23. As a result of HCC Life Insurance's actions, inactions, and conduct, Park National Corp. is entitled to injunctive relief from this Court, ordering HCC Life Insurance Company to follow, and to adhere to the "Contract" and stop loss insurance policy.

### COUNT IV – TORTIOUS BAD FAITH INSURANCE DENIAL

24. Plaintiff restates and reavers its claims and allegations set forth in paragraphs 1-23 of this, its Complaint.

25. The actions, inactions and conduct described herein by HCC Life Insurance was arbitrary, capricious, without rationale or reasoning, and malicious.

8

26. The actions, inactions and conduct of HCC Life Insurance Company constitute tortious, bad faith denial of insurance claims and benefits for which Park National Corp. seeks injunctive and monetary relief, in addition to punitive damages.

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Enter an order awarding Plaintiff's Two Hundred Sixty Six Thousand Nine Hundred Sixty Six Dollars and Forty-Two Cents ($266,966.42), with interest and expended costs;

2. Enter a declaratory judgment that Defendant HCC Life Insurance has breached, and continues to breach the "Contract", and the stop loss insurance policy;

3. Enter an injunction prohibiting HCC Life Insurance Company from breaching, and continuing to breach the "Contract", and the stop loss insurance policy;

4. Award Plaintiff punitive damages in an amount determined, and to be determined, by a jury;

5. Award Plaintiff recovery of its expended costs and attorneys' fees; and

6. Award all such further relief as the Court deems just, proper and equitable.

Respectfully submitted,

 s/Keith L. Pryatel
Keith L. Pryatel (#0034532)
kpryatel@kwwlaborlaw.com
*(Trial Counsel)*
Kenneth M. Haneline (#0037017)
khaneline@kwwlaborlaw.com
KASTNER WESTMAN & WILKINS, LLC
3550 West Market Street, Suite 100
Akron, OH 44333
330.867.9998 (phone)
330.867.3786 (fax)



STOP LOSS INSURANCE
**HCC LIFE INSURANCE COMPANY**
Three Town Park Commons, 225 TownPark Drive, Suite 350
Kennesaw, Georgia 30144 (800 447-0460)
**APPLICATION**

| | |
|---|---|
| 1. Full Legal Name of Applicant and Address<br>**Park National Corp.**<br>**21 S. First Street**<br>**Newark, OH 43055**<br>   **Telephone No.:** | 2. Applicant is a (check one):<br>☒ Corporation  ☐ Labor Union  ☐ Trust<br>☐ Association  ☐ PEO<br>☐ Partnership  ☐ MEWA<br>Other: |

3. Contract Period: **Effective Date: 10/01/2013**                    **Expiration Date: 09/30/2014**

4. Full Legal Name of Affiliates, Subsidiaries and other major locations to be included in coverage:


   **Address of Affiliates or Subsidiaries:** ☐ None   ☐ See attached listing

| | |
|---|---|
| 5. Nature of Business of the Applicant to be Insured:<br>**National Commercial Banks** | 6. Key Contact Person at Applicant: |

7. Enter full name of the Employee Benefit Plan(s): **Park National Corporation Employee Health Benefit Plan**
   A signed copy of such Employee Benefit Plan(s) must be attached and will form part of this contract.

8. Name and Address of Plan Supervisor:
   **Medical Benefits Administrators, Inc. 1975 Tamarack Road Newark, OH 43055**

9. Agent of Record: **MedBen Marketing Services, Inc.**

10. Estimated Initial Enrollment: **Single: 654  Family: 606  Total Covered Units: 1,260**

11. Retirees Covered: ☒ Yes    ☐ No

12. The Utilization Review vendor will be: **inVentiv Medical Management**

13. Deposit Premium (Minimum of first month's estimated premium): $ **38,712.42**
    Please review the deposit premium on the Monthly Premium Accounting Worksheet.

14. **SPECIFIC STOP LOSS INSURANCE:**                    ☒ Yes    ☐ No

   A. Covered Expenses Paid under the Employee Benefit Plan for the following Plan Benefits are covered for
      Specific Stop Loss Insurance (not included unless checked):
      ☒ Medical  ☒ Prescription Drug Card  ☐ Prescription Drugs Under Medical  ☐ Other:

   B. Specific Deductible in each Contract Period per Covered Person: **$200,000**

   C. Contract Basis: **24/12**
      **Covered Expenses Incurred from 10/01/2012 through 09/30/2014, and Paid from 10/01/2013 through
      09/30/2014.**

   D.   Unlimited Specific Lifetime Reimbursement Maximum per Covered Person
        Specific Contract Period Reimbursement Maximum per Covered Person: **Unlimited**

   E. Separate Individual Specific Deductible: **Amber Smith ($375,000 - 24/12 Contract Basis)**

   F. Monthly Specific Premium Rates: **(Based on Split Funded Endorsement)**
      **Single: $14.29  Family: $48.46**

   G. Specific Percentage Reimbursable **100%**

   H. Specific Terminal Liability Option:                    ☐ Yes    ☒ No
      Specific Terminal Liability Option premium per Covered Person per month:

15. **AGGREGATE STOP LOSS INSURANCE:**   ☐ Yes   ☒ No

   A. Covered Expenses Paid under the Employee Benefit Plan for the following Plan Benefits are covered for Aggregate Stop Loss Insurance (not included unless checked):
      ☐ Medical  ☐ Dental  ☐ Weekly Income  ☐ Vision  ☐ Prescription Drug Card  ☐ Prescription Drugs under Medical  ☐ Other:

   B. Minimum Annual Aggregate Deductible: $
      (Subject to the Definition of Minimum Annual Aggregate Deductible in the Policy)

   C. Contract Basis:

   D. Aggregate Contract Period Reimbursement Maximum: $

   E. Monthly Aggregate Factors:

| Monthly Factors | Combined | Medical | Dental | Weekly Income | Vision | Prescription Drugs |
|---|---|---|---|---|---|---|
| Single | | | | | | |
| Employee + Child | | | | | | |

   F. Aggregate Percentage Reimbursable %

   G. Loss Limit: $
      For the purposes of Aggregate Stop Loss Insurance, the Loss Limit is the maximum amount of Covered Expenses Incurred by each Covered Person, which can be used to satisfy the Annual Aggregate Deductible.

   H. Monthly Deductible Advance Reimbursement Option:   ☐ Yes   ☐ No

   I. Aggregate Terminal Liability Option:   ☐ Yes   ☐ No

   J. Aggregate Premium:
      1. ☐ Annual Premium payable in advance for Contract Period:
      2. ☐ Monthly Premium rate per Covered Unit:
      3. ☐ Monthly Deductible Advance Reimbursement premium per Covered Unit per month:
      4. ☐ Aggregate Terminal Liability Option premium per Covered Unit per month:

SPECIAL RISK LIMITATIONS are stated on the Addendum to Application (if applicable).

It is understood and agreed by the Applicant that:

1. The Applicant is financially sound, with sufficient capital and cash flow to accept the risks inherent in a "self-funded" health care plan, and
2. The Plan Supervisor retained by the Applicant will be considered the Applicant's Agent, and not the Company's Agent, and
3. All documentation requested by the Company must be received within 90 days of the Policy effective date, and is subject to approval by the Company and may require adjustment of rates, factors, and / or Special Limitations to accommodate for abnormal risks, and
4. The Stop Loss Insurance applied for herein will not become effective until accepted by the Company, and
5. Premiums are not considered paid until the premium check is received by the Company, is paid according to the rates set forth in the Application, and all items required to issue the Policy have been returned to the Company. Premiums are subject to refund should any outstanding policy requirement not be met within 90 days of the Policy's effective date, and
6. This Application will be attached to and made a part of the Policy issued by the Company, and
7. The Employee Benefit Plan(s) attached shall be the basis of any Stop Loss Insurance provided by the Company and such Employee Benefit Plan(s) conforms with all applicable State and Federal statutes, and
8. Any reimbursement under the Stop Loss Insurance provided by the Company shall be based on Covered Expenses Paid by the Applicant in accordance with the Employee Benefit Plan(s) attached hereto, and
9. After diligent and complete review, the representations made in this Application, the disclosures made, and all of the information provided for underwriters to evaluate the risk, are true and complete.

Any person who knowingly and with the intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Full Legal Name of Applicant:

Applicant's Federal Tax I.D. Number:

Park National Corp.

311179518

Dated at _225 First St Newark OH 43055_ this _22nd_ day of _August_, 20 _13_.

_Jill S Evens_   Jill S Evens          _[signature]_          _[print name]_
Officer / Partner Signature   (print name)          Licensed Agent Signature          (print name)

For HCC Life Insurance Company Office Use Only:  ACCEPTANCE

Accepted on behalf of the Company, this _8th_ day of _November_, 20_13_.

By: _[signature]_                Title: _Senior Vice President_

Policy No.: _HCL17885_

B

### HCC LIFE INSURANCE COMPANY
STOP LOSS POLICY
Independent Review Organization Coverage Endorsement

Policy Number:          HCL17885

Endorsement Number:     5

Policyholder:           Park National Corp.

Effective Date:         10/01/2013

You and We agree that this Policy is amended as follows:

In the event Covered Expenses are Paid by You for a Covered Person based on an Independent Review Organization's reversal of previously denied claims, and such Covered Expenses are Paid after the last paid date provided in the Contract Basis of this Policy, the Paid Covered Expenses shall be deemed to have been Paid during this Policy's Contract Period, provided that:
1.  Such Covered Expenses are not eligible for reimbursement under any other coverage; and
2.  Such Plan Benefits are otherwise eligible for reimbursement under the terms of this stop loss policy.

You (or You through your Plan Supervisor) agree to provide notice to Us that an appeal has been sent to an Independent Review Organization on a claim that could or is expected to exceed the specific stop loss deductible under this policy within 30 days of the referral to the Independent Review Organization.  We will not reimburse any stop loss claim under this Endorsement if we do not receive such notice within the 30-day time frame.

When filing a reimbursement claim under this Endorsement, You agree to provide us all documentation related to the Independent Review Organization's reversal of the previously denied Covered Expenses. We will not reimburse any stop loss claim where the Independent Review Organization's reversal documentation, along with any other information necessary to process the claim, is not received within 90 days from the last date a claim is eligible for payment under the Contract Period or within 90 days of the date the claim was Paid if Paid after the Contract Period has lapsed.

For purposes of this Endorsement, Independent Review Organization means the organization for external review as required under the external review process of the Patient Protection and Affordable Care Act.

Fees, or any similar expenses, paid to the Independent Review Organization for their services are not reimbursable under this Endorsement.  Coverage under this endorsement does not modify any other terms, conditions, deductibles or split funded retentions of this policy. If coverage is available under a subsequent policy issued by Us, coverage shall be provided under this endorsed policy and not the subsequent policy.

## HCC LIFE INSURANCE COMPANY
### STOP LOSS POLICY
Independent Review Organization Coverage Endorsement

**THERE ARE NO POLICY CHANGES UNDER THIS ENDORSEMENT OTHER THAN STATED ABOVE.**

HCC LIFE INSURANCE COMPANY

President

Corporate Secretary

Dated: November 11, 2013

## HCC LIFE INSURANCE COMPANY
### STOP LOSS POLICY
### QUALIFIED CLINICAL TRIALS ENDORSEMENT

Policy Number:          HCL17885

Endorsement Number:  4

Policyholder:            Park National Corp.

Effective:               10/01/2013

YOU and WE agree that this Policy is amended as follows:

Article VI, Item C is amended to include the following:

The Stop Loss Policy will reimburse Covered Expenses, in excess of the Specific Deductible, for Patient Care Services furnished in connection with participation in Qualified Clinical Trials as defined by this Endorsement.

**Qualified Clinical Trials - Definition**

A Qualified Clinical Trial is defined as a clinical trial that meets all the following conditions:

1. The clinical trial is intended to treat cancer in a patient who has been so diagnosed, and
2. The clinical trial has been peer reviewed and is approved by at least one of the following:
   A. One of the United States National Institutes of Health,
   B. A cooperative group or center of the National Institutes of Health,
   C. A qualified nongovernmental research entity identified in guidelines issued by the National Institutes of Health for center support grants,
   D. The United States Food and Drug Administration pursuant to an investigational new drug exemption,
   E. The United States Departments of Defense or Veterans Affairs,
   F. Or, with respect to Phase II, III and IV clinical trials only, a qualified institutional review board, and
3. The facility and personnel conducting the clinical trial are capable of doing so by virtue of their experience and training and treat a sufficient volume of patients to maintain that expertise, and
4. The patient meets the patient selection criteria enunciated in the study protocol for participation in the clinical trial, and
5. The patient has provided informed consent for participation in the clinical trial in a manner that is consistent with current legal and ethical standards, and
6. The available clinical or pre-clinical data provide a reasonable expectation that the patient's participation in the clinical trial will provide a medical benefit that is commensurate with the risks of participation in the clinical trial, and
7. The clinical trial does not unjustifiably duplicate existing studies, and
8. The clinical trial must have a therapeutic intent and must, to some extent, assess the effect of the intervention on the patient.

**Patient Care Services - Definition**

Patient Care Services are defined as health care items or services that are furnished to an individual enrolled in a Qualified Clinical Trial, which is consistent with the usual and customary standard of care for someone with the patient's diagnosis, is consistent with the study protocol for the clinical trial, and would be covered if the patient did not participate in the Qualified Clinical Trial.

Patient Care Services must be determined to be eligible under the Policyholder's Employee Benefit Plan.

**HCC LIFE INSURANCE COMPANY**
STOP LOSS POLICY
QUALIFIED CLINICAL TRIALS ENDORSEMENT

Patient Care Services do not include any of the following:

1.    An FDA approved drug or device shall be a Patient Care Service only to the extent that the drug or device is not paid for by the manufacturer, the distributor or the provider of the drug of device, or
2.    Non-health care services that a patient may be required to receive as a result of being enrolled in the Qualified Clinical Trial, or
3.    Costs associated with managing the research associated with the Qualified Clinical Trial, or
4.    Costs that would not be covered for non-investigational treatments, or
5.    Any item, service or cost that is reimbursed or otherwise furnished by the sponsor of the Qualified Clinical Trial, or
6.    The costs of services, which are not provided as part of the Qualified Clinical Trial's stated protocol or other similarly, intended guidelines.

**Additional Provisions**

We may require a copy of the Qualified Clinical Trial's study protocol before determining if any benefits are payable under this Endorsement.

Stop Loss Policy benefits paid under this Endorsement will be included in the Specific Contract Period Reimbursement Maximum.

Stop Loss Policy benefits paid under this Endorsement shall not create any legal presumption that HCC Life Insurance Company has recommended, directed, endorsed or required any Covered Person's participation in the Qualified Clinical Trial.

Stop Loss Policy benefits paid under this Endorsement shall be subject to all terms and conditions of the Policyholder's Employee Benefit Plan Document.

**THERE ARE NO POLICY CHANGES UNDER THIS ENDORSEMENT OTHER THAN STATED ABOVE.**

HCC LIFE INSURANCE COMPANY

President                                    Corporate Secretary

Dated: November 11, 2013

## HCC LIFE INSURANCE COMPANY
STOP LOSS POLICY
ENDORSEMENT TO A POLICY ISSUED IN THE STATE OF OHIO

Policy Number:                HCL17885

Endorsement Number:       3

Policyholder:                Park National Corp.

Effective Date of Endorsement:  10/01/2013

Article VII – GENERAL PROVISIONS is amended as follows:

    Paragraph C is amended to read as follows:

C.      ARBITRATION:  If We and You agree, any controversy or dispute, involving Us that arises out of or relates to this Policy, shall be settled by arbitration in accordance with the rules of the American Arbitration Association.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  This provision shall survive the termination of this Policy.

    Paragraph N is amended to read as follows:

N.      LEGAL ACTION:  No legal action can be brought to recover under this Policy:

      1.      Until 60 days after the date proof of claim is submitted, or

      2.      Three years after the date a reimbursement claim is required to be furnished.  You shall notify Us in writing within 10 days after receipt of any objection, notice of legal action or complaint regarding Your handling of a claim.

**THERE ARE NO POLICY CHANGES UNDER THIS ENDORSEMENT OTHER THAN STATED ABOVE.**

HCC LIFE INSURANCE COMPANY

*Cray J. Kelbl*

President

*Alexander Jenkin*

Corporate Secretary

Dated: November 11, 2013

HCCL MSL-2007 END - OH

**HCC LIFE INSURANCE COMPANY**
STOP LOSS POLICY
SPLIT FUNDED ENDORSEMENT

Policy Number:                          HCL17885

Endorsement Number:                     2

Policyholder:                           Park National Corp.

Effective Date of Endorsement:   10/01/2013

<u>SPLIT FUNDED ARRANGEMENT - FIXED</u>

Notwithstanding any other provisions of the Stop Loss Policy, the provisions of this Endorsement shall be used to determine the amount of Individual Stop Loss Insurance benefits payable by Us.

You and We agree that this Policy is amended as follows:

1.      You shall pay for all Covered Expenses:

        A.      Which are used to satisfy the Specific Deductible shown on Your Application for each Covered Person, and
        B.      Which exceed the Specific Deductible up to an amount (hereinafter called Split Funded Liability) as set forth in this Endorsement.

2.      Your Split Funded Liability, for the purposes of this Endorsement is $310,000.

3.      We will not be responsible for paying any Specific Stop Loss Insurance Benefits under this Policy until You have paid the Split Funded Liability as set forth in this Endorsement.

4.      If the Specific Stop Loss Insurance is terminated before the end of the Policy Year, the added Split Funded Liability will not be eliminated or reduced in any way.  Such terminations will take effect pursuant to Article VII. of the Policy.

5.      To the extent that there is any conflict between the terms of this Endorsement and the Policy, the terms of this Endorsement will control.

6.      This Endorsement will terminate on the first to occur of:

        A.      The end of the Policy Year, or
        B.      Your failure to comply with any provision of this Endorsement, or
        C.      Termination of the Policy pursuant to Article VII of the Policy.

You understand that it is Your responsibility to pay the Split Funded Liability amount of $310,000 over and above the amounts used to satisfy the Specific Deductible shown on Your Application.  Our responsibility for reimbursement begins with those Covered Expenses that are in <u>excess</u> of the Specific Deductible <u>plus</u> the Split Funded Liability.

### HCC LIFE INSURANCE COMPANY
STOP LOSS POLICY
SPLIT FUNDED ENDORSEMENT

**THERE ARE NO POLICY CHANGES UNDER THIS ENDORSEMENT OTHER THAN STATED ABOVE.**

Park National Corp.
Full Legal Name of Applicant / Policyholder

8.22.13
Signed At / Date Signed

Jill Evans     JILL SEvans
Officer / Partner Signature     (print name)

Licensed Agent Signature

**FOR HCC LIFE INSURANCE COMPANY OFFICE USE ONLY:**

ACCEPTANCE

Accepted on behalf of the Company, this __8th__ day of __November__ , __2013__

By_____

Title: _____Senior Vice President_____

### HCC LIFE INSURANCE COMPANY
STOP LOSS POLICY
ENDORSEMENT

| | |
|---|---|
| Policy Number: | HCL17885 |
| Endorsement Number: | 1 |
| Policyholder: | Park National Corp. |
| Effective Date of Endorsement: | 10/01/2013 |

You and We agree that above policy is amended as follows:

Subject to the terms and conditions of the Policy and only in the event the identified Covered Person receives eligible dialysis and a kidney and/or pancreas transplant after the Original Effective Date of this Policy and prior to the termination date of this Policy or any renewal Policy, the Separate Individual Specific Deductible for Amber Smith will be $475,000 . The Separate Individual Specific Deductible shall apply for the entire Contract Period in which the eligible dialysis and a kidney and/or pancreas transplant occurs.

If We reimburse any Plan Benefits for the identified Covered Person(s) subject to the Separate Individual Specific Deductible during the Contract Period but prior to the identified eligible dialysis and a kidney and/or pancreas transplant occurring, we reserve the right to a) invoke the Policy's Offset provision to recover the reimbursements We have paid above Your Specific Deductible and below the Separate Individual Specific Deductible for the identified Covered Person(s), or b) request a refund from You to recover the reimbursements We have paid above Your Specific Deductible and below the Separate Individual Specific Deductible for the identified Covered Person(s).

**THERE ARE NO POLICY CHANGES UNDER THIS ENDORSEMENT OTHER THAN STATED ABOVE.**

Park National Corp.
Full Legal Name of Applicant / Policyholder

8.22.13

Signed At / Date Signed

Jill Sevans   Jill Sevans
Officer / Partner Signature      (print name)

Brian Fry
Licensed Agent Signature      (print name)

FOR HCC LIFE INSURANCE COMPANY OFFICE USE ONLY:

ACCEPTANCE

Accepted on behalf of the Company, this  8th  day of  November , 2013

By

Title:  Senior Vice President

HCCL MSL-2004 END

**HCC LIFE INSURANCE COMPANY**
225 Town Park Drive, Suite 350
Kennesaw, Georgia 30144
1-800 447-0460

**STOP LOSS POLICY**

THIS IS A LEGAL CONTRACT - PLEASE READ IT CAREFULLY

Policy Number:      HCL17885

Policyholder:        Park National Corp.

Principal Address:   21 S. First Street
                     Newark OH  43055

Designated Third Party Administrator (TPA):  Medical Benefits Administrators, Inc.
                     1975 Tamarack Road
                     Newark OH   43055

This Policy is issued in consideration of Your Application, Your Plan Document, Your Disclosure Statement and the payment of premiums.  The aforementioned documents combine to form this Policy.

The effective date of this Policy is 12:01 a.m., at Your address and the expiration date of this Policy is 11:59 p.m., as shown below at Your principal address.

Effective Date:      10/01/2013

Expiration Date:     09/30/2014

This Policy is issued by Us as of the Effective Date, but is not valid unless countersigned by Our duly authorized representative.

Jurisdiction of Issue:       Ohio

This policy is governed by the laws of the jurisdiction of issue.

President

Corporate Secretary

**NON-PARTICIPATING INSURANCE**

**This is a reimbursement policy.  You, or Your Plan Supervisor, are responsible for making benefit determinations under Your Employee Benefit Plan.  We have no duty or authority to administer, settle, adjust, or provide advice regarding claims filed under Your Employee Benefit Plan.**

HCCL MSL-2007

## TABLE OF CONTENTS

ARTICLE I.     DEFINITIONS ............................................................................................PAGE 3

ARTICLE II.     SPECIFIC STOP LOSS INSURANCE ........................................................PAGE 8

ARTICLE III.     AGGREGATE STOP LOSS INSURANCE. ...................................................PAGE 8

ARTICLE IV.     CLAIMS UNDER THE POLICY..................................................................PAGE 9

ARTICLE V.     LIMITATIONS OF COVERAGE .................................................................PAGE 12

ARTICLE VI.     EXCLUSIONS ........................................................................................PAGE 12

ARTICLE VII.     GENERAL PROVISIONS..........................................................................PAGE 12

## ARTICLE I. DEFINITIONS

When used in this Policy, the following terms will have the meanings as indicated below:

ANNUAL AGGREGATE DEDUCTIBLE. For any one Contract Period, (or any fraction thereof, if the Contract terminates during the Contract Period) the total of the number of Covered Single or Family units multiplied by its corresponding Monthly Aggregate Factor, applied each month that the Contract is in-force. In no instance shall the Annual Aggregate Deductible be less than the Minimum Annual Aggregate Deductible.

AGGREGATE CONTRACT PERIOD REIMBURSEMENT MAXIMUM. The maximum amount We will reimburse the Policyholder for Covered Expenses during each Contract Period under the terms of the Aggregate Stop Loss Insurance as shown on the Application.

AGGREGATE PERCENTAGE REIMBURSABLE. The percentage of Covered Expenses to be reimbursed that were Paid under the Employee Benefit Plan in excess of the Annual Aggregate Deductible.

COBRA BENEFICIARY. Any former Covered Person of the Employee Benefit Plan continuing participation under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) and its amendments.

COMPANY. Company, We, Our, and Us refers to HCC Life Insurance Company.

COMPLETE CLAIMS HISTORY. All of the following for a minimum of 12 consecutive months immediately preceding the Policy Year:

1. Participant census, and
2. Eligibility information, and
3. Claims Experience, and
4. Large Claim Disclosures, and
5. Details of any condition shown on the Trigger Diagnosis List in the Disclosure Statement.

CONTRACT. All of the following:

1. The Application, and
2. This Policy and any endorsements to it, and
3. The Policyholder's Plan Document.

CONTRACT BASIS. The form of coverage shown on the Application that was selected by the Policyholder. The Contract Basis shall be considered in determining what Covered Expenses will be reimbursed by Us.

CONTRACT MONTH. A period of one-month that begins on:

1. The effective date of the Policy, or
2. The same day of each following month during the Contract Period.

CONTRACT PERIOD. The period of time shown on the Application during which the Policyholder is covered for Aggregate and / or Specific Stop Loss Insurance.

COST CONTAINMENT PROGRAM. A program designed to reduce or control the cost of providing Plan Benefits to participants of the Employee Benefit Plan.

COVERED EXPENSES.  Plan Benefits incurred by a Covered Person (or Covered Family):

1.   For which benefits are Paid by the Policyholder under the Employee Benefit Plan, and
2.   Which are not in excess of the Reasonable and Customary Charge for those services, and
3.   Which are Medically Necessary for the treatment of an illness or injury or for any preventative care covered by the Employee Benefit Plan, and
4.   Which are reimbursable under this policy subject to its terms, deductible(s), limitations and exclusions.

Plan Benefits provided by the Employee Benefit Plan that are specifically excluded by this Policy are not considered Covered Expenses.  Covered Expenses shall not include any expenses which are not reimbursable under this Policy, such as:

1.   The expenses related to processing claim payment, or
2.   PPO discounts, network or negotiated discounts, and other reductions from billed charges, whether or not they were actually deducted from Plan Benefits, or
3.   Salaries paid to any individual, or
4.   Plan Supervisor's fees, or
5.   Litigation expenses, or
6.   Premiums paid for coverage under this Policy.

COVERED FAMILY.  The Covered Person and his or her dependents covered under the Employee Benefit Plan.

COVERED PERSON.  If so indicated on the Application, an individual covered under the Employee Benefit Plan.  This includes:

1.   Legally employed covered employees, and
2.   Covered dependents, and
3.   Participating COBRA Beneficiaries, and
4.   Retirees.

COVERED UNITS.  A Covered Person, a Covered Family, or such other defined unit as agreed upon between You and Us in writing.

DEDUCTIBLE.  The amount of Covered Expenses You must pay before Aggregate Stop Loss Insurance and / or Specific Stop Loss Insurance benefits become reimbursable.  The Deductible(s) is / are shown on the Application issued to You.  See also:

1.   Annual Aggregate Deductible, and
2.   Specific Deductible, and
3.   Specific Family Deductible.

ELIGIBLE.  Eligible under the Employee Benefit Plan.

EMPLOYEE BENEFIT PLAN.  The medical benefits You have agreed to provide under a plan of benefits for Your Eligible employees and their Eligible dependents, whether or not it is subject to the Employee Retirement Income Security Act of 1974, as is or as may be amended.

EXPERIMENTAL AND INVESTIGATIVE. A drug, device or medical treatment or procedure is Experimental or Investigative:

1. If the drug or device cannot be lawfully marketed without approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished, or

2. If reliable evidence shows that the drug, device or medical treatment or procedure is the subject of ongoing Phase I, II or III clinical trials or under study to determine its:
   a. Maximum tolerated dose, or
   b. Toxicity, or
   c. Safety, or
   d. Efficacy, or
   e. Efficacy as compared with the standard means of treatment or diagnosis, or

3. If reliable evidence shows that the consensus among experts regarding the drug, device or medical treatment or procedure is that further studies or clinical trials are necessary to determine its:
   a. Maximum tolerated dose, or
   b. Toxicity, or
   c. Safety, or
   d. Efficacy, or
   e. Efficacy as compared with the standard means of treatment or diagnosis.

Reliable evidence shall mean:

1. Only published reports and articles in the authoritative peer reviewed medical and scientific literature, or

2. The written protocol or protocols used by the treating facility or the protocol(s) of another facility studying substantially the same drug, device or medical treatment or procedure, or

3. The written informed consent used by the treating facility or by another facility studying substantially the same drug, device or medical treatment or procedure.

INCURRED. The date on which medical care or a service or supply is provided to a Covered Person for Plan Benefits under the Employee Benefit Plan for which a charge results.

LARGE CLAIM DISCLOSURE. You, with the assistance of Your Plan Supervisor, agree to disclose to us any known or potential shock losses. Shock Losses are:

1. Injuries, and
2. Illnesses, and
3. Diseases, and
4. Diagnoses, and
5. Any condition listed on the Trigger Diagnosis list, and
6. Other losses of the type, which are reasonably expected or are likely to result in significant medical expense or liability.

LOSS LIMIT. The maximum amount of Covered Expenses Incurred by each Covered Person (or Covered Family), which can be used to satisfy the Annual Aggregate Deductible. This amount is shown in the Application. The maximum allowable amount of Covered Expenses by a Covered Person who has been assigned a Separate Individual Specific Deductible will be the specified amount as shown under the Loss Limit on the Application, regardless of that Covered Person's Separate Individual Specific Deductible.

MEDICALLY NECESSARY.  A procedure, treatment, service, supply, equipment, drug or medicine that is:

1.     Deemed appropriate, essential and is recommended for the diagnosis or treatment of the Covered Person's symptoms by a licensed physician, dentist or other medical practitioner who is practicing within the scope of his or her license and specialty or primary area of practice, and

2.     Within the scope, duration and intensity of that level of care which is required to provide safe, adequate and appropriate diagnosis or treatment, and

3.     Prescribed in accordance with the generally accepted, current professional medical practice and is not considered Experimental or Investigative.

MINIMUM ANNUAL AGGREGATE DEDUCTIBLE.  For each Contract Period, the number of Contract Months times the Monthly Aggregate Factor times the number of Covered Units.  Covered Units shall be based on the first month's enrollment or the quoted enrollment whichever is greater.  The Minimum Annual Aggregate Deductible as shown on the Application is based on the quoted enrollment and it is subject to change if the first month's enrollment is greater.

MONTHLY AGGREGATE DEDUCTIBLE.  The Monthly Aggregate Deductible is determined for each Contract Month by multiplying the number of Covered Units for that month by the applicable Monthly Aggregate Factor(s) shown on the Application.

MONTHLY AGGREGATE FACTOR.  The amount specified in the Application.

MONTHLY SPECIFIC PREMIUM RATES.  The amounts specified in the Application.

NET PAID CLAIMS.  The sum of Covered Expenses Paid during the Policy Year by You less the sum of all amounts paid by You that exceeds the Loss Limit of any Covered Person(s).

ORIGINAL EFFECTIVE DATE.  The first day of the Contract Period of Your initial Stop Loss Policy with Us subject to any Run-In Period as shown on the Application.  If coverage has not been continuous with Us, then the Original Effective Date shall be the first day of the most recent continuous coverage.

PAY, PAID, PAYMENT.  Charges that, as of the dates shown in the Contract Basis, are:

1.     Covered and payable under your Employee Benefit Plan, and

2.     Have been adjudicated and approved, and

3.     A check or draft for remuneration is issued and deposited in the U.S. Mail, or other similar conveyance or is otherwise delivered to the payee, and

4.     Sufficient funds are on deposit the date the check or draft is issued.

Our reimbursements will not be made until all of these conditions are satisfied.  Checks or drafts that are returned to the payor unpaid for any reason will not be considered Paid.

PLAN BENEFITS.  The medical expense benefits to which Covered Persons become entitled under the Employee Benefit Plan during the Policy Year which are:

1.     Incurred after the effective date of this Policy or the first date of the Run-In Period, and

2.     Incurred while this Policy is in-force, and

3.     Paid during the Policy Year or before the end of the Run-Out Period.

Plan Benefits do not include:

1.     Deductibles, or

2.     Co-insurance amounts, or

3.     Interest, or

4.    Expenses, or
5.    The amounts of any PPO discounts, network or negotiated discounts, or any other reductions to billed charges, whether or not they were actually deducted, and
6.    Claims paid under an Employee Benefit Plan's discretionary clause or similar provision that would not otherwise be payable under the terms and conditions of the Employee Benefit Plan, and
7.    Claims that are not covered under the terms and conditions of the Employee Benefit Plan or that are reimbursable from any other source.

An Employee Benefit Plan expense is incurred at the time the service is rendered or the supply is provided.

PLAN DOCUMENT.  The written document evidencing Your Employee Benefit Plan including any amendments.  You will provide Us with a copy of Your Plan Document that is in effect as of the Policy effective date.  Amendments are subject to Article VI, Item A and Article VII, Item A.3.a and B of this Policy.  We will provide written confirmation of receipt of this Plan Document.  The Plan Document does not waive of any provisions of this Policy.

PLAN SUPERVISOR (TPA).  The person or entity selected by the Plan Sponsor and approved by Us to perform administrative services for the Employee Benefit Plan, including payment of claims.

POLICY YEAR.  The period beginning on the effective date and ending on the expiration date as shown on the face page of this Policy, or the actual period of time during which the Policy is in force if the Policy terminates prior to the expiration date.

POLICYHOLDER.  Employer, Insured, You, Your or Plan Sponsor.

REASONABLE AND CUSTOMARY CHARGE.  Charges for medical expenses, including but not limited to, physician services, hospital supplies, hospital bed rates, drugs, ancillary services and durable medical equipment usually made by such providers in the same geographical area using nationally and regionally adjusted data.

RUN-IN PERIOD.  The period of time as defined under the Contract Basis on the Application during which claims for Plan Benefits may be Incurred provided they are Paid during the Contract Period.

RUN-OUT PERIOD.  The period of time as defined under the Contract Basis on the Application during which claims for Plan Benefits may be Paid provided they were Incurred during the Contract Period.

SPECIFIC CONTRACT PERIOD REIMBURSEMENT MAXIMUM.  The maximum amount of Covered Expenses We will reimburse You in each Contract Period for any one Covered Person (or Covered Family).    This amount shall not exceed the amount shown as the Specific Contract Period Reimbursement Maximum on Your Application, or any maximum benefit amount or limit defined in Your Employee Benefit Plan, whichever is less.

SPECIFIC DEDUCTIBLE.  If a Specific Deductible is shown on the Application, this is the amount of Covered Expenses that must be Paid by the Employee Benefit Plan for any Covered Person before Specific Stop Loss Insurance benefits are reimbursable under the Policy.  It applies separately for each Policy Year and will be determined annually by Us.

SPECIFIC FAMILY DEDUCTIBLE.  If a Specific Deductible is shown on the Application per a Covered Family, this is the amount of Covered Expenses which must be Paid by the Employee Benefit Plan for any Covered Family member or combination of Covered Family members before Specific Stop Loss Insurance benefits are reimbursable under the Policy.  It applies separately for each Policy Year and will be determined annually by Us.

SPECIFIC PERCENTAGE REIMBURSABLE.  The percentage of Covered Expenses to be reimbursed that were Paid under the Employee Benefit Plan in excess of the Specific Deductible.

## ARTICLE II.  SPECIFIC STOP LOSS INSURANCE

A.    Subject to the terms, conditions and limitations of this Policy, We will reimburse You for Covered Expenses Paid in excess of the Specific Deductible (or Specific Family Deductible).

B.    We will not reimburse you for any amounts after the Specific Contract Period Reimbursement Maximum has been reached.

C.    We will not reimburse You for Plan Benefits Incurred after the Policy's expiration date.

D.    If the Policy terminates before the expiration date, Plan Benefits paid after the date of termination will not be eligible for reimbursement.

E.    Plan Benefits Paid by You which have been reimbursed by Us under Your Aggregate Stop Loss Insurance or by another insurance company or reinsurance company will not be used to:

   1.    Satisfy the Specific Deductible (or the Specific Family Deductible), or
   2.    Compute Specific Stop Loss Insurance benefits payable to You.

F.    The Monthly Specific Premium Rates shown on the Application apply only to the Policy Year shown therein.  New Monthly Specific Premium Rates will be furnished for each new Policy Year and will be shown on a new Application provided for each Policy Year.

## ARTICLE III.  AGGREGATE STOP LOSS INSURANCE

A.    Subject to the terms, conditions and limitations of this Policy, We will reimburse You for Eligible Covered Expenses Paid, less:

   1.    The Annual Aggregate Deductible or the Minimum Annual Aggregate Deductible, whichever is greater, and
   2.    Specific Stop Loss reimbursements due or paid to You, and
   3.    Any amounts paid by you that exceeds the Loss Limit for any Covered Person (or Covered Family).

B.    We will not reimburse you for any amounts after the Aggregate Contract Period Reimbursement Maximum has been reached.

C.    We will not reimburse You for Plan Benefits Incurred after the Policy's expiration date.

D.    If the Policy terminates before the expiration date, any Plan Benefits paid after the date of termination will not be eligible for reimbursement.

E.    Plan Benefits Paid by You which have been reimbursed by Us under Your Specific Stop Loss Insurance, by another insurance company or reinsurance company will not be used to:

   1.    Satisfy the Annual Aggregate Deductible or the Minimum Annual Aggregate Deductible, or
   2.    Compute the Aggregate Stop Loss Insurance benefits payable to You.

F.    Plan Benefits Paid by You which exceed the Specific Contract Period Reimbursement Maximum for Specific Stop Loss Insurance as shown on the Application will not be used to:

1. Satisfy the Annual Aggregate Deductible or Minimum Annual Aggregate Deductible, or
2. Compute the Aggregate Stop Loss Insurance benefits payable to You.

G. Reimbursement for Aggregate Stop Loss Insurance for any Covered Person (or Covered Family) will be limited to an amount not to exceed the Specific Deductible (or Specific Family Deductible) or the Loss Limit, whichever is less, as set forth in the Application.

H. The Monthly Aggregate Factor(s) shown on the Application apply only to the Policy Year shown therein. New Monthly Aggregate Factors will be furnished for each new Policy Year and will be shown on a new Application provided for each Policy Year.

I. The Monthly Aggregate Deductible cannot be reduced by more than 10% per month if the number of Covered Persons decreases for any reason. If any Covered Persons are absent from work due to a strike, lockout, or work stoppage during any Contract Month, the number of Covered Persons will remain at the same level as for the Contract Month preceding the disruption.

## ARTICLE IV. CLAIMS UNDER THE POLICY

A. Specific Claims

1. We will reimburse You for Specific Stop Loss Insurance, subject to the terms, conditions and limitations of this Policy, only after We receive a request for reimbursement with complete claim information.

2. The following documentation is required to file a Specific Stop Loss claim:

   a. *Specific Claim Notification / Initial Filing form*, and
   b. A copy of the employee's enrollment card, including the employee's hire date and the original effective date, and
   c. A copy of the Plan Supervisor's claim form if the claim is for a dependent, and
   d. Complete details regarding eligibility, and if applicable, information regarding work status, pre-existing / HIPAA documentation, subrogation, Coordination of Benefits, provider discounts and COBRA, including a copy of the COBRA election form and COBRA payment verification for all months, and
   e. Copies of *Explanations of Benefits* attached to the corresponding itemized bills, and
   f. Check copies, if not part of an *Explanation of Benefits*, and
   g. Completion of the *Specific Supplemental Claim Request* portion of the claim form if applicable, and
   h. Miscellaneous information as applicable, including but not limited to:
      i. Complete accident details, including how, when and where an accident may have occurred, and
      ii. Police reports for motor vehicle accidents or for services for which a law enforcement agency is involved, and
      iii. A *Subrogation and Right of Recovery Reimbursement Agreement* if charges were incurred as a result of a third party liability, and
      iv. Coordination of benefits documentation, and
      v. PPO discount / repricing sheets, and
      vi. *Large Case Management Reports*, and
   i. Other documentation We may request.

3. LATE CLAIMS: Any claim that is either submitted, or that remains incomplete, more than 90 days after the last date for which Plan Benefits can be reimbursed under the terms of

the Policy will be denied, whether or not the delay has prejudiced Us. Your or Your Plan Supervisor's failure to file a complete claim in a timely manner may result in an adjustment of Our reimbursement to You to reflect any savings We could have obtained had a timely claim filing taken place pursuant to this provision.

4.      50% NOTIFICATION: You or Your Plan Supervisor must give notice to Us when the total amount of Plan Benefits Paid by You on a Covered Person equals or exceeds 50% of the Specific Deductible, or has the potential to exceed 50% of the Specific Deductible. Your failure to give prompt notice may result in an adjustment of Our reimbursement to You, if any, to reflect any savings We could have obtained had a prompt 50% Notification been given.

B.      Aggregate Claims

1.      We will reimburse You for Aggregate Stop Loss Insurance, subject to the terms, conditions and limitations of this Policy, only after We receive a request for reimbursement with Complete Claim History.

2.      The following documentation is required to file an Aggregate Stop Loss claim:

a.      Completed *Year End Aggregate Claim Form*, and
b.      *Paid Claims Analysis report* indicating claimant's name, Incurred date, charged amount, Paid amount and Paid date, and
c.      Eligibility listing which identifies birth date, effective date, termination date and coverage type, and
d.      Proof of funding to include bank statements and/or deposit slips, and
e.      *Void & Refund report*, and
f.      *Benefit / Service Code report*, and
g.      *Aggregate Report* (Monthly Loss Summary Reports), and
h.      *Specific Report* showing which claimants have exceeded the Specific Deductible or Loss Limit, and
i.      Listing of payments made outside the Aggregate Stop Loss Insurance (i.e. Dental, Weekly Income, Vision, PPO fees capitated and, PCS Administrative Fees), and
j.      Check Register, and
k.      Outstanding overpayment and subrogation log, and
l.      Prescription invoices if Prescriptions are covered under the Aggregate Stop Loss Insurance, and
m.      Other documentation We may request.

We may also request this information the month following the expiration date of the Policy to review for retroactive adjustments.

3.      Any reimbursement payable by Us to You, under this article, will be paid after the end of the Contract Period, unless otherwise endorsed.

4.    CLAIM FILING: You must file a request for reimbursement with Us on Our customary Notice / Proof of Loss form within 90 days after the end of the time specified for payment of claims under this Policy.  Your failure to file a claim within 90 days will result in claim denial, whether or not the delay has prejudiced Us.

5.    DETERMINATION OF THE ULTIMATE AGGREGATE CLAIM: You must submit a Proof of Loss within 90 days of the end of the Policy Year or Run-Out Period, whichever is later, showing the amount of all Plan Benefits Eligible under the Employee Benefit Plan and this Policy which You have Paid.  These shall be compared to the greater of the Annual Aggregate Deductible or the Minimum Annual Aggregate Deductible.  If the amount of Net Paid Claims eligible under this policy is greater than the appropriate Annual Aggregate Deductible, We will reimburse You for the amount of the excess.

C.    All Claims

1.    REIMBURSEMENT OF CLAIMS: Prior to making any reimbursement, We have the right to review each claim submitted to Us to determine if You are entitled to any reimbursement under this Policy.  This review may include, but is not limited to, an on-site audit or requests for additional documentation.  You warrant that You have Paid the providers of Plan Benefits for which reimbursement is sought.

2.    SETTLEMENT OF PLAN CLAIMS: We have no duty or obligation to settle or adjust any claims for Plan Benefits filed under Your Employee Benefit Plan.

3.    RIGHT OF RECOVERY.  If You are entitled to recover from any party Plan Benefits Paid under the Employee Benefit Plan, such amounts cannot be used to satisfy either the Specific and / or Aggregate Deductibles.  We also will not reimburse You for any Plan Benefit recovered from any party.  If We have reimbursed You for all or part of a Plan Benefit and You recover any part of the Plan Benefit from any party, You must repay Us to the extent of Our reimbursement regardless of whether the policy is still in-force on the date of the recovery.  You must reimburse Us first, and in full, before You receive any benefit of the recovery.  We retain the right to employ our own independent counsel and You assign to us Your rights and the Employee Benefit Plan's rights to the extent of Our reimbursement(s) to You.

In the event that You reimburse Us in the matter where Our designated counsel is not involved, Your repayment may be reduced by the reasonable and necessary expenses incurred in recovering from the third party.

If You fail to reimburse Us for a valid claim for a Covered Expense against a third party, and We are required to reimburse You for such a Covered Expense, We shall be subrogated to Your rights to pursue the claim.

Any amount We recover shall first be used to pay Our expenses of collection and then apply towards any amount that We reimbursed You under the policy.  Any remaining amount will be paid to You.

You are required to provide Us with such information as We request in order to protect Our right to reimbursement.

4.    CLAIMS ELIGIBLE UNDER TWO CONTRACTS.  If a claim for reimbursement can be filed under two different policy years, it must be filed under the earlier policy year.

**ARTICLE V.  LIMITATIONS OF COVERAGE**

A.  This Policy is between You and Us.  No other party has any rights under this Policy.

B.  Coverage for Plan Benefits Incurred for an employee who is not actively at work as a result of sickness, accidental bodily injury, maternity, military service, personal reasons, lay-off, strike, or any other leave of absence (either before or after the effective date of the Policy), or the employee's covered dependent(s), unless the employee or dependent(s) are receiving continuation benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended, shall be limited to the length of time specified in the Plan Document.

C.  All Plan Benefits Incurred outside the United States of America will be excluded from coverage unless:

1.  The service(s) would have been a Covered Expense if the service(s) had been provided in the United States, and

2.  The Covered Person is not covered by any other country's national health care program or any employer's foreign voluntary compensation coverage.

**ARTICLE VI.  EXCLUSIONS**

WE will not reimburse YOU for:

A.  Plan Benefits covered by amendments to the Employee Benefit Plan that were incurred prior to Our written approval of such amendments.

B.  Plan Benefits that are covered under any Coordination of Benefits provision.  We may elect to reduce or deny any reimbursement which may be payable to You, to the extent that a payment may be made by another insurer, another Employee Benefit Plan or any other party, to either the Employee Benefit Plan or Covered Person.  This provision is applicable irrespective of how such payment is characterized and whether or not payment has actually been made for any or all of the Covered Person's losses.

C.  Plan Benefits paid for any surgery, prescription drugs, device, or procedure, which is defined as Experimental or Investigative and any complications or other expenses arising thereto.

D.  Plan Benefits Incurred by or on behalf of an employee or dependent of an employee of any affiliated or subsidiary company not included in the Application, unless added by Policy endorsement.

**ARTICLE VII.  GENERAL PROVISIONS**

A.  CHANGES AND TERMINATIONS OF THE POLICY

1.  Your Policy may be changed at any time with Our written consent.

2.  Only an officer of The Company has the authority to alter this Policy, or to waive any of Our rights or requirements, and then only by written endorsement.

3.  We reserve the right to change any Specific or Aggregate Premium Rates and Monthly Aggregate Factors with written notice to You as to the extent and effective date of the change at any time during Your Policy Year if:

a. Your Employee Benefit Plan is changed, or

b. The number of Covered Units Eligible under Your Policy:

    i. Drops below 15, or

    ii. Increases or decreases by 15% from the number of Covered Units on the first day of the Contract Period, or

    iii. Increases or decreases by 10% in any Contract Month from the prior Contract Month.

c. If we have agreed to reduce the Monthly Aggregate Factors, the Minimum Annual Aggregate Deductible and / or the Monthly Specific Premium Rates in consideration of Your agreement to implement a Cost Containment Program, we may recalculate in accordance with Our normal practice, the Monthly Aggregate Factors, the Minimum Annual Aggregate Deductible and / or the Monthly Specific Premium Rates if you have not followed the procedures relating to the Cost Containment Program as defined in Our agreement.

d. Upon the enactment of any law, regulation or amendment thereto, by any state or jurisdiction, which affects our liability under this Policy, and in Our judgment, requires such a change.

4. You may terminate the Policy by giving Us not less than 31 days written notice.

5. We may terminate this Policy prior to the end of a Contract Period by giving you 31 days written notice if You fail to comply with any provision of the Policy.

6. We may terminate this Policy at the end of the Contract Period by giving You 31 days written notice of such termination.

7. All insurance provided hereunder to You will automatically terminate:

a. At the beginning of any Contract Month for which any premium for either Specific or Aggregate Stop Loss Insurance has not been paid in full by the end of the grace period, or

b. On the date You fail to Pay claims promptly or make funds available to Pay claims promptly as required by this Policy, or

c. On the date Your agreement with Your Plan Supervisor is terminated, or

d. On the date You change Your Plan Supervisor before obtaining Our written consent for a successor Plan Supervisor, or

e. On the date Your Employee Benefit Plan terminates or ceases to accept newly incurred claims, whichever is earlier, or on the date You obtain other coverage for Your Employee Benefit Plan participants, or

f. On the date You terminate the Policy for any reason prior to the end of the Contract Period. In this event, We will not be liable for any Plan Benefits Paid after the termination date, or

g. At the end of the Contract Period unless You accept in writing Our terms for renewal of the Stop Loss Insurance before the end of the Contract Period, or

h. On the expiration date of this Policy.

B. AMENDMENTS TO THE PLAN: You must give Us at least 31 days written notice of any proposed amendments to Your Employee Benefit Plan. No amendment to Your Employee Benefit Plan will be binding on Us until We have approved the amendment in writing.

C. ARBITRATION: Any controversy or dispute, involving Us that arises out of or relates to this Policy, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. This provision shall survive the termination of this Policy.

D.     ASSIGNMENT: You may not assign any of Your rights under this Policy without Our prior written consent.

E.     CLERICAL ERROR: Our obligations under this Policy will not be expanded by any clerical error whether by You or Us in creating or maintaining records or calculating rates, factors, premiums, deductibles or claims pertaining to this Policy. A clerical error is a mistake in performing a clerical function, such as typing, but does not include intentional acts or the failure to comply with the provisions of the Employee Benefit Plan or Policy.

F.     CONCEALMENT OR MISREPRESENTATION: This Policy is issued based upon Our understanding that You, Your Plan Supervisor and your agent or broker have provided to Us a Complete Claims History. The Policy will be void if We find that You, your Plan Supervisor and your agent or broker have concealed or misrepresented any material fact or circumstance concerning this coverage or the Employee Benefit Plan's Complete Claims History, whether intentional or not. Our liability will be limited to return of the premium paid by You after deducting the amount of the reimbursements made by Us to You prior to the date of termination. If the amount of reimbursements paid to You exceeds the premium paid to Us, You will pay Us the difference. If We find that You, Your Plan Supervisor, your agent or broker have not provided to Us a Complete Claims History, We may, at Our option, either rescind the policy or re-underwrite coverages under this Policy, using all claims data available to Us.

G.     CONFORMITY WITH STATE AND FEDERAL LAW: Any provision of this Policy, which, on its effective date, is in conflict with the laws of the state of jurisdiction or which is mandated by Federal law, is hereby amended to conform to the minimum requirements of said laws.

H.     COST CONTAINMENT PROGRAM: We have the right to participate, at Our option and expense, in any savings or Cost Containment Program that You have in place. If no such program exists, We have the right to retain the services of a third party to implement a Cost Containment Program.

I.     DISCLAIMER: We act only as an insurer to You. We are not a fiduciary or a party in interest to the Employee Benefit Plan or any participant. We do not assume any duty to perform any of the functions of, or to provide any of the reports required by, You by the Employee Retirement Income Security Act of 1974, as amended or any other applicable state or federal law. We assume no responsibility or obligation for the administration of Your Employee Benefit Plan or Your acts. We reserve the right to determine amounts payable under this Policy without regards to such acts.

J.     ENDORSEMENTS: Any endorsements attached or subsequently issued by us shall become a part of this Policy.

K.     ENTIRE AGREEMENT: This Policy and any attached endorsements, Your attached Application and your Plan Document are the entire agreement between You and Us. We have relied upon the underwriting information (including Complete Claims History and the Plan Document) provided by You in issuing this Policy and You represent such information is complete and accurate. Should We later learn such information was incomplete or incorrect, We have the right to modify the Policy as of the effective date to reflect the complete or correct information or to terminate the Policy.

L.    INDEMNIFICATION, DEFENSE AND HOLD HARMLESS:  You agree to indemnify, defend and hold Us harmless from any liability, including but not limited to, interest, penalties, attorney fees, extra contractual, exemplary or punitive damages ("expenses") arising from or relating to:

    1.    Any negligence, error, omission, defalcation or intentional acts by your Plan Supervisor, or

    2.    Any dispute involving Covered Person(s), former Covered Person(s), or any person(s) claiming entitlement to benefits under the Employee Benefit Plan, or

    3.    Any taxes We are assessed with respect to funds paid to or by You under Your Employee Benefit Plan, except any taxes or amounts paid to Us as premiums for this Policy.

We will promptly notify You upon discovery of matters to which Your obligations under this provision apply.  We have the right to participate in the defense at Our expense.  Without limiting the foregoing, if You fail to defend timely, We have the right, but not the duty, to defend and to compromise or settle the claim or other matters on Your behalf, for Your account and at Your risk.

M.    INSOLVENCY:  In the event of Your insolvency or bankruptcy, subject to the terms, conditions and limitations of this policy, We may pay to Your receiver, trustee, liquidator or legal successor amounts otherwise payable under this Policy.  We will make such payments only if You have Paid all required premiums and have complied with Your obligations under this Policy.  Nothing in this section shall increase Our liability beyond that which would have existed had You not become insolvent or bankrupt.

N.    LEGAL ACTION:  No legal action can be brought to recover under this Policy:

    1.    Until 60 days after the date a reimbursement claim is submitted, or

    2.    Two years after the date a reimbursement claim is required to be furnished.  You shall notify Us in writing within 10 days after receipt of any objection, notice of legal action or complaint regarding Your handling of a claim.

O.    NOTICE: Notice under this Policy will be given to You through Your Plan Supervisor and will be deemed to have been received by You.

P.    OFFSET: We may offset payments due to You under this Policy against claims overpayments, cost containment charges and premiums due and unpaid.

Q.    PAYMENT OF PREMIUMS:

    1.    Each premium is payable to HCC Life Insurance Company, P.O. Box 402032, Atlanta, GA 30384-2032 or such other place as We designate in writing.

    2.    Specific Stop Loss Insurance premiums are due on the first day of each calendar month, regardless of the effective date of the Policy.  If the effective date is other than the first day of a calendar month, the first month's premium will be pro-rated.

    3.    Aggregate Stop Loss Premium(s) are due monthly or are payable in advance for the Policy Year, as stated in Your Application.

4.      A grace period of thirty-one (31) days is allowed for the payment of each premium after the first premium. If the premium is not paid during the grace period, the Policy will terminate without further notice as of the premium due date.

5.      If we terminate this Policy for non-payment of premium, application may be made for reinstatement.

All outstanding premiums, including the current month's premium, must be remitted within 10 days of the end of the grace period.

Payment of premiums shall not guarantee reinstatement of the Policy. We reserve the right to conduct a diligent review of the Complete Claims History and re-underwrite the Policy as We deem necessary as part of the terms for reinstatement.

If the Policy is terminated more than one time during a Policy Year for non-payment, no requests for reinstatement will be granted.

6.      In no event, will more than three (3) months of retroactive credit be granted for any clerical error(s) in the remittance of any premium.

R.      POLICY NON-PARTICIPATING: This Policy is non-participating and does not entitle You to share in Our earnings.

S.      RECORDS: You and / or Your Plan Supervisor will maintain such records as may be required by Us for this Policy and will make them available to us upon Our request. These records may include, but are not limited to, the Complete Claims History. We may audit Your records relating to this Policy and the claims filed under the Employee Benefit Plan at any time during the Policy Year and for two years after the expiration date of such Policy. Your records will include records held by You or by Your Plan Supervisor. As a result of any audit, We may readjust your Monthly Specific Premium Rates, Monthly Aggregate Factors, premiums, deductibles or expenses as may be necessary to reflect Our original intent in underwriting this Policy.

T.      RENEWAL: Unless terminated for any of the reason(s) described in this Policy, Your insurance will be renewed for another Policy Year if You accept Our renewal terms. We will not change rates more than once in any Policy Year, except as allowed under the Changes and Termination Provisions in Article VII.

We reserve the right to change the renewal premium rates and Monthly Aggregate Factors for the new Contract Period if the average monthly payments made by You for Plan Benefits during the last two months of the current Policy Year vary by more than 30% from the average of the monthly payments made for Plan Benefits during the previous ten (10) Contract Months.

We will not offer a renewal if We are no longer doing business with Your Plan Supervisor.

U.      SUBSIDIARIES AND AFFILIATED COMPANIES: You must notify Us in the event You acquire a subsidiary or affiliated company that will be included under Your Employee Benefit Plan. If You do acquire a subsidiary or affiliated company that will be included under Your Employee Benefit Plan, You must disclose certain claims information on the acquired subsidiary as a whole and / or on persons whose coverage You will be assuming under Your Employee Benefit Plan. Failure to do so will subject benefits under this Policy to certain limitations, as described under the ENTIRE AGREEMENT provision of this Article.

Acquisition of a subsidiary or affiliated company that will be included under Your Employee Benefit Plan may affect Your Monthly Specific Premium Rates and/or Monthly Aggregate Factors, as described in the CHANGES AND TERMINATIONS provision of this Article.

You must notify Us in the event You cede or dissolve a subsidiary or affiliated company that was included under your Employee Benefit Plan.  Failure to do so may subject this Policy to termination or may affect Your Monthly Specific Premium Rates and/or Monthly Aggregate Factors as described in the CHANGES AND TERMINATIONS provision of this Article.

V.      TAXES: You shall hold Us harmless from any taxes, which may be assessed against Us with respect to Your Employee Benefit Plan or with respect to claims for Covered Expenses paid under the Policy, and You shall reimburse Us for such taxes, if any, as determined by Us.

W.      YOUR DESIGNATED PLAN SUPERVISOR (YOUR TPA).  We agree to recognize Your Plan Supervisor as Your agent and attorney-in-fact for the administration of Your Employee Benefit Plan.  You agree that:

1.      Your Plan Supervisor is Your agent and attorney-in-fact, and is not Our agent.  You authorize Your Plan Supervisor to act in Your name, place and stead for purposes of this Policy, to include submission of proofs of loss, certifying the Payment of Plan Benefits, transmitting reports and payments of premiums to Us and receiving reimbursements from Us.  Payments sent by Us to Your Plan Supervisor are payments to You.  Premium payments by You through Your Plan Supervisor will be payments to Us only to the extent We actually receive them.

2.      You or Your Plan Supervisor is responsible for administering Your Employee Benefit Plan, preparing reports as required by Us and keeping and making available to Us such data as We may require.

3.      You or Your Plan Supervisor will perform such duties and keep such records as are required for You to comply with this Policy.

4.      You will pay Your Plan Supervisor for all administrative functions performed in relation to this Policy.

5.      We reserve the right to cease doing business with Your Plan Supervisor.

C

PARK NATIONAL CORPORATION
EMPLOYEE HEALTH BENEFIT PLAN  - WELLNESS PLAN


REVISED EFFECTIVE OCTOBER 1, 2012
(unless otherwise indicated)

THIS DOCUMENT CONTAINS ALL PROVISIONS OF THE PLAN.  ANY CONFLICT
OR AMBIGUITY ARISING BETWEEN THIS DOCUMENT AND ANY OTHER
DOCUMENT OR COMMUNICATION, INCLUDING, BUT NOT LIMITED TO, ANY
SUMMARY PLAN DESCRIPTION, BROCHURE, OR ORAL OR VIDEO
PRESENTATION, DESCRIBING THE RIGHTS, BENEFITS, OR OBLIGATIONS OF THE
COMPANY AND PARTICIPANTS UNDER THE PLAN SHALL BE RESOLVED IN
FAVOR OF THIS PLAN DOCUMENT.

PRKpln 2012

Park National Corporation Employee Health Benefit Plan Wellness Plan

## MEDICAL BENEFITS ADMINISTRATORS, INC.

Established in 1989, Medical Benefits Administrators, Inc. (MBA) is a subsidiary of Medical Benefits Mutual Life Insurance Co., one of the oldest health insurance firms in the United States. In 1938, the Company entered the insurance business operating under the name Hospital Services Association. Later, it became known as HSA of Ohio.

The name, Medical Benefits Mutual, was adopted in 1987, signaling the Company's establishment as a full-fledged mutual life insurance company. Medical Benefits Administrators, Inc. builds on this great service tradition and commitment to the future by delivering the services the marketplace demands.

MBA is pleased to have been chosen as your Benefit Manager. MBA is committed to the fundamental criteria which distinguish us from the crowd. The first is a commitment to excellent claims administration. The second is a commitment to long term relationships with the people we serve.

We will appreciate your comments and strive to make any dealings with us as simple as possible. If you have any questions about a claim, we invite you to call us or to drop in at our offices at 1975 Tamarack Road, Newark, Ohio 43055.

2

Park National Corporation Employee Health Benefit Plan Wellness Plan

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Article I | Plan Information .............................................................. | 7 |
| Article II | Schedule of Benefits ....................................................... | 10 |
| | 2.1 Coverages Available under this Plan ............................ | 10 |
| | 2.2 Schedule of Medical Benefits ................................... | 10 |
| | 2.3 Deductible.......................................................... | 11 |
| | 2.4 Coinsurance and Coinsurance Limit (Through December 31, 2012) .... | 11 |
| | 2.5 Medical Coinsurance and Out-of-Pocket Limits (Effective ............ | |
| | January 1, 2013) ................................................... | 12 |
| | 2.6 Preferred Provider Copayment ................................. | 12 |
| | 2.7 Medical Coinsurance Amount ................................. | 13 |
| | 2.8 Medical Plan Benefit Maximums............................... | 14 |
| | 2.9 Schedule of Prescription Drug Card Program .................. | 15 |
| | 2.10 Dental Schedule of Benefits ................................. | 16 |
| | 2.11 Dental Deductible............................................. | 16 |
| | 2.12 Dental Coinsurance Amounts ................................. | 16 |
| | 2.13 Dental Plan Benefit Maximums............................... | 16 |
| | 2.14 Vision Plan Copayments ...................................... | 17 |
| | 2.15 Vision Plan Frequency Limitations............................ | 17 |
| | 2.16 Maximum per Benefit Period.................................. | 17 |
| Article III | Definitions ................................................................. | 19 |
| | 3.1 General and Medical Plan Definitions......................... | 19 |
| | 3.2 Dental Definitions ............................................ | 32 |
| | 3.3 Common Dental Terms ....................................... | 32 |
| | 3.4 Vision Plan Definitions ....................................... | 35 |
| Article IV | Claim and Appeal Procedures ........................................... | 36 |
| | 4.1 Initial Filing of Claims........................................ | 36 |
| | 4.2 Requests for Additional Information .......................... | 36 |
| | 4.3 Appeals of Adverse Benefit Determinations................... | 37 |
| | 4.4 Access to Documents, Records or Other Information .......... | 38 |
| | 4.5 External Review Rights and Procedures ....................... | 38 |
| | 4.6 Additional Appeal Rights ..................................... | 39 |
| | 4.7 Examination.................................................... | 39 |
| | 4.8 Plan Administrator Discretion ................................ | 39 |
| Article V | Coverage and Eligibility.................................................. | 40 |
| | 5.1 Coverage under this Plan ..................................... | 40 |
| | 5.2 Employee Eligibility........................................... | 40 |
| | 5.3 Dependent Coverage .......................................... | 40 |
| | 5.4 Participant Effective Date ..................................... | 40 |
| | 5.5 Dependent Effective Date ..................................... | 41 |
| | 5.6 Dental Coverage Waiting Period .............................. | 41 |
| | 5.7 Newborn Children ............................................. | 41 |
| | 5.8 Special Enrollment Periods.................................... | 41 |
| | 5.9 Open Enrollment .............................................. | 43 |
| | 5.10 Participant Termination ....................................... | 43 |
| | 5.11 Dependent Termination ....................................... | 43 |
| | 5.12 Extended Medical Benefits Provision.......................... | 43 |
| | 5.13 Extended Dental Benefits Provision........................... | 44 |
| | 5.14 Special Termination Provisions................................ | 44 |
| | 5.15 Continuation of Medical and Dental Coverage for ............. | |
| | Dependents of Deceased Active Employees ..................... | 44 |
| | 5.16 Family and Medical Leave Provisions......................... | 45 |
| | 5.17 USERRA Rights................................................ | 45 |

Park National Corporation Employee Health Benefit Plan Wellness Plan

| | | |
|---|---|---|
| Article VI | Cost Management Services | 46 |
| | 6.1 Utilization Review | 46 |
| | 6.2 Continued Stay Review | 47 |
| | 6.3 Weekend Admission Review | 47 |
| | 6.4 Emergency and Urgent Care Review | 47 |
| | 6.5 Discharge Planning | 48 |
| | 6.6 Pre-Certification of Outpatient Surgery | 48 |
| | 6.7 Voluntary Second Surgical Opinion | 48 |
| Article VII | Continuation Coverage under COBRA | 49 |
| | 7.1 Right to Elect Continuation Coverage | 49 |
| | 7.2 Notification of Qualifying Event | 49 |
| | 7.3 Length of Continuation Coverage | 49 |
| | 7.4 Termination of Continuation of Coverage | 50 |
| | 7.5 Multiple Qualifying Events | 50 |
| | 7.6 Total Disability | 50 |
| | 7.7 Carryover of Deductibles and Plan Maximums | 51 |
| | 7.8 Payments of Premium | 51 |
| | 7.9 Definitions | 51 |
| Article VIII | Medical and Dental Expense Benefits | 53 |
| | 8.1 Coinsurance Percentage and Deductible | 53 |
| | 8.2 Allocation and Apportionment of Benefits | 53 |
| | 8.3 Dental Plan Benefit Maximum | 53 |
| Article IX | Description Of Benefits | 54 |
| | 9.1 Medical Benefits - Covered Expenses | 54 |
| | 9.2 Pre-Existing Conditions Exclusion | 59 |
| | 9.3 Exception to the Pre-Existing Conditions Exclusion | 60 |
| | 9.4 Creditable Coverage | 60 |
| Article X | Other Benefits | 62 |
| | 10.1 Common Accident Benefit | 62 |
| | 10.2 Schedule of Prescription Drug Card Program | 62 |
| | 10.3 Covered Expenses and Limitations under the Prescription Drug Card Program | 62 |
| | 10.4 Wellness Education and Disease Management Program | 63 |
| | 10.5 Comprehensive Care Management | 64 |
| Article XI | Description of Dental Benefits | 66 |
| | 11.1 Dental Benefits - Covered Expenses | 66 |
| | 11.2 Advance Treatment Review | 66 |
| | 11.3 Class I (Preventive And Diagnostic) – Covered Expenses | 66 |
| | 11.4 Class II (Basic) - Covered Expenses | 66 |
| | 11.5 Class III (Major) – Covered Expenses | 67 |
| | 11.6 Class IV (Orthodontic) – Covered Expenses | 67 |
| | 11.7 Alternative Benefit Provision | 68 |
| | 11.8 Proof of Dental Claim | 68 |
| Article XII | Description of Vision Benefits | 69 |
| | 12.1 Vision Benefits | 69 |
| | 12.2 Participating Provider Claims | 69 |
| | 12.3 Limitations on Charges by Participating Providers for Services and Supplies Which are Not Covered under this Plan | 70 |
| Article XIII | Benefit Exclusions and Limitations | 71 |
| | 13.1 General Plan Benefit Exclusions and Limitations | 71 |
| | 13.2 Medical Plan Benefit Exclusions and Limitations | 72 |
| | 13.3 Dental Plan Benefit Exclusions and Limitations | 73 |

4

Park National Corporation Employee Health Benefit Plan Wellness Plan

|   | 13.4 | Vision Benefit Exclusions and Limitations | 74 |
| Article XIV | | General Information | 76 |
|   | 14.1 | Coordination of Benefits | 76 |
|   | 14.2 | Right of Recovery | 77 |
|   | 14.3 | Medicare Benefits | 78 |
|   | 14.4 | Other Rights of Recovery | 79 |
|   | 14.5 | Facility of Payment | 79 |
|   | 14.6 | Administration of the Plan | 79 |
|   | 14.7 | Non-Alienation and Assignment | 80 |
|   | 14.8 | Failure to Enforce | 81 |
|   | 14.9 | Fiduciary Responsibilities | 81 |
|   | 14.10 | Disclaimer of Liability | 81 |
|   | 14.11 | Administrative and Clerical Errors | 81 |
|   | 14.12 | Rescission of Coverage | 81 |
| Article XV | | Privacy | 83 |
|   | 15.1 | Privacy of Health Information | 83 |
|   | 15.2 | Use and Disclosure of Protected Health Information | 83 |
|   | 15.3 | Disclosures of Health Information to the Company | 83 |
|   | 15.4 | Access of Covered Persons to Protected Health Information | 84 |
|   | 15.5 | Amendment Rights | 85 |
|   | 15.6 | Security of Protected Health Information | 85 |
| Article XVI | | Statement of ERISA Rights | 86 |
| Plan Adoption | | | 91 |

Park National Corporation Employee Health Benefit Plan Wellness Plan

This page intentionally left blank.

# ARTICLE I
## PLAN INFORMATION

**NAME OF PLAN**
The name of the Plan is the Park National Corporation Employee Health Benefit Plan – Wellness Plan.

**PURPOSE OF THE PLAN**
Park National Corporation executes this document, including any amendments, to establish a health benefit plan for the exclusive benefit of its participating employees and their Dependents and to grant such Participants and Dependents legally enforceable rights under this Plan. While Park National Corporation has every intention of continuing this Plan indefinitely, it reserves the right to amend or terminate the Plan, and the benefits provided hereunder, at any time.

The Plan Administrator has issued a Summary Plan Description to each Participant which summarizes the benefits to which that person is entitled, to whom benefits are payable, and the provisions of this Plan principally affecting the Participant and his or her covered Dependents.

**PLAN EFFECTIVE DATE**
The effective date of this revision of the Plan is October 1, 2012, unless otherwise indicated. This Plan was originally effective on October 1, 1993.

**AMENDMENT OR TERMINATION**
Park National Corporation may amend or terminate the Plan at any time by means of a writing signed by a person authorized by Park National Corporation to do so. Any such amendment or termination shall become effective upon its execution or on such date as may be specified in that writing. Such amendment, modification or termination may result in the termination of Participant and Dependent coverage under the Plan.  Expenses incurred prior to any Plan termination will be paid as provided under the terms of the Plan prior to such termination. Any termination of the Plan will be communicated by Park National Corporation to the Participants.

Upon Plan termination, any Plan assets remaining in the Plan's account(s) will be distributed by the Plan Administrator to the Plan Sponsor and/or Participants, in accordance with method(s) set forth in ERISA, or any other applicable law or regulation.  The Plan Administrator shall pay all eligible Plan benefits and expenses before any distribution is made.

The terms of the Plan cannot be amended or modified by oral statement(s).  Only the Plan Administrator can interpret the terms of the Plan.

Park National Corporation reserves the right, at any time and from time to time, to modify or amend, in whole or in part, any or all of the provisions of the Plan.

**PLAN ADMINISTRATOR TAX ID NUMBER (EIN)**
31-1179518

**PLAN ADMINISTRATOR**
Park National Corporation
22 S. First Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

**PLAN NUMBER**
501

**GROUP NUMBER**
10040

7

Park National Corporation Employee Health Benefit Plan Wellness Plan

## PLAN YEAR
The Plan Year is a time period defined for fiscal purposes and used for certain Plan reporting and disclosure requirements. The Plan Year begins on October 1st and ends on September 30th of the following year.

## CALENDAR YEAR
The Calendar Year is the period beginning January 1st and ending December 31st, which is used in the application of Deductible, Coinsurance and benefit maximum amounts under the Plan.

## TYPE OF ADMINISTRATION
Contract Administration.

## DESCRIPTION OF PLAN
The Plan is an employee health and welfare benefit plan providing medical benefits utilizing a Preferred Provider network, dental benefits and vision benefits. A copy of the Plan documents and insurance contracts, if any, are on file at the Plan Administrator's office and may be read by any Covered Person at any reasonable time. In the event of any discrepancy between any summary of this Plan and the actual provisions of the Plan document, the Plan document shall govern.

The Plan shall not be deemed to constitute a contract between the Company and any employee or to be a consideration for, or an inducement or condition of, the employment of any employee. Nothing in the Plan shall be deemed to give any employee the right to be retained in the service of the Company or to interfere with the right of the Company to discharge any employee at any time.

## NAMED FIDUCIARY
Park National Bank
22 S. First Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

## AGENT FOR THE SERVICE OF LEGAL PROCESS
Park National Bank
22 S. First Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

In addition, service of legal process may be made upon the Plan Administrator.

## FUNDING
The costs of the Plan are paid out of the Employer's general assets. Funds for payment of claims considered under the Plan are forwarded to account(s) from which claims are to be paid.

## SOURCE OF CONTRIBUTIONS
The Plan is funded by contributions made by the Employer, Park National Corporation, and employees participating under the Plan. Contributions are required for Participant coverage under the Plan.

The Employer shall, from time to time, evaluate the funding method of the Plan benefits and determine the amount to be contributed by the Employer and the amount to be contributed, if any, by the Participants.

8

## ASSIGNMENT

A Covered Person's benefits may not be assigned, except by consent of the Company, other than to providers of Plan benefits.

## MEDICAL AND DENTAL BENEFIT MANAGER

Medical Benefits Administrators, Inc.
1975 Tamarack Road
P. O. Box 1099
Newark, Ohio 43058-1099
(740) 522-8425
(800) 423-3151

## VISION BENEFIT MANAGER

VisionPlus of America, Inc.
1975 Tamarack Road
P.O. Box 1260
Newark, OH 43058-1260
(740) 522-8425
(800) 252-3447
www.visplus.com

## UTILIZATION REVIEW SERVICE

iProcert
(866) 214-5962

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE II
## SCHEDULE OF BENEFITS

### 2.1 COVERAGES AVAILABLE UNDER THIS PLAN

This Plan will allow Participants and their eligible Dependents to select the following health care options:

    A.  medical coverage;

    B.  dental coverage; and/or

    C.  vision coverage.

A Participant can select any combination of the above options. Prescription drug coverage is included with the medical option. All covered Family members must be enrolled in the same coverages. The coverages as described below shall only apply to a Covered Person to the extent that the Covered Person has been enrolled in, and coverage has become effective for the type of coverage selected, as described in Article V.

*In order to be eligible for the coverage described in Section 2.2 through Section 2.9 and Article IX, the Covered Person must be properly enrolled in the medical coverage as described in Article V.*

### 2.2 SCHEDULE OF MEDICAL BENEFITS

This Plan provides a higher level of benefits when a Covered Person uses a Preferred Provider for covered services described under this Schedule of Benefits and the Plan. Covered Expenses for services obtained from Preferred Providers are paid at the In-Network (Preferred Provider) level of benefits shown in this Article. Services provided by non-Preferred Providers are considered at the Out-of-Network (non-Preferred Provider) level of benefits, unless one or more of the following conditions are met:

    A.  the Covered Person resides outside of the service area of the Preferred Provider network, as determined by the Plan Administrator;

    B.  the Covered Person requires treatment in an Emergency, and cannot reasonably obtain such treatment from a Preferred Provider or cannot express a provider preference due to his or her medical condition. The In-Network level of benefits will apply until the Covered Person's condition has sufficiently stabilized so that transfer to a Preferred Provider for any required continued treatment is reasonably possible;

    C.  the Covered Person requires Medically Necessary services or supplies while traveling outside of the service area of the Preferred Provider network. This provision shall not apply if the reason for the travel was to obtain such services or supplies;

    D.  the Covered Person requires Medically Necessary services or supplies, and there is no Preferred Provider reasonably available in the Preferred Provider network who is qualified to provide such services, as determined by the Plan Administrator;

    E.  diagnostic services are performed on a Covered Person in a Preferred Provider's office, that are then sent to an outside facility for processing and/or interpretation;

    F.  the Covered Person receives professional services for pathology, radiology or anesthesiology, or the services of an emergency room Physician at a Preferred Provider Hospital or other Preferred Provider Facility; or

    G.  the Covered Person is confined in a Preferred Provider Hospital or other Inpatient Preferred Provider Facility and there is no Preferred Provider reasonably available to provide necessary services.

In any of the above described situations, such charges will be considered at the In-Network level of benefits described in this Article.

The Preferred Providers have agreed to provide services and supplies to Covered Persons under this Plan in accordance with a previously determined discounted fee schedule. The provisions of the agreements with the Preferred Providers allow Covered Persons to benefit

10

from these discounted fees. After the Plan has paid the appropriate benefits to a Preferred Provider based on such fees, these providers have agreed not to bill a Covered Person under this Plan for the amount above the discounted fee. Of course, the Covered Person's Deductible, Copayments and Coinsurance will still be applied as described in this Plan.

The Plan will determine Covered Expenses for non-Preferred Providers based upon the Reasonable and Customary fee for the services. In many cases, the amount that would be considered as Reasonable and Customary will be in excess of the fee that a Preferred Provider would charge for the same service under the Plan. This means that the Covered Person may be responsible for an increased dollar amount if an Out-of-Network provider is utilized. In addition, the payment of any amount in excess of the Reasonable and Customary fee shall be the responsibility of the Covered Person, in addition to the Deductibles and Coinsurance otherwise applicable under this Plan.

The Plan Administrator will provide, at no cost, a directory of the Preferred Providers.

This Schedule of Medical Benefits is intended to provide only a general description of a Covered Person's medical benefits. This Plan contains limitations and restrictions that are described later in this booklet and could affect any benefits that may be payable.

> COVERAGE UNDER THIS PLAN FOR A PRE-EXISTING CONDITION MAY BE SUBJECT TO CERTAIN LIMITATIONS. FOR MORE INFORMATION, SEE THE PROVISIONS REGARDING PRE-EXISTING CONDITIONS IN ARTICLE IX.

## 2.3 DEDUCTIBLE

|  | In-Network | Out-of-Network |
|---|---|---|
| **COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Individual Calendar Year Deductible ("CYD") | $750.00 | $1,500.00 |
| Family Calendar Year Deductible | $1,500.00 | $3,000.00 |
| **NON-COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Effective through December 31, 2012 | | |
| *Individual Calendar Year Deductible ("CYD")* | $1,000.00 | $2,000.00 |
| *Family Calendar Year Deductible* | $2,000.00 | $4,000.00 |
| Effective January 1, 2013 and After | | |
| *Individual Calendar Year Deductible ("CYD")* | $1,500.00 | $3,000.00 |
| *Family Calendar Year Deductible* | $3,000.00 | $6,000.00 |

The In-Network Deductible applies to the Out-of-Network Deductible and vice versa.

## 2.4 COINSURANCE AND COINSURANCE LIMIT(THROUGH DECEMBER 31, 2012)

|  | In-Network | Out-of-Network |
|---|---|---|
| **COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Per Individual | 80% of the first $8,000.00 of Covered Expenses after CYD, then 100% thereafter. | 60% of the first $8,000.00 of Covered Expenses after CYD, then 100% thereafter. |
| Per Family | 80% of the first $16,000.00 of Covered Expenses after Family CYD, then 100% thereafter. | 60% of the first $16,000.00 of Covered Expenses after Family CYD, then 100% thereafter. |

Park National Corporation Employee Health Benefit Plan Wellness Plan

**NON-COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)*

| | | |
|---|---|---|
| Per Individual | 80% of the first $10,000.00 of Covered Expenses after CYD, then 100% thereafter. | 60% of the first $10,000.00 of Covered Expenses after CYD, then 100% thereafter. |
| Per Family | 80% of the first $20,000.00 of Covered Expenses after Family CYD, then 100% thereafter. | 60% of the first $20,000.00 of Covered Expenses after Family CYD, then 100% thereafter. |

See Section 2.7, Medical Coinsurance Amounts, for Coinsurance amounts which vary from this standard.

All individual or Family Covered Expenses, except those charges paid by the Plan at 100% will be applied to the Coinsurance maximum. Charges which are applicable to any Copayment or Deductible under this Plan do not apply to such maximums. Amounts which are applied to Preferred Provider Covered Expenses Coinsurance limits shall be credited toward satisfaction of non-Preferred Provider Covered Expenses Coinsurance limits and vice-versa.

## 2.5 MEDICAL COINSURANCE AND OUT-OF-POCKET LIMITS (EFFECTIVE JANUARY 1, 2013)

In-Network (Preferred Provider) Coinsurance                20%

Out-of-Network (Non-Preferred Provider) Coinsurance        40%

See Section 2.7, Medical Copayment and Coinsurance Amounts, for Coinsurance amounts that vary from this standard.

### Calendar Year Out-of-Pocket Limits
*(including Deductibles)*

| | In-Network | Out-of-Network |
|---|---|---|
| **COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Per Individual | $2,350.00 | $4,700.00 |
| Per Family | $4,700.00 | $9,400.00 |
| **NON-COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Per Individual | 4,700.00 | $9,400.00 |
| Per Family | $9,400.00 | $18,800.00 |

All charges, except those paid at 100%, will be applied to the Out-of-Pocket maximum. In addition, charges used to satisfy any Copayment described in this Plan will not be applied to the Out-of-Pocket maximum. Amounts applied to the In-Network Out-of-Pocket limits will be applied to the Out-of-Network Out-of-Pocket limits, and vice versa.

## 2.6 PREFERRED PROVIDER COPAYMENT

A Copayment of $20.00 shall apply to charges made by a Preferred Provider Physician for an office visit. Effective January 1, 2013, if the Participant is not compliant with the wellness program described in Section 10.4, the Copayment will be $40.00 for a Primary Care Physician, and $60 for a specialist, per visit. The Deductible listed in Section 2.3 shall not apply to the office visit charges. The balance of charges for the office visit will be paid at 100%. The balance of the Covered Expenses for services performed during the visit will be paid as described in Section 2.7. If the Participant is not compliant with the wellness program, a Copayment of $50.00 will apply to a visit at an urgent care office. The balance of the Covered expenses for services obtained at the urgent care office will be paid as described in Section 2.7.

12

2:17-cv-00816-GCS-CMV Doc #: 1 Filed: 09/15/17 Page: 53 of 150  PAGEID #: 53

Park National Corporation Employee Health Benefit Plan Wellness Plan

## 2.7 MEDICAL COINSURANCE AMOUNT

Deductibles are applied on a Calendar Year basis, while Copayments will be applied on a per visit or per service basis, and both reflect amounts to be paid by the Covered Person. Coinsurance reflects the percentage amount of Covered Expenses to be paid by the Covered Person after any applicable Deductible or Copayment.

| | Copayment | Deductible | Preferred Provider Coinsurance | Non-Preferred Provider Coinsurance |
|---|---|---|---|---|
| Second Surgical Opinion | None | None | None | None |
| Hospice Services① | None | None | None | None |
| Physicians Office Visit not Listed Elsewhere | | | | |
|   Preferred Provider | | | | |
|     *Compliant with Wellness Program (and Non-Compliant through 12/31/2012)* | $20.00 | None | None | N/A |
|     *Non-Compliant with Wellness Program (effective 1/1/2013)* | | | | |
|     Primary Care Physician | $40.00 | None | None | N/A |
|     Specialist | $60.00 | None | None | N/A |
|   Non-Preferred Provider | None | Applies | N/A | 40% |
| Rx Dispensed in Physician's Office or Urgent Care Facility | | | | |
|   Generic Drugs | None | Applies | 10% | 10% |
|   Brand Name Drugs | None | Applies | 20% | 20% |
| Other Office-Based Services/Supplies | None | Applies | 20% | 40% |
| Other Urgent Care Facility, including Physician | | | | |
|   Compliant with Wellness Program (and Non-Compliant through 12/31/2012) | None | Applies | 20% | 40% |
|   *Non-*Compliant with Wellness Program (effective 1/1/2013) | $50.00 | Applies | 20% | 40% |
| Wellness Services① | | | | |
|   Preferred Provider | None | None | None | N/A |
|   Non-Preferred Provider | None | Applies | N/A | 40% |
| Elective Sterilization | | | | |
|   Preferred Provider | None | None | None | N/A |
|   Non Preferred Provider | None | Applies | N/A | 40% |
| Female Contraceptives Services and Supplies *(not including oral)* | None | None | None | Not Covered |
| Breast Feeding Equipment and Lactation Support | None | None | None | Not Covered |

Park National Corporation Employee Health Benefit Plan Wellness Plan

| | | | | |
|---|---|---|---|---|
| Emergency Room Services, including Physician True Emergency, including Mental/Nervous Disorders, Alcoholism & Substance Abuse | None | Applies | 20% | Paid Same as In-Network |
| Non-Emergency | None | Applies | 20% | 40% |
| Hospital Room & Board, Intensive Care Units ② | None | Applies | 20% | 40% |
| Other Hospital-Based Services/Supplies | None | Applies | 20% | 40% |
| Spinal Manipulation① | None | Applies | 50% | 50% |
| Temporomandibular Joint Dysfunction① Outpatient Services, including Visits | None | Applies | 50% | 50% |
| Inpatient Services | None | Applies | 20% | 40% |
| Covered Foot Benefit① Outpatient Services | None | Applies | 50% | 50% |
| Inpatient Hospital Services | None | Applies | 20% | 40% |
| Mental Nervous Disorder, Substance Abuse, & Alcoholism | None | Applies | 20% | 40% |
| Other Covered Services/Supplies① | None | Applies | 20% | 40% |

## EXPLANATION

① Please see additional limitations on the schedule of Medical Plan Benefit Maximums set forth in Section 2.8.

② Charges for Hospital Room & Board will be considered at the Hospital's average Semi-Private room rate, unless it is Medically Necessary that the patient occupy a private room for isolation and no isolation facilities are available.

## 2.8 MEDICAL PLAN BENEFIT MAXIMUMS

The medical plan maximum benefits and limitations are shown below. A daily, per visit or per accident maximum indicates the total Covered Expenses which will be payable at the appropriate coinsurance percentages shown in the "Medical Coinsurance Amount" section above. Both Calendar Year and Lifetime maximums indicate the actual benefits payable under the Plan. Any amounts applied to a maximum under any other plan sponsored by Park National Corporation shall be applied to the applicable maximum under this Plan.

| | |
|---|---|
| Outpatient Temporomandibular Joint (TMJ) Services | 50 visit Calendar Year Maximum |
| Outpatient Covered Foot Benefit | 50 visit Calendar Year Maximum |
| Outpatient Spinal Manipulation | 50 visit Calendar Year Maximum |

14

Park National Corporation Employee Health Benefit Plan Wellness Plan

| Routine Wellness Services Employees & Dependents ages 18 & older) | Except as specifically listed below, wellness services will be provided in accordance with the Plan's wellness education and disease management program. For more information on these recommended services, please see the Plan Administrator. |
| --- | --- |
| | The limitations listed below may be waived if the Covered Person has a family history or other risk factors for the disease that may dictate having the test at an earlier age. In these cases, the Covered Person will be responsible for submitting a letter of Medical Necessity from his or her Physician to the Plan Administrator for review. |
| Prostate Examinations | Age 45 and older – one per Calendar Year. |
| Screening Mammography Benefit | Ages 35 – 39 – one baseline mammography |
| | Ages 40 & older one mammography per Calendar Year |
| Screening PAP smears | Age 18 & over – one PAP smear per Calendar Year |
| Hospice Bereavement Services | $200.00 for all counseling sessions with the family prior to and within 6 months after the death of terminally ill patient |
| Diabetic Counseling | One visit per Calendar Year Maximum |
| Convalescent Care Benefits | 100 days Calendar Year Maximum |
| Home Health Care Benefit | 6 hour maximum per visit |
| Speech Therapy | 60 visits per Calendar Year Maximum |
| Bras related to Mastectomy | 2 per Calendar Year Maximum |

## 2.9 SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM

The Plan has a prescription drug card program that covers prescriptions dispensed through a participating pharmacy. For a listing of the participating pharmacies, contact the Plan Administrator. The Plan will cover up to a maximum of thirty-four (34) days per prescription. Certain exclusions and limitations apply to the prescription drug card program. These are described in Section 10.2 of the Plan. Effective January 1, 2013, a ninety (90) day supply can be obtained through the prescription drug program. Three (3) Copayments will apply.

### COPAYMENTS

| | |
| --- | --- |
| Bowel Kits in Connection with Colonoscopy | None |
| Over-the-Counter Alavert, Claritin, Claritin D, Prilosec, Prevacid 24, Zyrtec, Zyrtec D, Abreva, Alaway, Zaditor, Slo-Niacin, and Omeprazole | $5.00 |
| Generic Equivalent Drug Copayment | Lesser of $10.00 or the cost of the drug |

15

Park National Corporation Employee Health Benefit Plan Wellness Plan

**Brand Name Drug Copayment**

| | |
|---|---|
| Formulary/Preferred | 30% of the cost of the drug up to $100.00 maximum Copayment per prescription |
| Non – Formulary/ Non - Preferred | 30% of the cost of the drug plus $20.00 up to $100.00 maximum Copayment per prescription |
| Specialty Copayments For Specific Conditions | Certain drugs for specific health conditions may be available at a reduced Copayment. Please contact the Plan Administrator for a listing of qualifying drugs. |

## 2.10 DENTAL SCHEDULE OF BENEFITS

This Schedule of Dental Benefits is intended to provide only a general description of your dental benefits under this Plan. This Plan contains limitations and restrictions which are described later in the Plan document and could affect any benefits which may be payable.

## 2.11 DENTAL DEDUCTIBLE

Per Individual                    $50.00

This is a Calendar Year Deductible applicable to Class II and Class III dental benefits under the Plan, combined. Class IV expenses are not subject to the Calendar Year Deductible.

## 2.12 DENTAL COINSURANCE AMOUNTS

Deductibles are applied on a Calendar Year basis and reflect amounts to be paid by the Covered Person. Coinsurance reflects the percentage amount of Covered Expenses to be paid by the Covered Person after any applicable Deductible.

| | DEDUCTIBLE | CO-INSURANCE |
|---|---|---|
| Class I  (Preventive & Diagnostic) | None | 20% |
| Class II  (Basic) | Applies | 20% |
| Class III (Major) | Applies | 20% |
| Class IV  (Orthodontic) | None | 50% |

## 2.13 DENTAL PLAN BENEFIT MAXIMUMS

| | |
|---|---|
| Advance Treatment Review | Course of Treatment over $100.00 |
| Dental Plan Benefit Maximum (Class I, II and III) | $2,000.00 per Covered Person per Calendar Year for all Dental Services |
| Orthodontic Services (Class IV) | $1,000.00 Lifetime maximum<br>Covered for Dependent children only |

16

—————————————————————————— Park National Corporation Employee Health Benefit Plan Wellness Plan

## 2.14  VISION PLAN COPAYMENTS

| | |
|---|---|
| Professional Services | $10.00 |
| Materials | $15.00 |

## 2.15  VISION PLAN FREQUENCY LIMITATIONS

| Type of Service | Frequency Limitation/Benefit Period |
|---|---|
| Professional Services | One examination every 12 months |
| Lenses | One pair every 12 months |
| Frames | One every 12 months |
| Contact Lenses | One Calendar Year's supply every 12 months |

## 2.16  MAXIMUM PER BENEFIT PERIOD

| TYPE OF SERVICE | MAXIMUMS | |
|---|---|---|
| | Participating Provider | Non-Participating Provider |
| **Professional Services:** | | |
| Examination | Covered in Full after Examination Copayment | $25.00 after Examination Copayment |
| **Lenses*:** | | |
| Single Vision Lenses | Covered in Full after Materials Copayment** | $25.00 after Materials Copayment** |
| Bifocal Lenses | Covered in Full after Materials Copayment** | $40.00 after Materials Copayment** |
| Trifocal Lenses | Covered in Full after Materials Copayment** | $50.00 after Materials Copayment** |
| Lenticular Lenses | Covered in Full after Materials Copayment** | $80.00 after Materials Copayment** |
| Frame | Through December 31, 2012 - $75.00 after Materials Copayment** | $30.00 after Materials Copayment** |
| | Effective January 1, 2013 - $125.00 after Materials Copayment** | |
| **Contact Lenses***:** | | |
| Cosmetic | Through December 31, 2012 - $100.00**** | |
| | Effective January 1, 2013 – $130.00**** | $80.00 |
| Medically Necessary | Covered in Full | $160.00 |

### EXPLANATION

\*      means one (1) pair of lenses in glass or plastic, not including lens extras.

\*\*     one materials Copayment applies to all materials that are supplied during a single visit.

\*\*\*    includes contacts, fitting fees, and any specialty exam costs. The Plan benefits for contact lenses are provided in lieu of any vision benefits for any other professional services,

Park National Corporation Employee Health Benefit Plan Wellness Plan

lenses or frames for that benefit period. Effective January 1, 2013, the Plan benefits for contact lenses are provided in lieu of vision benefits for any materials for that benefit period.

**** Fifteen percent (15%) discount applies to contact lenses only at the Participating Provider level, or, in the case of disposables, the discount applies to the first ninety (90) days supply.

 Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE III

## DEFINITIONS

### 3.1 GENERAL AND MEDICAL PLAN DEFINITIONS

**ACCIDENTAL BODILY INJURY or INJURY**
The term "Accidental Bodily Injury" and the term "Injury" mean an adverse physical condition which is not an Illness, but requires treatment by a Physician. Each is the result of an event, which is not intentional and not foreseen.

**ACTIVELY AT WORK or ACTIVE WORK**
The terms "Actively at Work" or "Active Work" mean the active expenditure of time and energy in the service of the Company. A Participant shall be deemed Actively at Work while working the full number of hours shown in Section 5.2 and while in a relationship with the Employer within the meaning of "employee" for federal tax withholding purposes. In addition, individuals acting as independent contractors; leased employees; consultants; a member of the Board of Directors; temporary, freelance, incidental, seasonal or occasional employees or individuals on retainers are not considered Actively At Work unless each meets the requirements specified in Section 5.2. This term shall not apply to any provision of this Plan to the extent that such application would be deemed to violate the requirements of HIPAA.

**ALCOHOLISM, DRUG ADDICTION or SUBSTANCE ABUSE**
The terms "Alcoholism, Drug Addiction" or "Substance Abuse" mean the taking of alcohol or other drugs at dosages that place a Covered Person's welfare at risk, cause the Covered Person to endanger the public welfare and which constitute alcohol or drug dependence.

**ALCOHOLISM TREATMENT FACILITY**
The term "Alcoholism Treatment Facility" means a facility that is primarily engaged in the treatment of alcoholism. The facility must have in effect plans for utilization and peer review and programs for rehabilitation or rehabilitation and detoxification of alcoholism. The facility must be approved by the Joint Commission on the Accreditation of Health Care Organizations or certified by the Department of Health.

**AMBULATORY HEALTH FACILITY**
The term "Ambulatory Health Facility" means a facility, which is organized and operated to provide medical care to Outpatients. The facility must provide preventive, diagnostic, therapeutic or rehabilitation services under the direction of a Physician. The facility must not be a part of a Hospital.

**BENEFIT MANAGER**
The term "Benefit Manager" means the individual or business entity, if any, appointed and retained by the Plan Administrator to supervise the administration, consideration, investigation and settlement of claims, maintain records, submit reports and other such duties as may be set forth in a written administration agreement. If no Benefit Manager is appointed or retained (as a result of the termination or expiration of the administrative agreement or other reason) or if the term is used in connection with a duty not expressly assigned to and assumed by the Benefit Manager in writing, the term will mean the Plan Administrator.

As of the Plan Effective Date, the Benefit Manager of the Plan is Medical Benefits Administrators, Inc.

**CALENDAR YEAR**
The term "Calendar Year" means the period of time from January 1, at 12:00 A.M. Midnight, through the next December 31.

**CLOSE RELATIVE**
The term "Close Relative" means the spouse, parent, child, brother, or sister of a Covered Person, by blood or marriage.

Park National Corporation Employee Health Benefit Plan Wellness Plan

**COBRA**
The term "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**COINSURANCE**
The term "Coinsurance" means the specific percentage of the Covered Expenses that the Covered Person must pay, after any applicable Deductible is taken. The Plan will pay the balance of the Covered Expenses after the Coinsurance has been applied.

**COMPANY**
The term "Company" means Park National Corporation, the Plan Sponsor.

**CONVALESCENT FACILITY**
The term "Convalescent Facility" means a legally operating institution or a distinct part of a one which:

    A. is supervised by a resident Physician or a resident registered graduate nurse;

    B. requires that the health care of each patient be under the supervision of a Physician;

    C. requires that a Physician be available to furnish necessary medical care in emergencies;

    D. provides 24-hour nursing service;

    E. provides facilities for the full-time care of five (5) or more patients; and

    F. keeps clinical records on all patients.

**COPAYMENT**
The term "Copayment" means a specific dollar amount (or percentage) of the Covered Expenses that the Covered Person must pay before the Plan pays benefits for a particular service or supply. The Copayment does not apply to any Deductible or Out-of-Pocket maximum, and is still payable once the Out-of-Pocket maximum is met.

**COSMETIC PROCEDURE**
The term "Cosmetic Procedure" means a procedure performed solely for the improvement of a Covered Person's appearance rather than for the improvement or restoration of bodily function.

**COVERED EXPENSES**
The term "Covered Expenses" means expenses incurred by a Covered Person for any Medically Necessary treatments, services or supplies that are not specifically excluded from coverage elsewhere in this Plan.

**COVERED PERSON**
The term "Covered Person" means any person meeting the eligibility requirements for coverage as specified in this Plan and who is properly enrolled in the Plan.

**CREDITABLE COVERAGE**
The term "Creditable Coverage," means any amount of time a Covered Person is covered under certain eligible health coverage prior to the eligibility date of the person under this Plan, provided that there were no "significant breaks in coverage" under any health plan or coverage. Prior coverage which is eligible to be considered as Creditable Coverage includes only those coverages required to be included as such under Section 701(2) of ERISA, and shall exclude those coverages that are permitted to be excluded under the same section. A "significant break in coverage" is a time period during which the person was not covered under any other eligible health coverage (excluding any plan waiting periods) which exceeds 62 days in length. Any amount of time a person was covered under an eligible health plan or coverage prior to a "significant break in coverage" shall not apply towards Creditable Coverage. Any days during which the Covered Person was covered under eligible health care coverage after the "significant break in coverage" up to the person's eligibility date under this Plan will be considered as Creditable Coverage. For more information regarding Creditable Coverage, see Section 9.4.

 Park National Corporation Employee Health Benefit Plan Wellness Plan

## CUSTODIAL CARE

The term "Custodial Care" means that type of care or service, wherever furnished and by whatever name called, that is designed primarily to assist a Covered Person, whether or not Totally Disabled, in the activities of daily living. Such activities include, but are not limited to, bathing, dressing, feeding, preparation of meals or special diets, housekeeping, assistance in walking or in getting in and out of bed, and supervision of medication that can normally be self-administered. Custodial care is that which consists of basic care given to maintain life and/or comfort with no reasonable expectation of cure or improvement of the Injury or Illness.

## DEDUCTIBLE

The term "Deductible" means the amount of Covered Expenses incurred by a Covered Person in a Calendar Year before any other Covered Expenses can be considered for payment at the percentages stated in the Schedule of Medical Benefits and this Plan.

An Individual Deductible is the amount that each individual Covered Person must pay during a Calendar Year before the Plan begins paying benefits for that person.

A Family Deductible is the maximum amount that two (2) or more Family members covered under the same certificate must pay in Deductible expense in a Calendar Year. Once this cumulative Family Deductible is reached, the Deductible will be considered satisfied for all Family members under that certificate during the remainder of the Calendar Year.

## DENTIST

A Physician who is licensed to practice dentistry within the state where the dental service is being performed and who is operating within the scope of his or her license.

## DEPENDENT

The term "Dependent" means:

    A.  the Participant's legal spouse who:

        1.  is a resident of the same country in which the Participant resides;

        2.  has met all requirements of a valid marriage contract in the state in which such parties were married. In no event shall the term "spouse" include an individual who is the same sex as the Participant, regardless of whether such relationship is recognized in any way under any state law; and

        3.  if eligible for similar health coverage through his or her employer, is enrolled in such coverage. This provision shall not apply if the spouse is unemployed or retired, self-employed or employed part time with no portion of the premium paid by the employer, as determined by the Plan Administrator; or

    B.  the Participant's child who meets all of the following conditions:

        1.  is the Participant's natural child, legally adopted child, stepchild, a child for whom the Participant or the Participant's spouse has Legal Guardianship or is a child Placed For Adoption with the Participant or the Participant's spouse; and

        2.  is less than twenty-six (26) years of age. The age requirement above is waived for any mentally or physically handicapped child who is incapable of self-sustaining employment and is chiefly dependent upon the Participant for support and maintenance, provided the child suffered such incapacity prior to the end of the Calendar Year in which he or she attains nineteen (19) years of age. Proof of incapacity must be furnished to the Plan Administrator, or its designee, within thirty-one (31) days of the date the child's coverage would have ended due to age.

The Plan Administrator has the right to obtain sufficient proof of Dependent status from any Participant under the Plan who is requesting coverage of his or her Dependents.

This definition and all provisions of this Plan are intended to comply with state and federal law as both regard "Qualified Medical Child Support Orders" and "Medical Child Support Orders," as those terms are defined in the law. The Plan Administrator has established procedures governing "Qualified Medical Child Support Orders". Covered Persons under this Plan can receive upon request, free of charge, a copy of such procedures from the Plan Administrator.

Park National Corporation Employee Health Benefit Plan Wellness Plan

The term "Dependent" excludes these situations:

A. a spouse who is legally separated or divorced from the Participant. Such separation/ divorce must have met all the requirements of a valid legal separation or divorce in the state granting it;

B. any spouse on active military duty; or

C. any person who is covered under this Plan as an individual Participant.

**DEPENDENT COVERAGE**
The term "Dependent Coverage" means coverage under the Plan for benefits payable as a consequence of an Illness or Injury of a Dependent.

**DIAGNOSTIC SERVICES**
The term "Diagnostic Services" means tests and procedures performed, when you have specific symptoms, to detect or to monitor your disease or condition. Diagnostic Services include, but are not limited to, the following: x-ray and other radiology services; laboratory and pathology services; cardiographic, encephalographic and radioisotope tests.

**DURABLE MEDICAL EQUIPMENT**
The term "Durable Medical Equipment" means equipment which is:

A. able to withstand repeated use;

B. primarily and customarily used to serve a medical purpose; and

C. not generally useful for a person in the absence of Illness or Injury.

**EMERGENCY**
The term "Emergency" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:

A. placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy; or

B. serious impairment to bodily functions;

C. serious dysfunction of any bodily organ or part.

**EMERGENCY CARE**
The term "Emergency Care" means care and treatment provided in the Outpatient emergency department of a Hospital or other facility within 72 hours of the onset of the Illness or occurrence of the Injury.

**EMPLOYER**
The term "Employer" means the Company and any entity that is affiliated with the Company within the meaning of Section 414(b), (c) or (m) of the Internal Revenue Code of 1986, as amended, that adopts this Plan for the benefit of its employees, whose participation in the Plan is approved by the President (or any duly authorized officer) of the Company. An employer may withdraw from the Plan by delivering to the Plan Administrator written notice of its withdrawal no later than thirty (30) days prior to the date withdrawal is to be effective.

**ERISA**
The term "ERISA" refers to the Employee Retirement Income Security Act of 1974, as amended.

**EXPERIMENTAL OR INVESTIGATIONAL**
The terms 'Experimental" or "Investigational" mean any one or more of the following is true of a treatment, procedure, devise, drug or medicine:

A. it cannot be lawfully marketed without the U.S. Food and Drug Administration approval; and approval for marketing for the condition treated has not been given at the time the device, drug or medicine is furnished.

22

    B.  reliable evidence shows that to determine its maximum tolerated dose, toxicity, safety, efficacy (or efficacy as compared with the standard means of treatment or diagnosis):

        1.  it is undergoing phase I, II or III clinical trials or is under study; or

        2.  further clinic trials or studies are needed, according to the experts' consensus of opinion.

    This does not exclude coverage for Patient Care Services provided as part of Qualified Clinical Trials for the treatment of cancer.

Reliable evidence means only published reports and articles in the authoritative medical and scientific literature; or the written protocol or written informed consent used by the treating facility (or by another facility studying substantially the same treatment, procedure, device, drug or medicine). The terms "Experimental" or "Investigational" shall also mean:

    A.  any treatments, services, supplies or related expenses that are educational or provided primarily for research; or

    B.  treatments, procedures, devices, drugs or medicines or other expenses relating to the transplant of non-human organs.

## FAMILY
The term "Family" means a covered Participant and his or her covered Dependents.

## HEALTH CARE REFORM or PPACA
The terms "Health Care Reform" or "PPACA" mean the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, and as otherwise amended.

## HEALTH INFORMATION
The term "Health Information" means any information, whether oral or recorded in any form or medium that:

    A.  is created or received by this Plan, or a Plan designee; and

    B.  relates to any of the following:

        1.  the past, present or future physical or mental health or condition of an individual;

        2.  the provision of health care to an individual; or

        3.  the past, present or future payment for the provision of health care to an individual.

## HIPAA
The term "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended.

## HOME HEALTH CARE AGENCY
The term "Home Health Care Agency" means a public or private agency or organization that specializes in providing medical care and treatment in the home. Such a provider must meet all of the following conditions:

    A.  it is primarily engaged in providing skilled nursing care and other therapeutic services and is duly licensed, if such licensing is required, by the appropriate licensing authority to provide such services;

    B.  it has policies established by a professional group associated with the agency or organization. This professional group must include at least one Physician and at least one Registered Nurse to govern the services provided and it must provide for full-time supervision of such services by a Physician or Registered Nurse;

    C.  it maintains a complete medical record on each individual; and

    D.  it has a full-time administrator.

## HOME HEALTH CARE PLAN
The term "Home Health Care Plan" means a plan, in writing, by the attending Physician for continued treatment, which includes an estimate of the duration of care. The plan must be presented within seven (7) days following the end of a Hospital confinement and it must be to

Park National Corporation Employee Health Benefit Plan Wellness Plan

care for the same or related condition which caused the Hospital confinement. The Physician must certify that in the absence of home health care service the proper treatment of the Injury or Illness would mean the Hospital confinement would continue. After each thirty (30) days of home health care services the Physician will again have to certify the need for the care to continue.

## HOSPICE

The term "Hospice" means a health care program providing a coordinated set of services rendered at home, in Outpatient settings or in institutional settings for Covered Persons suffering from a condition that has a terminal prognosis. A Hospice must have an interdisciplinary group of personnel which includes at least one Physician and one Registered Nurse, and it must maintain standards of the National Hospice Organization (NHO) and meet applicable state licensing requirements.

## HOSPICE BENEFIT PERIOD

The term "Hospice Benefit Period" means a specified amount of time during which the Covered Person undergoes treatment in a Hospice program. Such time period begins on the date the attending Physician of a Covered Person certifies a prognosis of Terminally Ill, and the Covered Person is accepted into a Hospice program. The period shall end the earliest of six (6) months from this date or at the death of the Covered Person. A new Hospice Benefit Period may begin if the attending Physician certifies that the patient is still Terminally Ill; additional proof may be required by the Plan Administrator or its designee before a new Hospice Benefit Period can begin. The Hospice benefit may not exceed the lifetime maximum benefit as specified in the Schedule of Medical Benefits.

## HOSPICE CARE PLAN

The term "Hospice Care Plan" means a plan, in writing, by the attending Physician for home or Inpatient Hospice care which treats the Family. The Hospice Care Plan must be approved by the Plan Administrator as meeting established standards, including any legal licensing requirements of the state of locality in which it operates.

## HOSPITAL

The term "Hospital" means an institution which meets all of the following conditions:

A. it is engaged primarily in providing medical care and treatment to ill and injured persons on an Inpatient basis at the patient's expense;

B. it is constituted, licensed and operated in accordance with the laws of the jurisdiction in which it is located and which pertain to Hospitals;

C. it maintains, on its premises, all the facilities necessary to provide for the diagnosis and medical and surgical treatment of an Illness or Injury;

D. such treatment is provided for compensation, and is under the supervision of Physicians, with continuous twenty-four (24) hour nursing services by Registered Nurses; and

E. it qualifies as a Hospital, a psychiatric Hospital, or a tuberculosis Hospital and is accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) and/or the American Osteopathic Association (AOA). It is not, other than incidentally, a place for rest, a place for the aged, a place for drug addicts, a place for alcoholics, a nursing home, or a place for schooling of its patients. A Hospital is not an institution which is run mainly as a rest, nursing or convalescent home or residential treatment center.

## ILLNESS

The term "Illness" means a bodily disorder, disease, physical sickness, mental infirmity, Functional Nervous Disorder or Pregnancy of a Covered Person. A recurrent Illness will be considered one Illness. Concurrent Illnesses will be considered one Illness unless the concurrent Illnesses are totally unrelated. All such disorders existing simultaneously which are due to the same or related causes shall be considered one Illness.

24

## INJURY
The term "Injury" means a condition caused by accidental means which results in damage to the Covered Person's body from an external force.

## IN-NETWORK
The term "In-Network" means providers who are part of the Plan's Preferred Provider network at the time such providers render services to Covered Persons that are Covered Expenses under this Plan. The Plan Administrator can provide a listing of providers who are considered to be In-Network for the purposes of this Plan.

## INPATIENT
The term "Inpatient" refers to the classification of a Covered Person when that person is admitted to a Hospital, Hospice or Skilled Nursing Facility for treatment and charges are made for Room and Board to the Covered Person as a result of such admission.

## INTENSIVE CARE UNIT
The term "Intensive Care Unit" means a section, ward or wing within the Hospital which is separated from other facilities, and:

A. is operated exclusively for the purpose of providing professional medical treatment for critically ill patients;

B. has special supplies and equipment necessary for such medical treatment available on a standby basis for immediate use; and

C. provides constant observation and treatment by Registered Nurses or other highly trained Hospital personnel.

## LEGAL GUARDIAN or LEGAL GUARDIANSHIP
The terms "Legal Guardian" or "Legal Guardianship" mean a person, or the status of a person and his or her ward, who has been appointed by a state court with specific jurisdiction over guardianships and estates, to have the care and management of a minor child. The legal guardian must have guardianship of the person of the minor child, and not merely the estate of such child. An order granting a person legal custody of a minor child, without the appointment of the person as the child's Legal Guardian, does not create a Legal Guardianship.

For purposes of the Plan, if a Participant has made application for Legal Guardianship through a state court with specific jurisdiction over guardianships, and the application is uncontested and subject only to the court's administrative waiting period, then the date the application is made shall be the date the Participant is eligible for Dependent Coverage with regards to the child in question.

## LIFETIME
The term "Lifetime" is a word used in the Plan in reference to benefit maximums and limitations. The term "Lifetime" means the total time period of a Covered Person's coverage under this Plan, regardless of the number of breaks in that coverage. Under no circumstances does the term "Lifetime" mean the duration of a Covered Person's life.

## MATERNITY SERVICES
The term "Maternity Services" means services related to a normal Pregnancy, the complications of Pregnancy, a miscarriage and therapeutic abortions. Specific limitations may apply to this benefit.

## MEDICAL CARE
The term "Medical Care" means professional services given by a Physician or other provider to treat an Injury, ailment, condition, disease, disorder or Illness, including medical advice, treatment, medical diagnosis and the taking of prescription drugs.

## MEDICALLY NECESSARY or MEDICAL NECESSITY
The terms "Medically Necessary" or "Medical Necessity" mean that a service, medicine or supply is necessary and appropriate for the diagnosis or active treatment of an Illness or Injury based on generally accepted current medical practice.

Park National Corporation Employee Health Benefit Plan Wellness Plan

To be Medically Necessary, Covered Expenses must:

  A.  be rendered in connection with an Injury or Illness;

  B.  be consistent with the diagnosis and treatment of your condition; and

  C.  be in accordance with the standards of good medical practice.

To be Medically Necessary, Covered Expenses must also be provided at the most appropriate level of care or in the most appropriate type of health care facility. Only your medical condition (not the financial status or family situation, the distance from a Facility or any other non-medical factor) is considered in determining which level of care or type of health care is appropriate. Medically Necessary is the criteria by which the Plan determines the necessity of medical service and treatment under this Plan.

A service, medicine or supply will not be considered Medically Necessary if:

  A.  it is provided only as a convenience to the Covered Person or provider;

  B.  it is not appropriate treatment for the Covered Person's diagnosis or symptoms;

  C.  it exceeds (in scope, duration or intensity) that level of care that is needed to provide safe, adequate and appropriate diagnosis or treatment;

  D.  it is part of a plan of treatment that is considered to be investigative, experimental or for research purposes in the diagnosis or treatment of an Illness or Injury. "Investigative, experimental or for research purposes" means services or supplies not recognized or proven to be effective treatment of an Illness or Injury in accordance with generally accepted medical practice, based on consultation with an appropriate source; or

  E.  it involves the use of a drug or substance not formally approved by the United States Food & Drug Administration, even if approval is not required.

The fact that any particular Physician may prescribe, order, recommend or approve a service or supply does not, of itself, make the service or supply Medically Necessary.

**MEDICARE**
The term "Medicare" means the programs established by Title I of Public Law 89-98, as amended entitled "Health Insurance for the Aged Act," and which includes parts A and B of Subchapter XVIII of the Social Security Act, as amended from time to time.

**MENTAL/NERVOUS ILLNESS OR DISORDER and FUNCTIONAL NERVOUS DISORDER**
The terms "Mental/Nervous Illness or Disorder" and "Functional Nervous Disorder" mean mental, psycho-neurotic or personality disorders.

**MINOR EMERGENCY MEDICAL CLINIC**
The term "Minor Emergency Medical Clinic" means a freestanding facility, regardless of its name, including an ambulatory surgical center, that is engaged primarily in providing minor emergency and episodic medical care to a Covered Person. A Physician, a Registered Nurse and a registered x-ray technician must be in attendance at all times that the clinic is open. The clinic's facilities must include x-ray and laboratory equipment and a life support system.

**MORBID OBESITY**
The term "Morbid Obesity" means that the Covered Person's body is at least one hundred (100) pounds over his or her ideal body weight and his or her body mass index (BMI) is at least forty (40). Morbid Obesity is considered by the medical profession to be a serious disease and is associated with a high incidence of medical complications and a seriously shortened life span. Ideal body weight, and the incidence of Morbid Obesity, will be determined in accordance with standard medical tables and height/weight charts.

**NAMED FIDUCIARY**
The term "Named Fiduciary" means the individual or entity which has the authority to control and manage the overall operation of the Plan.

**NEWBORN**

The term "Newborn" means an infant from the date of birth until the initial Hospital discharge.

## OCCUPATIONAL THERAPY

The term "Occupational Therapy" means treatment rendered on an Inpatient or Outpatient basis as a part of a physical medicine and rehabilitation program to improve functional impairments where the expectation exists that the therapy will result in practical improvement in the level of functioning within a reasonable period of time. No benefits are provided for diversion, recreational and vocational therapies (such as hobbies, arts & crafts).

## ORTHOTIC APPLIANCE

The term "Orthotic Appliance" means an external device intended to correct any defect in form or function of the human body.

## OUT-OF-NETWORK

The term "Out-of-Network" means providers who are not part of the Plan's Preferred Provider network at the time such providers render services to Covered Persons that are Covered Expenses under this Plan.

## OUT-OF-POCKET

The term "Out-of-Pocket" means the amount of Covered Expenses that are the responsibility of the Covered Person and that accumulate towards the Plan's Out-of-Pocket maximum, not including amounts for:

A. Copayments;

B. other items specifically excluded from the Out-of-Pocket maximum listed in Section 2.5;

C. expenses that are not covered under this Plan;

D. in excess of the Reasonable and Customary charge for a service or supply;

E. in excess of any maximum benefit listed in the Plan; or

F. attributable to any penalty.

## OUTPATIENT

The term "Outpatient" refers to the classification of a Covered Person when that Covered Person receives medical care, treatment, services or supplies at a clinic, a Physician's office, or at a Hospital, if not a registered bed patient at that Hospital, an Outpatient Psychiatric Facility or an Outpatient Alcoholism Treatment Facility.

## OUTPATIENT ALCOHOLISM TREATMENT FACILITY

The term "Outpatient Alcoholism Treatment Facility" means an institution which provides a program for diagnosis, evaluation and effective treatment of Alcoholism; provides detoxification services needed with its effective treatment program; provides infirmary-level medical services or arrangements at a Hospital in the area for any other medical services that may be required; is at all times supervised by a staff of Physicians; provides at all times skilled nursing care by licensed nurses who are directed by a full-time Registered Nurse; prepares and maintains a written plan of treatment for each patient based on medical, psychological and social needs which is supervised by a Physician; and meets pertinent licensing standards.

## OUTPATIENT PSYCHIATRIC FACILITY

The term "Outpatient Psychiatric Facility" means an administratively distinct governmental, public, private or independent unit, or part of such unit, which provides Outpatient mental health services and which provides for a psychiatrist, with regularly scheduled hours in the facility, who assumes the overall responsibility for coordinating the care of all patients.

## PARTICIPANT

The term "Participant" means a person who is directly employed and compensated for services by the Company, who meets the eligibility requirements and who is properly enrolled in the plan.

## PARTICIPANT CONTRIBUTION

Park National Corporation Employee Health Benefit Plan Wellness Plan

The term "Participant Contribution" means that amount which is due from an eligible employee in order for that employee to obtain Participant and/or Dependent coverage(s) under the Plan. The Company shall determine the amount of the Participant Contribution which may vary depending upon the type of the coverage an eligible employee desires to obtain. Eligible Participants will be advised of any required Participant Contributions at the time each applies for Participant and/or Dependent coverage. Participants in the Plan will be notified by the Plan Administrator prior to an increase in the required Participant Contribution amount. Participants in the Plan that are not required to make Participant Contributions at the time of enrollment will be notified by the Plan Administrator prior to the date a Participant Contribution requirement is made effective.

## PATIENT CARE SERVICES
The term "Patient Care Services" means healthcare items or services that are furnished to an individual enrolled in a Qualified Clinical Trial, which is consistent with the usual and customary standard of care for someone with the patient's diagnosis, is consistent with the study protocol for the clinical trial, and would be covered if the patient did not participate in the Qualified Clinical Trial.

## PHARMACY
The term "Pharmacy" means a facility which is a licensed establishment where prescription drugs are dispensed by a pharmacist under applicable state laws.

## PHYSICAL THERAPY
The term "Physical Therapy" means treatment by physical means including modalities such as whirlpool and diathermy; procedures such as massage, ultrasound and manipulation; and tests of measurement requirements to determine the need and progress of treatment. Such treatment must be given to relieve pain, restore maximum function, and to prevent disability following disease, Injury, or loss of body part. Treatment must be for acute conditions where rehabilitation potential exists and the skills of a Physician or other professional are required.

## PHYSICIAN
The term "Physician" means a legally licensed medical or dental doctor or surgeon, chiropractor, osteopath, chiropodist, podiatrist, optometrist, certified consulting psychologist or limited licensed psychologist, who, within the scope of his or her license, is permitted to perform services for which coverage is provided by this Plan.

## PLACED FOR ADOPTION OR PLACEMENT FOR ADOPTION
The terms "Placed For Adoption" or "Placement For Adoption" mean the assumption and retention by such Participant hereunder of a legal obligation for total or partial support of such child in anticipation of adoption of such child. The child's placement with such Participant terminates upon the termination of such legal obligation.

## PLAN
The term "Plan" means the sickness and accident plan, as described in and administered by the Park National Corporation Employee Health Benefit Plan.

## PLAN ADMINISTRATOR
The term "Plan Administrator" means the entity responsible for the day-to-day functions and management of the Plan. The Plan Administrator may employ persons or firms to process claims and perform other Plan related services. As of the Plan Effective Date, the Plan Administrator is Park National Corporation.

## PLAN EFFECTIVE DATE
The Plan Effective Date of this revision of this Plan is October 1, 2012, unless otherwise indicated. The Plan was originally effective on October 1, 1993.

## PLAN YEAR
The term "Plan Year" means a period of time used for certain reporting and disclosure requirements of the Plan. The Plan Year begins on October 1st and ends on September 30th of the following year.

28

## PRE-EXISTING CONDITION
The term "Pre-Existing Condition" means an injury or illness (not including Pregnancy) of a Covered Person for which the Covered Person has been under the care of a licensed Physician or has received any Medical Care or services, within a specified period.

Covered Persons under the age of nineteen (19) will not be considered to have a Pre-Existing Condition for the purposes of this Plan.

## PREFERRED PROVIDER
The term "Preferred Provider" means a health care professional, group of professionals or medical facilities, that have agreed to provide medical services to a group of individuals for an agreed upon fee. The Plan will specify which professionals and/or facilities have Preferred Provider status. A list of Preferred Providers for this Plan will be provided by the Plan Administrator.

For the purposes of the organ and tissue transplant benefits, Preferred Provider includes providers that are in this Plan's special transplant network. The specific amount of the benefits provided, and any limitations applied, will be determined based on the terms of the specific contract with this network.

## PREGNANCY
The term "Pregnancy" means that physical state which results in childbirth, abortion or miscarriage, and any medical complications arising out of or resulting from such state.

## PRIMARY CARE PHYSICIAN or PCP
The terms "Primary Care Physician" or "PCP" mean a Physician or nurse practitioner who provides both the first contact for a person with an undiagnosed health concern as well as continuing care of varied medical conditions, not limited by cause, organ system, or diagnosis. Primary Care Physicians include those trained and actively practicing in family practice, general practice, pediatrics, internal medicine or gynecology.

## PROSTHETIC DEVICE
The term "Prosthetic Device" means a device which:
- A. replaces all or part of a missing body organ and its adjoining tissue; or
- B. replaces all or part of the function of a permanently useless or malfunctioning body organ.

## PROTECTED HEALTH INFORMATION
The term "Protected Health Information" means Health Information that either identifies an individual, or for which there is a reasonable basis to believe can be used to identify an individual and which is one (1) of the following:
- A. transmitted by electronic media, including:
  1. the internet;
  2. an extranet;
  3. leased lines;
  4. dial-up lines;
  5. private networks; and
  6. those transmissions that are physically moved from one location to another using magnetic tape, disk, or compact disk media;
- B. maintained in any electronic media; or
- C. transmitted or maintained in any other form or medium.

## PSYCHIATRIC CARE
The term "Psychiatric Care" also known as psychoanalytic care, means treatment for a Mental/Nervous Illness or Disorder, a Functional Nervous Disorder, Alcoholism or Drug Addiction.

29

Park National Corporation Employee Health Benefit Plan Wellness Plan

## PSYCHOLOGIST
The term "Psychologist" means an individual holding the degree of Ph.D., licensed by the jurisdiction in which he or she practices and acting within the scope of his license.

## QUALIFIED CLINICAL TRIALS
The term "Qualified Clinical Trial" means a clinical trial that meets all the following conditions:

A. the clinical trial is intended to treat cancer in a patient who has been so diagnosed; and

B. the clinical trial has been peer reviewed and is approved by at least one (1) of the following:

   1. one (1) of the United States National Institutes of Health;

   2. a cooperative group or center of the National Institutes of Health;

   3. a qualified nongovernmental research entity identified in guidelines issued by the National Institutes of Health for center support grants;

   4. the United States Food and Drug Administration pursuant to an investigational new drug exemption;

   5. the United States Departments of Defense or Veterans Affairs; and

C. the facility and personnel conducting the clinical trial are capable of doing so by virtue of their experience and training and treat a sufficient volume of patients to maintain that expertise, and

D. the patient meets the patient selection criteria enunciated in the study protocol for participation in the clinical trial; and

E. the patient has provided informed consent for participation in the clinical trial in a manner that is consistent with current legal and ethical standards; and

F. the available clinical or pre-clinical data provide a reasonable expectation that the patient's participation in the clinical trial will provide a medical benefit that is commensurate with the risks of participation in the clinical trial; and

G. the clinical trial does not unjustifiably duplicate existing studies; and

H. the clinical trial must have a therapeutic intent and must, to some extent, assess the effect of the intervention on the patient.

## REASONABLE AND CUSTOMARY
The term "Reasonable and Customary" refers to the designation of a charge as being the usual charge made by a Physician or other provider of services and supplies, medication or equipment that does not exceed the general level of charges made by other providers rendering or furnishing such care or treatment within the same area. The term "area" in this definition means a county or such other area as is necessary to obtain a representative cross section of such charges. Due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual circumstances that require additional time, skill or expertise.

## REGISTERED NURSE
The term "Registered Nurse" means an individual who has received specialized nursing training, is authorized to use the designation of " R.N." and is duly licensed by the state or regulatory agency responsible for such licensing in the state in which the individual performs such nursing services.

## ROOM AND BOARD
The term "Room and Board" refers to all charges, by whatever name called, which are made by a Hospital, Hospice or Convalescent Nursing Facility as a condition of occupancy. Such charges do not include the professional services of Physicians or intensive nursing care by whatever name called.

## SEMI-PRIVATE
The term "Semi-Private" refers to a class of accommodations in a Hospital or Convalescent Nursing Facility in which at least two (2) patient beds are available per room.

## SERVICE IN THE UNIFORMED SERVICES
The term "Service in the Uniformed Services" means performance of duty in the Armed Forces or Uniformed Services for a period of five years or less, on a voluntary or involuntary basis, including active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty in the Armed Forces, the Army National Guard, Air National Guard, the commissioned corps of the Public Health Service, or any other category of persons designated by the President of the United States in time of war or emergency. Service in the Uniformed Services also includes a period for which an individual is absent from a position of employment for the purpose of an examination to determine the fitness of the person for duty in the Armed Forces or the commissioned corps of the Public Health Service.

## SKILLED NURSING FACILITY
The term "Skilled Nursing Facility" means a facility which mainly provides Inpatient skilled nursing and related services to patients requiring convalescent and rehabilitative care. Such care is given by, or under the supervision of, Physicians. A Skilled Nursing Facility is not, other than incidentally, one that provides minimal Custodial Care, ambulatory care, part-time care or that provides treatment for mental illness, alcoholism, drug abuse or pulmonary tuberculosis.

## SPECIAL CARE UNITS
The term "Special Care Units" means those Hospital units established to provide specialized care for a specific diagnosis and includes such units as alternative birthing centers, burn units, cardiac care and step-down units, psychiatric units, neo-natal intensive care units and those units established for the treatment of substance abuse.

## SPEECH THERAPY or SPEECH PATHOLOGY
The terms "Speech Therapy" or "Speech Pathology" mean a program of care which evaluates the patient's motor-speech skills, expressive and receptive language skills, writing and reading skills, and determines if the patient requires an extensive hearing evaluation by an audiologist. The therapist also evaluates the patient's cognitive functioning, as well as his or her social interaction skills such as the ability to maintain eye contact and initiate conversation. Therapy may also involve developing the patient's speech, listening and conversational skills, and higher-level cognitive skills such as understanding abstract thought, making decisions, sequencing, etc. Therapy may be considered medically appropriate even for patients who do not have apparent speech problems, but who do have deficits in higher-level language functioning as a result of trauma or identifiable organic disease process.

## SUMMARY HEALTH INFORMATION
The term "Summary Health Information" means information that may be individually identifiable Health Information that:

A. summarizes the claims history, claims expenses or type of claims experienced by Covered Persons under this Plan; and
B. from which the following information has been removed:
1. names;
2. geographic subdivisions smaller than the level of a five (5) digit zip code, including, but not limited to, street addresses;
3. all elements of dates (except year) for dates directly related to an individual, including, but not limited to, birth dates and dates of admission and discharge;
4. telephone numbers;
5. fax numbers;
6. electronic mail addresses;

31

Park National Corporation Employee Health Benefit Plan Wellness Plan

  7. social security numbers;
  8. medical record numbers;
  9. Plan identification numbers; or
  10. other identifiers as listed in 45 C.F.R. § 164.514(b)(2)(i).

## TERMINALLY ILL

The term "Terminally Ill" means that the patient is diagnosed by a Physician as having six (6) months or less to live.

## TOTAL DISABILITY or TOTALLY DISABLED

The terms "Total Disability" or "Totally Disabled" mean a physical state of a Covered Person resulting from an Illness or Injury which wholly prevents:

  A. a Participant from engaging in any and every business or occupation and from performing any and all work for compensation or profit; or

  B. a Dependent from performing the normal activities of a person of like age and sex in good health.

## USERRA

The term "USERRA" means the Uniformed Services Employment and Re-employment Rights Act of 1994, as amended.

## WELL CHILD CARE

The term "Well Child Care" means child health supervision services which cover the periodic review of a child's physical and emotional status. This periodic review must be in accordance with the recommendations of the American Academy of Pediatrics and include a history, complete physical examination, developmental assessment, anticipatory guidance, appropriate immunizations and laboratory tests.

## 3.2 DENTAL DEFINITIONS

### COURSE OF TREATMENT

The term "Course of Treatment" means a planned program to correct a diagnosed dental problem or disease. A Course of Treatment starts when the Dentist or Physician first treats the dental problem.

### COVERED DENTAL EXPENSE

The term "Covered Dental Expense" means the items of expense for which comprehensive dental expense benefits are considered under this Plan.

## 3.3 COMMON DENTAL TERMS

### ABUTMENT

A tooth or root that retains or supports a fixed bridge or a removable prosthesis.

### ACID ETCH

The etching of a tooth with a mild acid to aid in the retention of Composite filling material.

### ACRYLIC

Plastic material used in the fabrication of Dentures and Crowns and occasionally as a restorative filling material.

### AMALGAM

A metal alloy usually consisting of silver, tin, zinc and copper combined with liquid pure Mercury and used as restorative material in operative dentistry.

### ANESTHESIA

Local - The condition produced by the administration of specific agents to achieve the loss of pain sensation in a specific location or area of the body. General - The condition produced by the administration of specific agents to render the patient completely unconscious and without pain sensation.

32

## APPLIANCE
A device used to provide function, therapeutic (healing) effect, space maintenance, or as an application of force to teeth to provide movement or growth changes as in Orthodontics. **Fixed** - One that is attached to the teeth by cement or by adhesive materials and cannot be removed by the patient. **Removable** - One that can be taken in and out of the mouth by the patient. **Prosthetic** - Used to provide replacement for a missing tooth.

## BITEWING
A type of dental x-ray film that has a central tab or wing upon which the teeth close to hold the film in position. They are commonly called detecting x-rays because they show decay better than other x-rays.

## BRIDGEWORK or PROSTHETIC APPLIANCE
**Fixed** - Pontics or replacement teeth retained with Crowns or Inlays cemented to the natural teeth, which are used as Abutments. **Fixed, Removable** - One which the dentist can remove but the patient cannot. **Removable** - A partial Denture retained by attachments which permit removal of the Denture. Normally held by clasps.

## CARIES
A disease of progressive destruction of the teeth from bacterially produced acids on tooth surfaces.

## COMPOSITE
Tooth colored filling material primarily used in the anterior teeth.

## CROWN
A natural Crown is the portion of a tooth covered by enamel. An artificial Crown (cap) restores the anatomy, function and esthetics of the natural Crown.

## DENTAL HYGIENIST
A person who has been trained to clean teeth, and provide additional services and information on the prevention of oral disease.

## DENTURE
A device replacing missing teeth. The term usually refers to full or partial Dentures but it actually means any substitute for missing natural teeth.

## ENDODONTIC THERAPY
Treatment of diseases of the dental pulp and their sequelae.

## FLUORIDE
A solution of fluorine which is applied topically to the teeth for the purpose of preventing dental decay.

## IMPLANT
A device surgically inserted into or onto the jaw bone. It may support a Crown or Crowns, partial Denture, complete Denture or may be used as an Abutment for a fixed bridge.

## IMPRESSION
A negative reproduction of a given area. It is made in order to produce a positive form or cast of the recorded teeth and/or soft tissues of the mouth.

## INLAY
A Restoration usually of cast metal made to fit a prepared tooth cavity and then cemented into place.

## MALOCCLUSION
An abnormal contact and/or position of the opposing teeth when brought together.

## OCCLUSION
The contact relationship of the upper and lower teeth when they are brought together.

33

Park National Corporation Employee Health Benefit Plan Wellness Plan

**ONLAY**
A cast Restoration that covers the entire chewing surface of the tooth.

**ORTHODONTICS**
The branch of dentistry primarily concerned with the detection, prevention and correction of abnormalities in the positioning of the teeth in their relationship to the jaws.

**PALLIATIVE**
An alleviating measure. To relieve, but not cure.

**PARTIAL DENTURE**
A prosthesis replacing one or more, but less than all, of the natural teeth and associated structures; may be removable or fixed, one side or two sides.

**PEDODONTICS**
The specialty of children's dentistry.

**PERIODONTICS**
The science of examination, diagnosis, and treatment of diseases affecting the supporting structures of the teeth.

**PONTIC**
The part of a fixed bridge which is suspended between the Abutments and which replaces a missing tooth or teeth.

**PROPHYLAXIS**
The removal of tarter and stains from the teeth. The cleaning of the teeth by a dentist or Dental Hygienist.

**REBASE**
A process of refitting a Denture by the replacement of the entire Denture-base material without changing the occlusal relations of the teeth.

**RELINE**
To resurface the tissue-borne areas of a Denture with new material.

**RESTORATION**
A broad term applied to any Inlay, Crown, bridge, partial Dentures, or complete Denture that restores or replaces loss of tooth structure, teeth or oral tissue. The term applies to the end result of repairing and restoring or reforming the shape, form and function of part or all of a tooth or teeth.

**ROOT CANAL THERAPY**
The complete removal of the pulp tissues of a tooth, sterilization of the pulp chamber and root canals, and filling these spaces with a sealing material.

**SCALING**
The removal of calculus (tarter) and stains from teeth with special instructions.

**SEALANT**
A resinous agent applied to the grooves and pits of teeth to reduce decay.

**SILICATE**
A relatively hard and translucent restorative material that is used primarily in the anterior teeth.

**SPLINTING**
Stabilizing or immobilizing teeth to gain strength and/or facilitate healing.

**TOPICAL**
Painting the surface of teeth as in Fluoride treatment, or application of an anesthetic formula to the surface of the gum.

**VERTICAL DIMENSION**
The degree of jaw separation when the teeth are in contact.

 Park National Corporation Employee Health Benefit Plan Wellness Plan

## 3.4 VISION PLAN DEFINITIONS

### COSMETIC CONTACT LENSES
The term "Cosmetic Contact Lenses" means contact lenses selected for reasons other than the Covered Person's medical welfare or which are not considered Medically Necessary.

### MEDICALLY NECESSARY CONTACT LENSES
The term "Medically Necessary Contact Lenses" means contact lenses dispensed under the following circumstances:

  A. following cataract surgery (aphakia);

  B. when visual acuity cannot be corrected to 20/70 in the better eye, except through the use of contact lenses (not including conditions caused by corneal distortion);

  C. in cases of Anisometropia of 4.0 departure or more, providing visual acuity improves to 20/60 or better in the poorer eye; or

  D. Keratoconus (the narrowing of visual fields due to high minus or plus corrections is not considered an authorized condition).

### PARTICIPATING PROVIDER
The term "Participating Provider" means any vision care provider, including an optician, an Optometrist, or an ophthalmologist, who has entered into a contract with the Plan to provide vision services to Covered Persons. These providers are listed in the Provider Directory available through the Plan Administrator.

Park National Corporation Employee Health Benefit Plan Wellness Plan—————————————————

## ARTICLE IV
## CLAIM AND APPEAL PROCEDURES

### 4.1 INITIAL FILING OF CLAIMS

A claim for benefits should be filed within ninety (90) days after the occurrence or commencement of any loss covered by this Plan. Failure to give such notice and proof within the time required will neither invalidate nor reduce any claim if it is shown that written notice and proof are given no later than one (1) year after the claim is incurred, unless the Covered Person is legally incapacitated.

Upon termination of the Plan, final claims must be received within ninety (90) days of termination. In any of the events described above, notice and proof of claim will be determined at the discretion of the Plan Administrator, subject to the requirements listed below.

Claims should be submitted to the appropriate address listed on the Covered Person's identification card, and can be submitted either by the provider or the Covered Person. Such claim should be on any of the following appropriate forms (or their successor forms):

    A. CMS 1500;

    B. UB-04 or UB-92;

    C. HCFA-1450 or CMS 1450;

    D. NCPDP Form 1983; or

    E. J512 claim forms.

A claim can be submitted by the provider in electronic format if the provider submits it in accordance with the electronic transaction requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and subsequent laws.

Such claims must use the most current CPT code in effect as published by the American Medical Association, the most current ICD-9 code in effect as published by the US Department of Health and Human Services, the most current dental code in effect as published by the American Dental Association in the *Code for Dental Procedures or Nomenclature* or the most current HCPCS code in effect, as published by US Department of Health and Human Services, Centers for Medicare and Medicaid Services.

If the Plan is not the primary carrier for a Covered Person who has, or had at the time the claim was incurred, more than one health plan that would provide benefits for the services or supplies for which the claim is being made, including, but not limited to Medicare, copies of the explanations of benefit payment from all carriers who would pay benefits before the Plan should be submitted with the claim. For more information regarding which plan pays first, see Section 14.1, or contact the Benefit Manager.

### 4.2 REQUESTS FOR ADDITIONAL INFORMATION

If the claim is not submitted in accordance with the procedures listed in Section 4.1, the Participant or Covered Person will be notified of the claim deficiencies, and requested to refile it in the proper format.

If the Plan Administrator or the Benefit Manager needs more information to process the claim, a letter will be sent to the Participant, the Covered Person, the provider or other parties requesting additional information. In some situations, information is needed on a periodic basis, including:

    A. information regarding other coverage. This may include providing copies of medical child support orders for children of divorced parents; and

    B. verification of handicapped status for overage Dependent children.

Other information may be requested on a case-by-case basis, including information pertaining to accident details or potential third-party liability.

36

The requested information must be provided within forty-five (45) days of the date the Participant or Covered Person receives notice of the required additional information. If the information is not received within this time period, the claim will be denied for failure to provide the needed information.

## 4.3 APPEALS OF ADVERSE BENEFIT DETERMINATIONS

The Covered Person can appeal a decision by the Plan that coverage for a service or supply is denied or reduced under the Plan, or any other eligibility issue, including a rescission of coverage for an individual, provided such appeal is made in writing within one hundred eighty (180) days of the Covered Person or Participant's receipt of the explanation of benefit payment, the precertification letter reflecting the denial or reduction or any other notification made by the Plan of an adverse decision involving the individual. Any individual other than the Covered Person who wishes to submit an appeal on the Covered Person's behalf (other than a parent or Legal Guardian filing an appeal for a minor child) must be designated by the Covered Person, in a writing signed by the Covered Person, as his or her authorized representative specifically for the purpose of the appeal. An assignment of benefits is not sufficient to designate another person as an "authorized representative" for the purpose of an appeal. These appeal procedures shall not apply to any contractual dispute between a provider and the Plan as to amounts due the provider, rather than the Covered Person, under the terms of any agreement between the provider and the Plan that does not affect the amount payable by the Covered Person (i.e. balance billing issues in a Preferred Provider contract).

A request for review in which the Covered Person is requesting an expedited appeal of a pre-service claim as an "urgent care" case, as described in Section 6.1, can be submitted either orally or in writing and can be submitted by a provider with knowledge of the Covered Person's condition without prior designation by the Covered Person. If a course of treatment has been previously approved by the Plan to be provided over a period of time or for a number of treatments, no reduction or termination of coverage for such treatment (other than termination of the individual's coverage under this Plan) will be made without allowing the Covered Person sufficient advance notification and the opportunity to appeal this termination or reduction.

The appeal request should be addressed as follows (unless the adverse benefit determination notification indicates otherwise):

Plan Administrator
Park National Corporation Employee Health Benefit Plan – Wellness Plan
c/o Benefit Manager
Medical Benefits Administrators, Inc.
P.O. Box 1099
Newark, Ohio 43058-1099

The writing should clearly be identified as an appeal, and include the name of the Plan, the Covered Person whose claims are the subject of the appeal, the Participant's identification number, and the identity of the specific treatment, service or supply for which coverage was denied or limited under the Plan.

The Covered Person should submit with the appeal written comments, documents, records and other information relating to the claim for benefits, even if such information was not submitted as part of the initial claim or request for preauthorization or precertification. The Covered Person will also have the right to present testimony as part of the appeal.

The Covered Person has the right to request information from the Plan Administrator as part of the appeals process, as described in Section 4.4.

Appeals submitted under this Plan will be adjudicated in a manner designed to ensure the independence and impartiality of the person making the decision. The Plan Administrator has the sole authority for the final decision on all Plan matters, including appeals.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## 4.4 ACCESS TO DOCUMENTS, RECORDS OR OTHER INFORMATION

A Covered Person is entitled to examine the claim file, and present testimony as part of the internal claims and review process. He or she can also receive, upon request and free of charge, reasonable access to documents, records and other information relevant to his or her claim for benefits, including any new or additional information received during the appeals process, and the rationale behind the Plan's adverse decision. Such information will be provided within sufficient time to respond prior to the final decision of the appeal by the Plan Administrator. Such information is considered to be relevant if it:

A. was relied upon by the Plan Administrator in making the benefit determination;

B. was submitted, considered or generated in the course of making the benefit determination;

C. demonstrates compliance with the administrative processes required by ERISA;

D. constitutes a statement of policy or guidance with respect to the Plan concerning the denial of a treatment option or benefit; or

E. involves the identity of medical or vocational experts whose advice was obtained in connection with the claim.

In addition, if an adverse benefit determination is based upon the Medical Necessity or Experimental nature of the service or supply, the Covered Person can request an explanation of the scientific or clinical judgment of the determination, free of charge.

## 4.5 EXTERNAL REVIEW RIGHTS AND PROCEDURES

If the Covered Person is not satisfied with the Plan Administrator's decision on his or her appeal of a medical issue, including issues involving Medical Necessity or the Experimental status of a medical procedure, or any coverage rescission, he or she may file a request for an external review with the Plan Administrator at the address listed above for submitting an appeal. The request must be filed within four (4) months after the date of receipt of the Plan Administrator's determination on his or her appeal. If there is no corresponding date four (4) months after the date of receipt of notice, then the request must be filed by the first (1st) day of the fifth (5th) month following the receipt of the Plan's determination on his or her appeal. The Covered Person can make a request for an expedited review of a precertification denial if the timeframe for completion of a standard review would seriously jeopardize the life or health of the Covered Person, or would jeopardize his or her ability to regain maximum function, or if the determination concerns an admission, availability of care, continued stay or health care item or service for which the Covered Person received Emergency services, but has not been discharged from a facility. A standard external review would generally be completed within fifty (50) days of the Plan's receipt of the request, while an expedited review must be completed by the independent review organization (IRO) within seventy-two (72) hours of the IRO's receipt of such request. The Plan Administrator will review the request and determine whether or not the request meets the criteria for external review or an expedited review, including whether or not the person was a Covered Person under the Plan at the time the claim arose, whether the person has exhausted the Plan's appeal process, and whether the sufficient information has been submitted to process the external review. A notification will be issued by the Plan Administrator regarding the Covered Person's incomplete request for an external review. If the request is incomplete, the Covered Person will be given additional time to complete the external review request. Once a determination has been made by the Plan Administrator that the request qualifies for external review, it will be forwarded by the Plan Administrator to a qualified IRO. The IRO will notify the Covered Person if the request is accepted for review, and, if a standard review, that he or she can submit additional information that is relevant to the request within ten (10) days of the notification. The IRO may also request additional information from the Covered Person and/or the Plan. Additional information provided by the Covered Person will be provided to the Plan Administrator. If, based on this additional information, the Plan Administrator determines that the initial determination should be reversed, and that coverage should be provided under the Plan, all parties will be notified, and the external review will be closed. Otherwise, after the IRO has completed the review, the



Covered Person and the Plan Administrator will be notified of the IRO's determination. If the IRO determines that coverage under the Plan should have been provided, the Plan will promptly pay any additional benefits deemed due on the Covered Person's behalf. However, either the Plan or the Covered Person has the right to appeal the decision, or utilize any other remedy available under any applicable state or federal law, if either disagrees with the decision of the IRO.

## 4.6 ADDITIONAL APPEAL RIGHTS

If, after the Covered Person has exhausted all appeal and review rights listed above, he or she is still not satisfied with the disposition of the claim, such Covered Person has the right to bring an action under section 502(a) of the Employee Retirement Income Security Act (ERISA).

No action at law or in equity shall be brought to recover benefits under the Plan prior to the exhaustion of all claims and appeals procedures described in this Article, nor shall such action be brought at all unless brought within three (3) years from the expiration of the time within which proof is required by the Plan.

## 4.7 EXAMINATION

The Plan Administrator shall have the right and opportunity to have the Covered Person examined whose injury or illness is the basis of a claim hereunder when and as often as it may reasonably require during the pending claim. The Plan Administrator shall also have the right and opportunity to have an autopsy performed in case of death, where it is not forbidden by law.

## 4.8 PLAN ADMINISTRATOR DISCRETION

Nothing in this Plan precludes the Plan Administrator from exercising full discretionary authority and responsibility with respect to all aspects of Plan administration and interpretation. The Plan Administrator shall have all powers necessary to carry out the purposes of the Plan, including supplying any omissions in accordance with the intent of the Plan and deciding all questions concerning eligibility for participation in the Plan and concerning the amount of benefits payable to a Covered Person.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE V
## COVERAGE AND ELIGIBILITY

### 5.1 COVERAGE UNDER THIS PLAN

Coverage provided under the Plan for a Participant shall be in accordance with the Participant Eligibility, Participant Effective Date and Participant Termination provisions included herein.

Should a Participant's coverage be continued during approved leave of absence, subject to the provisions of this Article V, the amount of his coverage shall be the amount for which he or she was covered on his last day of Active Work.

The eligibility provisions of this Article V are effective for medical, dental and vision coverage under the Plan.

### 5.2 EMPLOYEE ELIGIBILITY

Employees of the Employer who meet the conditions of one of the following classes shall be deemed eligible for coverage as a Participant under the Plan:

A. An employee who is employed by the Employer on a full-time basis for at least thirty seven and one half (37.5) hours per week, provided the employee has satisfied a waiting period consisting of thirty (30) days of Active Work. If an employee is employed by the Employer for any or all of this thirty (30) day period prior to his or her entry into Service in the Uniformed Services, this period of previous employment shall be credited towards the partial or full satisfaction of any waiting period imposed under this Plan if the employee is re-employed by the Employer at the expiration of the term of Service in the Uniformed Services; or

B. An employee who is employed by the Employer on a permanent, part-time basis for at least 1,000 hours per year and has satisfied a waiting period of one (1) year, commencing with his or her date of hire. If an employee is employed by the Employer for any or all of this waiting period prior to his or her entry into Service in the Uniformed Services, this period of previous employment shall be credited towards the partial or full satisfaction of any waiting period imposed under this Plan if the employee is re-employed by the Employer at the expiration of the term of Service in the Uniformed Services, provided such employee applies for reemployment within the applicable time frame listed in the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as described in Section 5.17.

Participants must agree to any applicable Participant Contribution for such coverage, if any such contribution is required.

### 5.3 DEPENDENT COVERAGE

A Participant eligible to elect Dependent coverage shall be any Participant whose Dependents meet the definition of a Dependent, set forth in Section 3.1 of the Plan. A Participant must make written request for Dependent coverage and agree to any applicable Participant Contribution for such Dependent coverage. Each Participant will become eligible to elect Dependent coverage on the latest of the following:

A. The date he or she becomes eligible for Participant coverage; or

B. The date on which he or she first acquires a Dependent.

If both the husband and wife are employed by the Company, and both are eligible to elect Dependent coverage, either the husband or wife, but not both, may elect Dependent coverage for the eligible Dependents.

### 5.4 PARTICIPANT EFFECTIVE DATE

Each eligible employee who makes written request for Participant coverage hereunder, on a form approved by the Plan Administrator, subject to the provisions of this section and to the Pre-Existing Condition clause of this Plan, and who agrees to the applicable Participant

40

Contribution for such coverage shall become effective on the date he or she becomes eligible, provided the written application for such coverage is made prior to the date he or she becomes eligible for such coverage.

Any eligible person who makes an application for Participant coverage other than as described above, or as described in Section 5.8, shall become effective for Participant coverage on the first of the month following the date the written application for coverage is approved by the Plan Administrator. Such person shall also be subject to an additional Pre-Existing Conditions limitation period as described in Section 9.2.

## 5.5 DEPENDENT EFFECTIVE DATE

Each Participant who makes written request for Dependent Coverage hereunder, on a form approved by the Plan Administrator, subject to the provisions of this section and to the Pre-Existing Conditions clause of this Plan, and who agrees to the applicable Participant Contribution for such coverage, shall become eligible for Dependent Coverage on the following effective dates:

A.  if the Participant makes written request for Dependent Coverage on or before the first day on which he or she is eligible for Dependent Coverage, his Dependent(s) shall become covered on the date the Participant becomes eligible for such Dependent coverage;

B.  if the Participant makes written request for Dependent Coverage within thirty (30) days after the first day on which he or she is eligible for Dependent Coverage, his Dependent(s) shall become covered on the date the application for Dependent Coverage is approved by the Plan Administrator; or

C.  any Participant who makes an application for Dependent Coverage other than as described in A. or B. above, or as described in Section 5.8, shall become effective for Dependent Coverage on the date the written application for coverage is approved by the Plan Administrator. Any Dependent enrolled under these conditions shall also be subject to an additional Pre-Existing Conditions limitation period as described in Section 9.2.

## 5.6 DENTAL COVERAGE WAITING PERIOD

A Participant or Dependent eligible for coverage as described above is also eligible for dental coverages under the Plan. However, if the Participant or Dependent is considered a late enrollee because he or she did not apply for coverage under the Plan within thirty (30) days of the date of eligibility or during a special enrollment period listed in Section 5.8, then, upon becoming a Participant or Dependent under the Plan, only Class I (Preventive and Diagnostic) benefits will be available during the first full year of dental coverage. The year is calculated from the Participant or Dependent's effective date of coverage under the Plan. After this dental coverage waiting period, full dental benefits will be available under the Plan.

## 5.7 NEWBORN CHILDREN

If the Participant already has Dependent Coverage in effect as of the date of birth, the Participant's Newborn will be automatically covered. If the Participant does not have Dependent Coverage in effect as of the date of birth, application must be made for the Newborn within thirty (30) days after the birth. In either case, coverage will be effective on the date of birth. If application for coverage for the Newborn is not made within this thirty (30) day period, coverage for the Dependent child will become effective on the date the written application for coverage is approved by the Plan Administrator and the Dependent child may be subject to an additional Pre-Existing Conditions limitation period as described in Article IX, unless he or she qualifies for a special enrollment period as described in Section 5.8.

## 5.8 SPECIAL ENROLLMENT PERIODS

An eligible person for whom written application for coverage is submitted under any of the circumstances listed below will be eligible for coverage on the date specified below, and will

41

not be subject to the additional Pre-Existing Conditions limitation period applicable to late enrollees:

A. within thirty (30) days of the date of a Dependent child's birth. The eligible employee, the Newborn and the Dependent spouse are entitled to this special enrollment period. Coverage shall become effective at the moment of the Dependent child's birth;

B. within thirty (30) days after the adoption of a Dependent child, or the Placement for Adoption with the employee of such a child. The eligible employee, the newly acquired Dependent child and the Dependent spouse are entitled to this special enrollment period. Coverage shall become effective on the date of the adoption or Placement for Adoption;

C. within thirty (30) days of the date of the eligible employee's marriage. The eligible employee, the new Dependent spouse and any Dependent children who become eligible because of the marriage are entitled to this special enrollment period. Coverage shall become effective on the date of the marriage;

D. within thirty (30) days of the entry of an order requiring the employee to provide medical coverage for a Dependent child. Only the Dependent child or children who are the subject of the court order are entitled to this special enrollment period. Coverage shall become effective on the date of entry of the court order;

E. within thirty (30) days of the date the employee becomes the Legal Guardian of a Dependent child. Only the newly acquired Dependent child shall be entitled this special enrollment period. Coverage shall become effective on the date of the court order appointing the employee Legal Guardianship of the child;

F. within sixty (60) days of the date an eligible employee and/or his or her Dependent(s) first become eligible for coverage under a state Medicaid or Children's Health Insurance Program (CHIP), or, if covered, becomes ineligible for coverage through such programs. The eligible employee and any eligible Family member who becomes eligible or loses eligibility through such programs, are eligible to enroll during this special enrollment period. Coverage shall become effective on the date of eligibility/ineligibility; or

G. within thirty (30) days of the date coverage under another group health plan or health insurance coverage was lost due to one of the following events, if:

   1. the reason the eligible employee and/or Dependent did not enroll for coverage under this Plan when initially eligible was the existence of the other coverage:

   2. the eligible employee/Participant stated in writing, at the time the person was initially eligible for coverage under this Plan, that the reason the person was not enrolled in this Plan was the existence of the other coverage; and

   3. the person lost coverage under the other plan due to one (1) of the following:

      a) if covered under a COBRA continuation provision, the exhaustion of COBRA continuation coverage under the other plan;

      b) the loss of eligibility for coverage due to legal separation, divorce, death, termination of employment, or reduction in hours of employment;

      c) if the person is a child for whom another parent has been ordered by a court to provide coverage, and such parent terminates or otherwise fails to provide such coverage. An attorney's confirmation of this fact must be provided to the Plan Administrator;

      d) the overall lifetime maximum benefit under the other coverage has been exhausted so that no further expenses will be payable under such coverage; or

      e) the termination of employer contributions towards such other coverage.

Coverage for which a person is eligible under this provision shall become effective on the day following the date coverage under the prior plan is terminated.

42

Any Family member who is not specifically listed above as entitled to a special enrollment period who is enrolled in coverage at the time another Family member is enrolled pursuant to a special enrollment period will not become effective until the date the written application for coverage is approved by the Plan Administrator, and will be subject to an additional Pre-Existing Conditions limitation period as described in Article IX.

## 5.9  OPEN ENROLLMENT

The Plan will have an open enrollment period on a date specified by the Human Resources department, during which Plan participants may submit an application to switch Plan options. Coverage for any participant choosing to switch Plan options shall become effective within thirty (30) days of the date the application was accepted by the Plan.

## 5.10  PARTICIPANT TERMINATION

Participant coverage terminates immediately upon the earliest of the following dates:

    A.  the date of termination of the Participant's employment;

    B.  the date the Participant ceases to meet the eligibility requirements listed in Section 5.2;

    C.  the date the Participant fails to make any required Participant Contribution for coverage;

    D.  the date the Plan is terminated or, with respect to any benefit of the Plan, the date of termination of such benefit; or

    E.  the date that is authorized by the Plan Administrator after the beginning of an approved leave of absence or temporary layoff, as described in Section 5.14 below.

Coverage will terminate as described above, unless COBRA continuation coverage is elected, and covered at the Participant's own cost, as described in Article VII.  This Plan will also comply with the continuation provisions contained in the Uniformed Services Employment and Re-Employment Rights Act of 1994 (USERRA) as they apply to Participants entering Service in the Uniformed Services.

## 5.11  DEPENDENT TERMINATION

Dependent Coverage terminates immediately upon the earliest of the following dates:

    A.  the date the Dependent ceases to be a Dependent as defined in the Plan;

    B.  the date of termination of the Participant's coverage under the Plan, unless the employee is deceased as described in Section 5.15;

    C.  the date the Participant fails to make any required Participant Contribution for Dependent Coverage.

## 5.12  EXTENDED MEDICAL BENEFITS PROVISION

If a Participant or Dependent is hospitalized at the time coverage is terminated, benefits will be paid for Covered Expenses incurred in connection with that one confinement.  However, no benefits will be paid after the earliest of:

    A.  the date maximum benefits are paid under the Plan;

    B.  twelve (12) months from the date coverage for the Covered Person terminates; or

    C.  the date the Covered Person is released from the Hospital.

If coverage terminates while the Covered Person is Totally Disabled by an Injury or Illness for which Covered Expenses are being incurred, benefits will be paid for Covered Expenses incurred after that date for that Injury or Illness.

However, no benefits will be paid after the earliest of:

    A.  the date Total Disability ceases;

    B.  the date the Covered Person becomes covered under a similar group plan;

    C.  the date the maximum benefits are paid for that Injury or Illness; or

    D.  twelve (12) months from the date coverage for the Covered Person terminates.

## 5.13    EXTENDED DENTAL BENEFITS PROVISION

If a Covered Person is incurring Covered Dental Expenses and his or her coverage terminates, benefits will be considered as follows:

A.  Charges for Dentures will be considered if:

   1.  the Impression was made prior to the date coverage terminates;

   2.  the Denture was ordered prior to the date coverage terminates; and

   3.  the Denture is placed in the mouth within sixty (60) days from the date coverage terminates.

B.  Charges for fixed Bridgework, Crowns and Inlays will be considered if:

   1.  the tooth or teeth were prepared prior to the date coverage terminates;

   2.  the Impression was taken prior to the date coverage terminates;

   3.  the Bridgework, Crown or Inlay was ordered prior to the date coverage terminates; and

   4.  the work is seated in the mouth within sixty (60) days from the date coverage terminates.

C.  Charges for endodontic treatment, to include Root Canal Therapy will be considered if:

   1.  the tooth was opened prior to the date coverage terminates; and

   2.  the procedure is completed within sixty (60) days from the date coverage terminates.

## 5.14    SPECIAL TERMINATION PROVISIONS

If a Participant's coverage ends due to lay-off or leave of absence, the Participant will be eligible immediately upon return to Active Work.  In order for this to occur, the Participant must be in an eligible class and return to work within twelve (12) months after the date his or her coverage ends.

A Participant's medical and dental coverage will remain in effect, while the Participant is on Long Term Disability Leave (LTDL), for up to twelve (12) months if the Participant continues to pay the Participant Contribution.  At the end of the twelve (12) month period, the Participant will be eligible to continue coverage under COBRA (see Article VII), if the Participant elects COBRA and agrees to pay the COBRA premium.

After six (6) months on LTDL, the Participant may become eligible to apply for Social Security disability benefits if the Participant's Physician certifies that the Participant will be Totally Disabled for at least a twelve (12) month period.  After two (2) years of Social Security disability, the Participant should become eligible for Medicare coverage.

## 5.15    CONTINUATION OF MEDICAL AND DENTAL COVERAGE FOR DEPENDENTS OF DECEASED ACTIVE EMPLOYEES

If a Participant dies while covered under this Plan, all medical and dental care coverage may be continued on the Participant's covered Dependents, until the sooner of:

A.  one (1) year from the date of the Participant's death;

B.  the date the Participant's Dependent becomes covered for other group medical care benefits or Medicare;

C.  the date the Participant's Dependent ceases to be otherwise eligible as a Dependent;

D.  the date the Plan terminates;

E.  the date ending the period for which the last Participant Contribution is made, if a Participant Contribution is required toward the cost of the Plan.

Coverage may be continued under this Section 5.15 or under any provision requiring the Company to offer continuation of coverage under any federal law.  Coverage may not be continued under both provisions.  Any rights that a Dependent may be entitled to under COBRA will begin after the period listed above.

## 5.16   FAMILY AND MEDICAL LEAVE PROVISIONS

This Plan intends to comply with the Family and Medical Leave Act of 1993 (FMLA) regarding the maintenance of health benefits during any period that an eligible employee takes a leave of absence in accordance with the Company's FMLA policy. In such situations, FMLA allows an eligible employee to maintain group health plan coverage at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave. Employee eligibility requirements, the obligations of the Company and employees concerning conditions of leave and notification and reporting requirements are specified in the Company's FMLA policy. Any Plan provision which conflicts with FMLA is superseded by FMLA to the extent such provision conflicts with FMLA. Questions regarding rights and/or obligations under FMLA should be directed to a Company representative or the Plan Administrator.

## 5.17   USERRA RIGHTS

A Participant under this Plan who is no longer Actively At Work due to his or her Service in the Uniformed Services can elect, under the provisions of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) to continue Participant and Dependent Coverage under this Plan for up to twenty-four (24) months after such coverage would otherwise have terminated. This period of continued coverage shall run concurrently with any continuation for which any Covered Person would have been entitled to under the provisions of COBRA due to the Participant's termination or reduction in hours of employment. If the Service in the Uniformed Services is for thirty-one (31) days or more, the Participant Contribution for such coverage will be one hundred two percent (102%) of the full cost of the coverage, without any Employer contribution. If the Service in the Uniformed Service is less than thirty-one (31) days, the Participant Contribution shall be the same as would have applied if the Participant were still an active employee.

If coverage is not continued as described above, or the Service in the Uniformed Services exceeds the time limit listed above, upon release from his or her Service in the Uniformed Services, coverage will be reinstated in the Plan effective the date the employee is reemployed by the Employer, provided the employees reapplies for employment or reports back to work within the following applicable time:

A. if the period of service was less than thirty-one (31) days, the beginning of the next regularly scheduled work period on the first full day after release from Service in the Uniformed Services, taking into account safe travel home plus an eight (8) hour rest period;

B. if the period of service was more than thirty (30) days, but less than one hundred eighty-one (181) days, within fourteen (14) days of release from Service in the Uniformed Services; and

C. if the period of service was more than one hundred eighty (180) days, but less than five (5) years, within ninety (90) days of the release from Service in the Uniformed Services.

This period may be extended for up to two (2) years from the date the Service in the Uniformed Services ended, under the provisions of USERRA, if the person is unable to return to active employment due to a disability incurred while performing Service in the Uniformed Services.

The Plan Administrator reserves the right to request verification of any Service in the Uniformed Services, including copies of military orders or the applicable Form DD 214.

For information regarding the application of the Pre-Existing Conditions limitations of this Plan once coverage has been reinstated as described above, see Section 9.3.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE VI
## COST MANAGEMENT SERVICES

### 6.1 UTILIZATION REVIEW

The Plan has a utilization pre-certification provision. Pre-admission certification must be obtained for every Inpatient admission to a covered facility, including, but not limited to Hospitals, Skilled Nursing Facilities, Hospices, psychiatric treatment facilities and Alcoholism and Substance Abuse treatment facilities, except Emergency admissions, Urgent Care admissions, and minimum stays following childbirth. ("Emergency" and "Urgent Care" admissions are defined below). A "minimum stay following childbirth" is either:

    A. a stay following a normal vaginal delivery which is forty-eight (48) hours or less; or

    B. a stay following a cesarean section which is ninety-six (96) hours or less.

If a Hospital stay following childbirth will exceed the limitations listed above, the Pre-Certification Center must be notified as soon as the Covered Person and/or her provider have determined that the hospitalization will exceed such limitations, but not later than the end of the applicable period listed above.

Pre-admission certification may be made through the Utilization Review Service. The telephone number for the Utilization Review Service is listed in Article I, Plan Information, and on the medical identification card. A Covered Person may inform his or her health care provider that he or she participates in a program, which has pre-admission certification provisions. In order to obtain pre-admission certification:

    A. contact the Utilization Review Service and report the upcoming Hospital or other facility stay no later than forty-eight (48) hours prior to the admission;

    B. notice can be given by:

        1. the Hospital or other covered facility;

        2. the Covered Person's admitting Physician;

        3. the Covered Person;

        4. a family member of the Covered Person; or

        5. a representative of the Employer; and

    C. the Utilization Review Service must be provided with information necessary to make a decision as to the Medical Necessity of the admission.

The Covered Person is ultimately responsible for making sure the notification is made.

The utilization review service may request additional information that is necessary to make the determination from the Covered Person or a provider. In the case of an urgent care request, such information must be provided within forty-eight (48) hours of the request. A decision will be made within seventy-two (72) hours of the Plan's receipt of all information necessary to make the determination. If the request does not involve urgent care, the information must be provided within forty-five (45) days of such request. An "urgent care" request is one that, if a determination is not made on an expedited basis, the life or health of the Covered Person, or the ability of the Covered Person to regain maximum function, could be seriously jeopardized, or, in the opinion of the attending Physician, the Covered Person would be subjected to severe pain that cannot be adequately managed without the care or treatment that is the subject of the request.

When pre-admission certification is provided to the Covered Person, a certain number of Inpatient days for the stay will be assigned. If the Utilization Review Service is not informed of the Covered Person's admission, there will be a penalty. Covered Expenses for Hospital or other facility services the Utilization Review Service, as the entity designated by the Plan Administrator to handle Utilization Review, would have approved for payment under the Pre-Admission Certification program will be reduced by two hundred ($200.00) dollars. (This reduction is the penalty.) The penalty will be figured before the Deductible and coinsurance are applied. The penalty is not considered an eligible expense. Charges for Inpatient days

46

which are determined by the Utilization Review Service to not be Medically Necessary are not covered under this Plan.

The Plan Administrator shall have full discretionary authority and responsibility with respect to all aspects of Plan administration, including utilization review. If a Utilization Review Service is designated by the Plan Administrator, the Utilization Review Service agrees to recognize the ultimate authority of the Plan Administrator.

## 6.2 CONTINUED STAY REVIEW

During a Covered Person's Inpatient stay, a Continued Stay Review will be conducted. This review applies to all Hospital admissions. The purpose of Continued Stay Review is to:

  A. provide the Utilization Review Service with an update as to the Covered Person's condition and/or progress; and, if necessary,

  B. enable the Utilization Review Service to re-evaluate the Medical Necessity of a continued Inpatient stay.

The Utilization Review Service has the right to initiate a Continued Stay Review for any Inpatient admission. The Utilization Review Service will always confirm the outcome of the Continued Stay Review by telephone or in writing. This notification will go to the Covered Person and/or the Covered Person's Physician. The notification always includes any newly authorized length of stay.

If a stay is longer than the specified number of Inpatient days that the Utilization Review Service considers to be Medically Necessary, Covered Expenses will be denied for any charges incurred for the days not Medically Necessary. This will occur if the Utilization Review Service is informed that the confinement is no longer Medically Necessary and the Covered Person knowingly chooses to remain in the Hospital or other facility.

If the Covered Person's Physician and the Covered Person disagree with the findings of the Utilization Review Service, the Covered Person may file an appeal, in accordance with the procedures described in Article IV, with the Plan Administrator. The Plan Administrator has final authority over any such decisions.

## 6.3 WEEKEND ADMISSION REVIEW

All weekend (Friday, Saturday, and Sunday) Hospital Admissions will be reviewed. Coverage is limited to Medically Necessary Admissions.

## 6.4 EMERGENCY AND URGENT CARE REVIEW

If a Covered Person is admitted to a Hospital or other covered facility for an Emergency or Urgent Care admission, notice of the admission may be provided to the Utilization Review Service no later than forty-eight (48) hours after the admission or as soon as reasonably possible. Notice may be given to the Utilization Review Service by:

  A. the Hospital or other facility;

  B. the Covered Person's admitting Physician;

  C. the Covered Person;

  D. a family member of the Covered Person; or

  E. a representative of the Employer.

The Utilization Review Service will review the case with the Covered Person's Physician to determine if a continued Inpatient stay is Medically Necessary. If the Utilization Review Service is not informed of the Covered Person's admission, there will be a penalty. Covered Expenses for Hospital or other facility services the Utilization Review Service, as the entity designated by the Plan Administrator to handle Utilization Review, would have approved for payment under the Pre-Admission Certification program will be reduced by two hundred ($200.00) dollars. (This reduction is the penalty.) The penalty will be figured before the Deductible and coinsurance are applied. The penalty is not considered an eligible expense.

Park National Corporation Employee Health Benefit Plan Wellness Plan

Charges for Inpatient days which are determined by the Utilization Review Service to not be Medically Necessary are not covered under this Plan.

An Emergency admission is an admission to a Hospital through the emergency room of that facility for treatment of a life threatening illness or injury. An Urgent Care admission is an unplanned admission or an admission scheduled less than 48 hours prior, for a condition requiring prompt medical attention. An Urgent Care admission is not an admission through the emergency room.

## 6.5 DISCHARGE PLANNING

Review for Discharge Planning occurs during Hospitalization Review. The purpose is to:

- A. identify patients requiring extended care following discharge; and
- B. determine the most appropriate setting for continued care.

## 6.6 PRE-CERTIFICATION OF OUTPATIENT SURGERY

The Plan requires that all Outpatient surgery be pre-approved by the Utilization Review Service prior to any Outpatient surgical procedure. As soon as possible after a Covered Person's Physician has determined that surgery is necessary, but not later than forty-eight (48) hours prior to the surgery, the Covered Person's Physician, the Covered Person or the Hospital or facility where the procedure is to be performed must notify the Utilization Review Service and submit any documentation required by such service. The Covered Person is ultimately responsible for making sure this notification is made. The Utilization Review Service reserves the right to request additional records or information from the Covered Person, the Covered Person's Physician, Hospital or other facility or provider that is related to the surgical procedure.

If prior approval is not obtained for any of these services, charges for such surgery will be subject to a penalty. Expenses for surgical services or supplies which would have been approved for payment by the Utilization Review Service, as the entity designated by the Plan Administrator to handle utilization review, will be by two hundred ($200.00) dollars. The penalty will be figured before the Deductible and coinsurance are applied. This penalty will not be considered as a Covered Expense under any other Plan provision, and shall not apply towards any Deductible, coinsurance limit, or maximum benefit limit. In addition to this penalty, any services and supplies which would not have been approved for payment will not be covered under this Plan.

## 6.7 VOLUNTARY SECOND SURGICAL OPINION

A second surgical opinion is suggested for the following procedures:

- A. Hysterectomy;
- B. Gallbladder Surgery;
- C. Prostate surgery;
- D. Heart Surgery;
- E. Spinal Surgery;
- F. Bone & Joint Surgery; and
- G. Transplant Surgery.

The Plan will pay for 100% of the second surgical opinion charges if obtained prior to beginning any of the above surgical procedures. Covered charges include Physician's examinations and diagnostic testing. Charges for the surgery itself are not included in this benefit.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE VII
## CONTINUATION COVERAGE UNDER COBRA

### 7.1 RIGHT TO ELECT CONTINUATION COVERAGE

If a Qualified Beneficiary loses coverage under the Group Health Plan due to a Qualifying Event, he or she may elect to continue coverage under the Group Health Plan in accordance with COBRA upon payment of the monthly contribution specified from time to time by the Company. A Qualified Beneficiary must elect the coverage within the sixty (60) day period beginning on the later of:

    A. the date of the qualifying event; or

    B. the date the Qualified Beneficiary was notified of his or her right to continue coverage.

If a Covered Employee has been determined to be an Eligible TAA Recipient or an Eligible Alternative TAA Recipient, as those terms are defined in the Trade Act of 2002, and his or her petition for certification for trade adjustment assistance (TAA) under the Trade Act of 1974 was submitted on or after November 4, 2002, such Covered Employee and his or her Dependents who lost coverage under the Plan due to a job loss which qualified such employee for TAA assistance shall be entitled to a second sixty (60) day election period (if continuation coverage was not elected during the period described above) beginning on the first day of the month in which the Covered Employee is determined to be TAA eligible, provided such election is made within six (6) months of the original loss of coverage. If elected under this provision, coverage shall begin on the first day of the month in which the Covered Employee is determined to be TAA eligible. The period of time between the original termination of coverage, and the coverage which is elected pursuant to this paragraph will not be regarded for purposes of determining whether the individual has experienced more than a sixty-two (62) day break in coverage under the Creditable Coverage provisions of this Plan.

### 7.2 NOTIFICATION OF QUALIFYING EVENT

If the Qualifying Event is divorce, legal separation or a Dependent child's ineligibility under a Group Health Plan, the Qualified Beneficiary must notify the Company, in writing addressed to the Plan Administrator, of the Qualifying Event within sixty (60) days of the event, or sixty (60) days of the date the Qualified Beneficiary would lose coverage because of the event, in order for coverage to continue. Appropriate documentation of the Qualifying Event must be submitted, including, as appropriate, final divorce and legal separation decrees issued and properly signed by the court. In addition, a Totally Disabled Qualified Beneficiary must notify the Company in accordance with the section below entitled "Total Disability" in order for coverage to continue.

### 7.3 LENGTH OF CONTINUATION COVERAGE

A Qualified Beneficiary who loses coverage due to the reduction in hours or termination of employment (other than for gross misconduct) of a Covered Employee may continue coverage under the Group Health Plan for:

    A. up to eighteen (18) months from the date of the Qualifying Event; or

    B. a Qualified Beneficiary who loses coverage due to the Covered Employee's death, divorce, or Medicare eligibility and Dependent children who have become ineligible for coverage may continue under the Group Health Plan for up to thirty-six (36) months from the date of the Qualifying Event; or

    C. if a Qualified Beneficiary is Totally Disabled at any time during the first sixty (60) days of Continuation Coverage, he or she may continue coverage for up to twenty-nine (29) months from the date of the Qualifying Event, provided the Qualified Beneficiary notifies the Company of the determination of his or her Total Disability under the Social Security Act:

        1. before the end of the original eighteen (18) month continuation period; and

49

Park National Corporation Employee Health Benefit Plan Wellness Plan

    2. within sixty (60) days following the date of such determination.

A Qualified Beneficiary who loses coverage due to the Covered Employee's death, divorce or entitlement to Medicare, and Dependent children who have become ineligible for coverage may continue under the Group Health Plan for up to thirty-six (36) months from the date of the Qualifying Event.

## 7.4 TERMINATION OF CONTINUATION OF COVERAGE

Continuation Coverage will automatically end earlier than the applicable 18 or 36-month period for a Qualified Beneficiary if:

    A. the required monthly contribution for coverage is not received by the Company within thirty (30) days following the date it is due;

    B. the Qualified Beneficiary becomes covered under any other Group Health Plan containing an exclusion or limitation relating to a Pre-Existing Condition, and such exclusion or limitation applies to the Qualified Beneficiary, then the Qualified Beneficiary shall be eligible for Continuation Coverage as long as the exclusion or limitation relating to the Pre-Existing Condition applies to the Qualified Beneficiary;

    C. for Totally Disabled Qualified Beneficiaries continuing coverage for up to twenty-nine (29) months, the last day of the month coincident with or following thirty (30) days from the date of a final determination by the Social Security Administration that such Qualified Beneficiary is no longer Totally Disabled;

    D. the Qualified Beneficiary becomes entitled to Medicare benefits; or

    E. the Company ceases to offer any Group Health Plans.

## 7.5 MULTIPLE QUALIFYING EVENTS

If a Qualified Beneficiary is continuing coverage due to a Qualifying Event for which the maximum Continuation Coverage is 18 months, and a second Qualifying Event occurs during the 18-month period, the Qualified Beneficiary may elect, in accordance with the section entitled "Right to Elect Continuation Coverage," to continue coverage under the Group Health Plan for up to 36 months from the date of the first Qualifying Event.

## 7.6 TOTAL DISABILITY

In the case of a Qualified Beneficiary who is determined under Title II or XVI of the Social Security Act (hereinafter the "Act") to have been Totally Disabled at the time of a Qualifying Event or at any time during the first sixty (60) days of the Qualified Beneficiary's Continuation Coverage (if the Qualifying Event is termination of employment or reduction in hours), that Qualified Beneficiary may continue coverage (including coverage for Dependents who were covered under the Continuation Coverage) for a total of twenty-nine (29) months as long as the Qualified Beneficiary notifies the Employer, in writing addressed to the Plan Administrator:

    A. prior to the end of eighteen (18) months of Continuation Coverage that he or she was disabled as of the date of the Qualifying Event; and

    B. within sixty (60) days of the determination of Total Disability under the Act.

A copy of the determination letter from Social Security must be submitted with the notification.

The Employer will charge the Qualified Beneficiary an increased contribution for Continuation Coverage extended beyond eighteen (18) months pursuant to this Section.

If during the period of extended coverage for Total Disability (Continuation Coverage months 19-29) a Qualified Beneficiary is determined to be no longer Totally Disabled under the Act:

    A. the Qualified Beneficiary shall notify the Employer of this determination within thirty (30) days; and

    B. Continuation Coverage shall terminate the last day of the month following thirty (30) days from the date of the final determination under the Act that the Qualified Beneficiary is no longer Totally Disabled.

50

## 7.7 CARRYOVER OF DEDUCTIBLES AND PLAN MAXIMUMS

If Continuation Coverage under the Group Health Plan is elected by a Qualified Beneficiary under COBRA, expenses already credited to the Plan's applicable Deductible and co-payment features for the year will be carried forward into the Continuation Coverage elected for that year.

Similarly, amounts applied toward any maximum payments under the Plan will also be carried forward into the Continuation Coverage. Coverage will not be continued for any benefits for which Plan maximums have been reached.

## 7.8 PAYMENTS OF PREMIUM

The Group Health Plan will determine the amount of premium to be charged for Continuation Coverage for any period, which will be a reasonable estimate of the cost of providing coverage for such period for similarly situated individuals, determined on an actuarial basis and considering such factors as the Secretary of Labor may prescribe.

A. The Group Health Plan may require a Qualified Beneficiary to pay a contribution for coverage that does not exceed one hundred two percent (102%) of the applicable premium for that period.

B. For Qualified Beneficiaries whose coverage is continued pursuant to the Section entitled "Total Disability" of this provision, the Group Health Plan may require the Qualified Beneficiary to pay a contribution for coverage that does not exceed one hundred fifty percent (150%) of the applicable premium for continuation coverage months 19-29.

C. Contributions for coverage may, at the election of the payer, be paid in monthly installments.

D. If Continuation Coverage is elected, the first monthly contribution for coverage must be made within forty-five (45) days of the date of election.

Without further notice from the Company, the Qualified Beneficiary must pay the monthly contribution for coverage by the first day of the month for which coverage is to be effective. If payment is not received by the Company within thirty (30) days of the payment's due date, Continuation Coverage will terminate in accordance with the section entitled "Termination of Continuation Coverage," Subsection A.

No claim will be payable under this provision for any period for which the contribution for coverage is not received from or on behalf of the Qualified Beneficiary.

## 7.9 DEFINITIONS

For purposes of this Article VII, unless specifically stated otherwise, the following definitions apply:

A. "COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

B. "Code" means the Internal Revenue Code of 1986, as amended.

C. "Company" means the Employer, as defined in Article III.

D. "Continuation Coverage" means the Group Health Plan coverage elected by a Qualified Beneficiary under COBRA.

E. "Covered Employee" has the same meaning as that term is defined in COBRA and the regulations thereunder.

F. "Group Health Plan" has the same meaning as that term is defined in COBRA and the regulations thereunder.

G. "Qualified Beneficiary" means:

1. a Covered Employee whose employment terminates (other than for gross misconduct) or whose hours are reduced, rendering the Covered Employee ineligible for coverage under the Plan; and

Park National Corporation Employee Health Benefit Plan Wellness Plan

2. a covered spouse or Dependent who becomes eligible for coverage under the Plan due to a Qualifying Event, as defined below. Qualified Beneficiary also includes any child who is born to or Placed for Adoption with the Covered Employee during the period of Continuation Coverage.

H. "Qualifying Event" means the following events that, but for Continuation Coverage, would result in the loss of coverage of a Qualified Beneficiary:

1. termination of a Covered Employee's employment (other than gross misconduct) or reduction in the Covered Employee's hours of employment;

2. the death of the Covered Employee;

3. the divorce or legal separation of the Covered Employee from his or her spouse;

4. the Covered Employee becoming entitled to Medicare coverage; or

5. a child ceasing to be eligible as a Dependent child under the terms of the Group Health Plan.

I. "Totally Disabled" or "Total Disability" means totally disabled as determined under Title II or Title XVI of the Social Security Act.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE VIII

## MEDICAL AND DENTAL EXPENSE BENEFITS

### 8.1 COINSURANCE PERCENTAGE AND DEDUCTIBLE

Each Covered Person must pay the Deductible amount stated in Section 2.3 before the Plan begins paying benefits. The Plan will pay the Coinsurance percentage stated in Section 2.4 or 2.5 to the limits shown.

The Deductible applies to Covered Expenses for each Calendar Year. The Deductible will be applied as explained in the definition of Deductible set forth in Article III.

In addition, each Covered Person must pay the Deductible amount stated in the Schedule of Dental Benefits before the Plan begins paying benefits. The Plan will then pay the coinsurance percentage shown for the benefits available in each Dental Class. The dental Deductible applies to Covered Expenses for each Calendar Year for Class II and Class III benefit types combined. Amounts paid to satisfy the dental Deductible during the last three (3) months of a Calendar Year will be applied toward the satisfaction of that individual's dental Deductible for the next Calendar Year on claims incurred once this Plan is in effect.

### 8.2 ALLOCATION AND APPORTIONMENT OF BENEFITS

The Plan Administrator may allocate the Deductible amount to any eligible charges and apportion the benefits to the Covered Person and any assignees. Such allocation and apportionment shall be conclusive and shall be binding upon the Covered Person and all assignees.

### 8.3 DENTAL PLAN BENEFIT MAXIMUM

The Dental Plan Benefit Maximum is shown in Section 2.13. It applies separately to Covered Dental Expenses for each Covered Person. Any benefits paid on behalf of a Covered Person whether covered as a Participant or a Dependent will be combined for purposes of determining the Dental Plan Benefit Maximum.

Park National Corporation Employee Health Benefit Plan Wellness Plan——————————————

## ARTICLE IX

## DESCRIPTION OF BENEFITS

### 9.1 MEDICAL BENEFITS - COVERED EXPENSES

In order to be eligible for benefits under this section of the Plan, a Covered Person must have enrolled for medical coverage under this Plan. In addition, charges actually incurred by a Covered Person must be administered or ordered by a Physician and be Medically Necessary for the diagnosis and treatment of an Illness or Injury unless otherwise specifically covered.

Covered charges include the following:

A. Charges made by a Hospital for:

    1. Inpatient treatment:

        a) average Semi-Private Room and Board. For confinement in a private room, the Covered Charges are limited to the Hospital's average Semi-Private room rate unless it is Medically Necessary that the Covered Person occupy a private room for isolation and no isolation facilities are available;

        b) intensive care, including isolation if Medically Necessary, while confined in an Intensive Care Unit;

        c) general nursing services; and

        d) Medically Necessary Inpatient services and supplies furnished by the Hospital and required for treatment, other than Room and Board, except: (1) those supplied by outside agencies; and (2) supplies not used while confined in the Hospital as a bed-patient.

    2. Outpatient treatment:

        a) Charges by a Hospital for Hospital services and supplies required for treatment which are provided by the Hospital and used while at the Hospital as an Outpatient:

            i. for a surgical operation; or

            ii. for treatment of Injury within one (1) week after the accident.

All Inpatient Confinements and Outpatient Surgery must be pre-certified as described in Article VI.

B. Benefits will be paid for Hospice care expense charges incurred by a Covered Person. The charges must be made by a Hospice under a Hospice Care Plan for a Terminally Ill patient. Hospice care expense benefits will be paid in addition to benefits that are provided under the medical care benefits of the Plan. Payment will be made as provided in the Section 2.7 and Section 2.8 for the items of expense listed below:

Items of expense considered in determining benefit payments include:

    1. charges for Room and Board and general nursing care for a Terminally Ill patient in a freestanding Hospice;

    2. charges for emotional support services provided in counseling sessions to assist in coping with the death of the Terminally Ill patient, as follows:

        a) with the patient; or

        b) with the Family, to the limitations shown in Section 2.8; and

    3. charges for homemaker services.

Emotional support services consist of a program for meeting the special physical, psychological, spiritual and social needs of a person.

All Inpatient Hospice Confinements must be pre-certified as described in Article VI.

The following charges for Hospice services are not covered under this Plan:

    1. services not included in the Hospice Care Plan;

54

Park National Corporation Employee Health Benefit Plan Wellness Plan

    2.  services not made or ordered by the attending Physician;

    3.  services for which coverage is provided under the other provisions of the Plan;

    4.  charges for an Injury arising from any employment;

    5.  charges for an Illness covered by Workers' Compensation; or

    6.  services or supplies for which the Covered Person is not required to pay.

C.  Charges for Convalescent Facility care if the Covered Person is admitted to the Convalescent Facility immediately following a confinement in a Hospital of at least five (5) consecutive days. Coverage is provided, to the limitations set forth in Section 2.8, for:

    1.  average Semi-Private Room and Board. For confinement in a private room, the Covered Charges are limited to the Convalescent Facility's average Semi-Private room rate unless it is Medically Necessary that the Covered Person occupy a private room for isolation and no isolation facilities are available;

    2.  general nursing care;

    3.  medical services and supplies, required for treatment, which are provided by the Convalescent Facility and used while the Covered Person is in the Convalescent Facility as a bed-patient.

D.  Charges made by local professional ambulance services to and from the nearest Hospital or Convalescent Facility where care and treatment can be given.

E.  Charges made for Inpatient and Outpatient kidney dialysis.

F.  Services of a Physician for medical care including office visits, home visits, Hospital Inpatient care, Hospital Outpatient visits and examinations, facility and institution visits, and clinic care. Physician's fees for the following are also covered:

    1.  surgical operations;

    2.  assisting at surgery, when required for medical reasons; and

    3.  administration of general anesthetic other than by the operating surgeon.

G.  Charges for hyperalimentation or total parenteral nutrition (TPN) for Covered Persons recovering from or preparing for surgery.

H.  Charges for skilled private duty nursing care, for medical treatment of an Injury or Illness, by:

    1.  a graduate registered nurse; or

    2.  a licensed vocational or licensed practical nurse.

I.  Charges for the initial purchase of artificial limbs or eyes if the loss of the limb or eye is the result of:

    1.  an accidental Injury. Such purchase will only be covered if made during the first year following the Injury, unless the purchase is delayed beyond that date due to the medical or physical condition of the Covered Person; or

    2.  a surgical operation. Such purchase will only be covered if made during the first year following the surgery, unless the purchase is delayed beyond that date due to the medical or physical condition of the Covered Person.

Any purchase of an artificial limb or eye more than one (1) year after the Injury or surgery, as applicable, must be pre-approved by the Plan Administrator.

J.  Charges for Orthotic Appliances and medical supplies made and used only for treatment of Injury or Illness, including, but not limited to:

    1.  rigid back or leg braces;

Park National Corporation Employee Health Benefit Plan Wellness Plan

    2. splints or casts for treatment of any part of the legs, arms, shoulders, hips or back;

    3. specialized surgical dressing or bandages;

    4. crutches;

    5. trusses;

    6. insulin and other supplies used only for care or monitoring of diabetic patients; and

    7. colostomy sets.

K. Charges for the rental of breast feeding equipment if obtained from a Preferred Provider only. The purchase of such equipment will be a Covered Expense if less costly than that of the rental.

L. Rental fees, not exceeding the purchase price, for:

    1. hospital bed or manually operated wheelchair;

    2. iron lung;

    3. kidney dialysis equipment; or

    4. other Durable Medical Equipment made and used only for treatment of Injury or Illness. (Durable Medical Equipment replacements are allowed only if the cost to repair it is more than the cost of a new piece of equipment. All replacements are subject to pre-authorization. Durable Medical Equipment repairs are allowed only if necessary due to growth only. Durable Medical Equipment repairs are not covered if due to wear and tear. All repairs are subject to pre-authorization.)

M. Charges by licensed medical personnel, operating within the scope of their license, for:

    1. diagnostic x-ray and laboratory services required for the investigation of specific symptoms and/or complaints, unless specifically covered and/or limited under another subsection of this covered services provision;

    2. physiotherapy, unless specifically covered and/or limited under another subsection of this covered services provision;

    3. Speech Therapy or Speech Pathology, subject to the limitations listed in Section 2.8; or

    4. use of x-ray, radium and other radioactive substances for treatment.

N. Charges for oxygen and rental of equipment to administer oxygen.

O. Charges for the first pair of eyeglasses or contact lenses prescribed due to a cataract operation performed while covered under the Plan.

P. Charges for transportation within the United States or Canada by railroad or schedule commercial airline to, but not from, a Hospital equipped to furnish special treatment for the Injury or Illness.

Q. Charges for Home Health Care made by a Home Health Care Agency for care in accordance with a Home Health Care Plan. Benefits will be paid for the items of expense listed below.

Items of expense in determining benefit payments include:

    1. charges for part-time nursing care, not to exceed six (6) hours per visit, by or under the supervision of a registered nurse;

    2. charges for part-time nursing care by a licensed practical nurse if a registered nurse is not available;

    3. charges for part-time home health aide services to care for the patient; and

    4. charges for physical, occupational or speech therapy provided by the Home Health Care Agency.

Benefits will also be paid for charges for the following items which would have been covered under the Plan if the Covered Person had remained in the Hospital:

1. medical supplies;
2. drugs and medicines prescribed by a Physician; and
3. laboratory services by or on behalf of a Hospital.

Benefits will not be paid for charges for:

1. services not included in the Home Health Care Plan; or
2. transportation.

R. Charges for the following routine wellness services:

1. the following services provided by a Preferred Provider:

   a) evidence-based preventive services with an A or B recommendation from the U.S. Preventive Services Task Force;

   b) immunizations recommended by the Advisory Committee on Immunization Practices; and

   c) guidelines supported by the Health Resources and Services Administration (applicable to children and women).

   See www.healthcare.gov/center/regulations/prevention/recommendations.html for a current listing of the above services;

2. routine prostate examinations;

3. other preventive services provided by non-Preferred Providers, including:

   a) x-rays, laboratory expenses, and immunizations in connection with a routine physical examination for a Participant or a Dependent age two (2) years or older, not to exceed the limitations set forth in Section 2.8. Camera pills will be covered in the place of a traditional colonoscopy, with an approved letter of Medical Necessity. CT scans (aka virtual colonoscopies) are not a Covered Expense under this Plan when performed in the place of a traditional colonoscopy;

   b) one (1) screening mammography for female Covered Persons 35 to 40 years of age;

   c) one (1) annual mammography for female Covered Persons 40 years of age or older, to the limitations set forth in Section 2.8;

   d) one (1) annual PAP smear from the attainment of age 18, unless such examination is needed more frequently based on the recommendation of a Physician; and

   e) preventative and primary care services for a Dependent child, prior to the attainment of age two (2), for:

      i. the initial Hospital examination; and

      ii. well-child care visits to a Physician for routine examinations, including screening and early detection services and routine and necessary immunizations.

S. For a well Newborn in the Hospital following birth, Covered Expenses also include nursery charges, Physician's charges for the initial examination, and routine circumcisions. Physician's charges for obstetrical service are paid on the same basis as for an Illness, including the mother's prenatal care. Maternity services are provided for normal pregnancy, complications of pregnancy, miscarriage and therapeutic abortion. Benefits are provided for a Pregnancy of a Dependent child, however, no benefits are provided for the Dependent's Newborn unless and until the Participant grandparent becomes the Legal Guardian for that child.

57

Group health plans and health insurance issuers may not, under Federal law, restrict benefits for any Hospital length of stay in connection with childbirth for the mother or Newborn child to less than forty-eight (48) hours following a vaginal delivery, or less than ninety-six (96) hours following a cesarean section. However, Federal law generally does not prohibit the mother's or Newborn's attending provider, after consulting with the mother, from discharging the mother or her Newborn earlier than forty-eight (48) hours (or ninety-six (96) hours as applicable). In any case, plans and issuers may not, under Federal law, require that a provider obtain authorization from the Plan or the insurance issuer for prescribing a length of stay not in excess of forty-eight (48) hours (or ninety-six (96) hours).

T.  Charges for Outpatient non-surgical spinal manipulation services, correcting by manual or mechanical means the structural imbalance or subluxation to remove nerve interference from or related to distortion, misalignment or subluxation of or in the vertebral column are covered to the limitations set forth in Section 2.8. Manipulations whether performed in conjunction with an examination and billed as an office visit will be counted toward any maximum specified. Both diagnosis and treatment services are covered, but not supplies or appliances.

U.  Charges for the Outpatient treatment and diagnostic services, but not supplies or appliance, rendered or prescribed by a Physician for non-surgical temporomandibular joint dysfunction services, are covered to the limitations set forth in Section 2.8. When such care is received as an Inpatient in a Hospital, the Physician's charges shall be covered as described in item "F" above and will be subject to the applicable limitations of Section 2.8.

V.  Charges for Outpatient treatment and diagnostic services by a Physician, for:

1.  nervous, emotional or mental disorders;

2.  Substance Abuse or Alcoholism or dependency;

3.  biofeedback, regardless of diagnosis.

In addition, Hospital charges for Inpatient treatment and diagnostic services and convulsive therapy are covered to the applicable limitations set forth in Section 2.8.

W.  Charges for allergy testing.

X.  Charges for occupational and physical therapy, both Inpatient and Outpatient.

Y.  Charges for treatment or diagnostic services by a Physician, to the limitations set forth in Section 2.8, for:

1.  weak, strained or flat feet or instability or imbalance of the feet;

2.  any tarsalgia, metatarsalgia, or bunion, other than operations involving the exposure of bones, tendons or ligaments (covered elsewhere under this Plan); or

3.  toe nails (other than the removal of nail matrix or root) or the removal by cutting or any other method of superficial lesions of the feet including corns, calluses and hyperkeratosis.

Z.  Charges for massage therapy when performed by a physical therapist or chiropractor.

AA. Charges for elective sterilization.

AB. Charges for cardiac rehabilitation.

AC. Charges for dental procedures or oral surgery in connection with any of the following:

1.  due to the repair of an injury to the jaw, sound natural teeth or face which are required as a result of an accident; and

2.  extraction of impacted teeth.

AD. Charges for Medically Necessary human organ and tissue transplants are covered under the Plan, subject to the limitations set forth in this provision. Transplantation of non-human or artificial organs which is not considered as Experimental or Investigative is also covered under this Plan. All organ and tissue transplants must be pre-certified by the Utilization Review Service as described in Article VI. Covered Expenses include the following:

1. All Medically Necessary expenses related to the organ or tissue transplant, including, but not limited to, services and supplies which are otherwise listed as Covered Expenses under this Plan;

2. Expenses related to the acquisition of organs and tissue for transplantation. Acquisition means the acquisition, preparation, transportation and storage of an organ or tissue; and

3. Expenses incurred by a human organ or tissue donor who is a Covered Person under this Plan for Medically Necessary services and supplies which are otherwise covered under this Plan and are related to an organ or tissue transplant to a recipient who is also a Covered Person under this Plan will be covered as expenses of the donor. No other charges related to the donation of organs or tissue, including donor charges when the recipient is a Covered Person under this Plan and the donor is not, or when the donor is a Covered Person under this Plan and the recipient is not, will be considered as Covered Expenses under this Plan.

No coverage will be provided for any expenses for any transplant considered Experimental or Investigative.

AE. Charges for wigs that are necessary due to hair loss due to Illness.

AF. Charges for Medically Necessary injections provided for pain management. After the initial injection, all claims for pain injections will be reviewed by the Plan for appropriateness and Medical Necessity, and coverage for additional injections may be denied if the Plan's criteria is not met. The Plan Administrator may request additional information from the provider to make this determination.

AG. Charges for FDA approved female contraceptives, including injections, implants, intrauterine devices (IUD), and medical services in connection with such contraceptives if performed by a Preferred Provider. Oral contraceptives are covered only under the prescription drug card program.

## 9.2 PRE-EXISTING CONDITIONS EXCLUSION

The Pre-Existing Conditions limitations described herein shall not apply to any individual who is less than nineteen (19) years of age at the time he or she becomes a Covered Person under this Plan. If any such limitation applied to any individual prior to October 1, 2010 who is still under age nineteen (19) on such date, such limitations will no longer apply to any services or supplies received on or after such date.

A Pre-Existing Condition is an Illness or Injury, not including Pregnancy, for which a Covered Person, during the six (6) month period immediately prior to his or her "eligibility date" under this Plan, was under the care of a Physician or received Medical Care or services.

Unless the provisions of Section 9.3 or Section 9.4 apply, expenses for such a condition will not be covered until the Covered Person has been continuously covered under the Plan:

A. for a period of three (3) months following his or her effective date of coverage under this Plan, if no Medical Care or services is received for the Pre-Existing Condition during that time;

B. for a period of twelve (12) months following either his or her "eligibility date" if enrolled when initially eligible or during a special enrollment period as described in Section 5.8; or

    C. for a period of eighteen (18) months following his or her "eligibility date", if the Covered Person was not enrolled when initially eligible, or during a special enrollment period which was applicable to such person as described in Section 5.8.

For the purposes of this section a Covered Person's "eligibility date" is the earliest of the following:

    A. the date the Covered Person became covered under this Plan;

    B. if enrolled when the Participant was initially eligible for coverage under this Plan, the date the Participant first began a waiting period before coverage under this Plan became effective, as described in Section 5.2; or

    C. if enrolled other than when the Participant was initially eligible for coverage under this Plan, the date the written application for coverage was approved by the Plan Administrator.

## 9.3 EXCEPTION TO THE PRE-EXISTING CONDITIONS EXCLUSION

If a Participant and his or her eligible Dependents, whose coverage under this Plan was terminated because the Participant was not Actively At Work due to his or her Service in one of the Uniformed Services, are re-enrolled in the Plan after the period of service is completed, the Pre-Existing Condition limitation as described above shall only apply to the following (unless the Creditable Coverage provisions shown in Section 9.4 apply):

    A. an Illness or Injury which has been determined by the Secretary of Veterans Affairs to have been incurred in, or aggravated during, Service in the Uniformed Services; or

    B. an Illness or Injury for which coverage was excluded or limited for the Covered Person by this Plan on the date the coverage was terminated due to the Participant's Service in the Uniformed Services. In no event shall the total period for which coverage of any Illness or Injury is limited or excluded both before and after the Participant's period of Service in the Uniformed Services exceed the applicable period described in the Pre-Existing Condition limitations section above.

## 9.4 CREDITABLE COVERAGE

Credit shall be applied towards the twelve (12) or eighteen (18) month, as applicable, Pre-Existing Conditions limitation period outlined above in Section 9.2 for any time during which the Covered Person was covered under Creditable Coverage, as defined in Article III.

Types of coverage which can be used as Creditable Coverage include, but are not limited to, the following:

    A. a group health plan;

    B. group or individual insurance coverage;

    C. Medicare or Medicaid;

    D. CHAMPUS or other military coverage; or

    E. a state health risks benefits pool.

Certain plans or coverage offering only limited benefits may not qualify as Creditable Coverage.

A Covered Person under this Plan, has the following rights and responsibilities in relation to Creditable Coverage:

    A. to provide documentation of the amount of time under which he or she was previously covered under other coverage, or of any time the person was subject to a waiting period under a prior plan. This documentation could include the following:

        1. a certificate of Creditable Coverage provided by the prior employer or plan. If coverage was terminated after July 1, 1996, an individual has the right under federal law to request such documentation from the prior employer or the insurance

carrier providing the coverage. If a Covered Person has difficulty obtaining such a certificate, he or she should contact the Plan Administrator for assistance; and

2. any other documentation of participation in other coverage or time credited towards waiting periods of other plans. This documentation includes, but is not limited to, pay stubs indicating deductions for health coverage or documenting employment status, plan booklets or certificates listing eligibility requirements for coverage with accompanying documentation that such requirements were met, or other correspondence between the individual and the other coverage which clearly demonstrates that coverage was in effect during the time in question;

B. to have the Plan review such documentation and to notify the Covered Person if her or she has any Pre-Existing Conditions limitations period left to fulfill after being credited with all Creditable Coverage; and

C. to receive credit, as described above, towards any Pre-Existing Conditions limitations period which would otherwise be imposed under this Plan, for the time period when the Covered Person was covered under Creditable Coverage; and

D. upon termination of any person's coverage under this Plan, a certificate of Creditable Coverage will be provided within a reasonable time by the Plan Administrator. If a Covered Person terminates under conditions where the Plan may not be aware of the termination, such as a Dependent child who no longer meets the full time student requirements, or a Covered Person does not receive his or her certification for any reason, please contact the Plan Administrator and they will provide it.

Park National Corporation Employee Health Benefit Plan Wellness Plan————————————

## ARTICLE X

## OTHER BENEFITS

### 10.1 COMMON ACCIDENT BENEFIT

If two (2) or more Family members are injured in the same accident, those Injured must only satisfy one individual Deductible among them for Covered Expenses relating to that accident. This special feature applies to Covered Expenses each Calendar Year under the Plan for the same accident.

### 10.2 SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM

The Plan has a prescription drug card program that covers prescriptions dispensed through a participating pharmacy. The Plan Administrator will provide a listing of the pharmacies that are participating in this program. The Plan will cover up to a maximum of a thirty-four (34) day or one-hundred (100) metric quantity, whichever is greater, per prescription. Certain exclusions and limitations apply to the prescription drug card program. These are described in Section 10.3 of the Plan.

### 10.3 COVERED EXPENSES AND LIMITATIONS UNDER THE PRESCRIPTION DRUG CARD PROGRAM

Prescriptions covered under the prescription drug card program described in Section 2.9 and Section 10.2 include the following:

A. federal legend drugs. A prescription legend drug is any medicinal substance which is required to bear the label, "Caution: Federal law prohibits dispensing without a prescription";

B. compounded medications. A compounded medication is a pharmacist's mixed-to-order medication which contains at least one eligible medicinal substance, a federal legend drug;

C. injectable insulin (A non-legend product.) If both insulin and syringes are dispensed, a separate Copayment shall apply to each product;

D. insulin disposable needles/syringes;

E. certain diabetic supplies, including glucose test strips, lancet devices and lancets;

F. injectables, including, Epi-Pen, and bee sting kits, with prior authorization;

G. drugs for treatment of migraine, such as Imitrex, in tablet, injectable or spray form;

H. Retin-A or Differin for cosmetic purposes for acne, for Covered Persons under age twenty-six (26);

I. prenatal vitamins;

J. immunosuppressants, such as Sandimmune, in tablet or injectable form;

K. AIDS related prescriptions, such as Zidovudine or AZT;

L. oral contraceptives;

M. over-the-counter Alavert, Claritin, Claritin-D., Prilosec, Prevacid 24, Zyrtec, Zyrtec-D., Abreva, Omeprazole, Alaway, Slo-Niacin and Zaditor, with a Physician's written prescription;

N. herpes zoster vaccine for shingles;

O. bowel kits used for colonoscopy preparation; and

P.  smoking cessation drugs including Chantix, Zyban and generic alternatives to Zyban or Wellbutrin SR up to a maximum of twelve (12) weeks annually. Nicotine replacement therapy drugs are not covered.

The following items are <u>excluded</u> from the prescription drug card program:

A.  items listed above as requiring pre-authorization, if such authorization is not obtained;

B.  diabetic supplies other than those specifically listed as covered above;

C.  contraceptives, except oral, including Implants, injectables and devices;

D.  fertility drugs;

E.  growth hormones;

F.  vitamins other than pre-natal vitamins, including multivitamins, multivitamins with fluoride or iron, pediatric vitamins and therapeutic vitamins;

G.  Retin-A or Differin for cosmetic purposes for acne, for Covered Persons over age twenty-five (25);

H.  anti-obesity or appetite suppressant drugs;

I.  vaccines or immunizing agents, biological sera or allergy sera;

J.  hair growth products;

K.  Experimental drugs or drugs labeled "Caution – limited by federal law to investigational use;

L.  blood or plasma;

M.  therapeutic devices or appliances, including support garments and other non-medical substances, unless otherwise listed above as specifically covered;

N.  charges for injection or administration of a drug;

O.  prescriptions that may be received without charge under worker's compensation laws or other local, state or federal programs;

P.  medication that is to be taken or administered to an individual in a licensed Hospital, nursing home or similar institution where such medications are normally provided by the facility on an Inpatient basis;

Q.  prescription refills in excess of the number specified or dispensed more than one (1) year from the date of the original order;

R.  needles and syringes, other than for insulin;

S.  over-the-counter products, except as specified as covered above;

T.  dietary supplements, such as Ensure or Sustacal; or

U.  Nexium.

## 10.4 WELLNESS EDUCATION AND DISEASE MANAGEMENT PROGRAM

The Plan includes a comprehensive Wellness Education and Disease Management Program (for purposes of this provision "Program") which provides wellness education for all Covered Persons and also identifies Covered Persons under the Plan who have been diagnosed with specific medical conditions, including, but not limited to, diabetes, asthma, hypertension, high cholesterol and coronary artery diseases. All Covered Persons are automatically eligible and enrolled in the Program. Covered Persons with specific medical conditions will be identified through information obtained through claims and other information submitted to the Plan,

63

Park National Corporation Employee Health Benefit Plan Wellness Plan

referrals by utilization review and case management and from other sources. Covered Persons with chronic conditions will be contacted for wellness education and health counseling. The goal of the Program is to help each Covered Person better manage his or her medical condition(s) by focusing on his or her lifestyle, and any barriers hindering the progression to a healthier lifestyle.

As part of the Program, Covered Persons will be required to obtain various preventive health screenings from the Covered Person's Physician, including, but not limited to, preventive wellness examination, PSA test, Screening Mammography, PAP smear, cholesterol screening and colonoscopy. Each screening will be performed based on a frequency recommended by the Program and/or the Company.

If a Participant or his or her spouse completes such testing by September 30th, the date specified by the Plan Administrator, the Covered Person under this Plan may be entitled to additional benefits for the following Calendar Year, such as premium reductions or other additional benefits. Covered Persons who meet the program's requirements by September 30th will be enrolled in the Wellness plan option with lower Deductibles and Out-of-Pocket limitations, effective January 1st of the following year. Covered Persons who choose not to participate in the program will be enrolled in the Non-Compliant Plan option.

The Plan Administrator will provide the required testing deadlines and the benefit enhancements for any Calendar Year to all interested persons. Covered Persons may also be asked to complete a Medical Risk Questionnaire (MRQ). In addition, the Covered Person may be placed on a telephone call schedule with an experienced nurse coordinator to discuss his or her health, to assess ongoing symptoms, to provide education in a variety of formats or to follow up on specific diagnostic requirements and tests.

## 10.5 COMPREHENSIVE CARE MANAGEMENT

The Plan provides specialized disease management programs for Covered Persons suffering from specific serious and chronic illnesses, including kidney disease, cancer, and heart disease. Potential participants who could benefit from these programs are identified through claims and pre-certification information received by the Plan. Services provided include, but are not limited to:

    A. prospective and retrospective clinical review of proposed and completed procedures for Medical Necessity, quality and alignment with established evidence-based medicine, including guidelines established by the American Heart Association, and the National Comprehensive Cancer Network;

    B. pre- and post-negotiation with providers for cost savings on treatment and supplies (which benefits both the Plan and the Covered Person by reducing the overall cost of care); and

    C. engagement with the Covered Person and his or her providers during treatment to provide support, education and identify resources that improve care.

This program requires that prior authorization be obtained for certain services and treatments covered by this program. This includes:

    A. any and all oncology services and/or treatment for any kind or type of cancer;

    B. any and all invasive heart procedures, implantable cardiac devices; and

    C. any and all kidney disease services and/or treatment.

Any Services and/or treatments described above that do not have prior authorization (prior approval) will not be a Covered Expense under the Plan.

This program applies a team approach to disease management, and includes a multidisciplinary team that may include:

Park National Corporation Employee Health Benefit Plan Wellness Plan

A.  board certified specialists in the appropriate specialties;

B.  case managers who are experienced registered nurses in the appropriate disciplines;

C.  licensed medical social workers;

D.  registered dieticians;

E.  pharmacologists; and

F.  billing, coding and negotiation professionals.

In addition, the Covered Person and his or her providers are considered important parts of this team. If selected for this program, the Covered Person will be contacted by a member of this team regarding his or her participation. Participation in this program is mandatory. Charges for services or supplies related to the above conditions will not be considered a Covered Expense under the Plan unless the Covered Person who has been selected for this program participates in such program. For additional information about this program, contact the Benefit Manager or the Utilization Review Service.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE XI

## DESCRIPTION OF DENTAL BENEFITS

### 11.1 DENTAL BENEFITS - COVERED EXPENSES

In order to be eligible for benefits under this section of the Plan, a Covered Person must have enrolled for dental coverage under this Plan. Covered Dental Expenses are charges for the services and supplies shown below. The services or supplies must be Medically Necessary and ordered by a Dentist or a Physician. Charges will be covered only to the extent that they do not exceed the amount allowed under the Alternative Benefit Provision, Section 11.7 below, and that they do not exceed the Reasonable and Customary charges generally made under similar conditions.

### 11.2 ADVANCE TREATMENT REVIEW

If a course of dental treatment will exceed $100.00, the treatment plan must be submitted for review before the work starts. The Covered Person and the Dentist will be advised of the estimated benefits payable under the Plan, subject to eligibility, coordination of benefits, maximum benefit provisions and all other limitations and exclusions of the Plan. In order to review the treatment plan, a description of each service and charge should be submitted along with all supporting documentation and aids, including pre-operative x-rays.

### 11.3 CLASS I (PREVENTIVE AND DIAGNOSTIC) – COVERED EXPENSES

The following services are covered as Class I services, subject to the Coinsurance listed in Section 2.12, the Calendar Year maximum listed in Section 2.13, and the limitations listed below:

    A. Oral examinations and routine cleaning of teeth, but not more than twice during any twelve (12) month period.

    B. Fluoride applied on the teeth of a Dependent child under age fifteen (15), but not more than two (2) times each Calendar Year.

    C. Space maintainers for a Dependent child under age nineteen (19), to replace teeth prematurely removed or missing.

    D. Dental x-rays, as follows:

        1. full mouth (single and multiple films), but not more than once every thirty-six (36) months;

        2. Bitewings, two (2) times per Calendar Year; or

        3. other x-rays when needed to diagnose and treat a specific condition.

    E. Emergency treatment to relieve pain, but not on the same day as any other services except x-rays.

    F. Sealants.

### 11.4 CLASS II (BASIC) - COVERED EXPENSES

The following services are covered as Class II services, subject to the Deductible listed in Section 2.11, the Coinsurance listed in Section 2.12, the Calendar Year maximum listed in Section 2.13, and the limitations listed below:

    A. Oral examinations and cleanings performed by a specialist. Only one specialist exam and cleaning, regardless of type, will be covered during any six (6) month period. This benefit is in addition to the routine oral examination and cleaning covered under Class I - Diagnostic and Preventive Services.

Park National Corporation Employee Health Benefit Plan Wellness Plan

B. Extraction (removal) of teeth.

C. Oral surgery (cutting procedures in the mouth).

D. Filling of decayed or fractured teeth, except as listed under Class III - Major Services.

E. General anesthetics (including intravenous sedation) when Medically Necessary and in connection with a covered dental procedure.

F. Periodontal treatment or surgery to remove diseased gum tissue or bone.

G. Endodontic treatment, including Root Canal Therapy.

H. Antibiotic injections when given by the Dentist.

I. Repairs and recementing of Crowns, Inlays, Bridgework or Dentures.

J. Relining or rebasing of Dentures, but not more than one (1) of either in a thirty-six (36) month period.

## 11.5 CLASS III (MAJOR) – COVERED EXPENSES

The following services are covered as Class III services, subject to the Deductible listed in Section 2.11, the Coinsurance listed in Section 2.12, the Calendar Year maximum listed in Section 2.13, and the limitations listed below:

A. Fixed Bridgework, partial or full Dentures, but only to replace teeth (excluding third molars) that are extracted after the Covered Person is covered under this Plan. No benefits will be allowed for adjustments during the first six (6) months after placement.

B. Add teeth to an existing fixed bridge, partial or full Denture, but only to replace teeth that are extracted after the Covered Person is covered under this Plan.

C. Replace an existing fixed bridge with a new bridge, subject to the replacement conditions set forth below.

D. Replace an existing removable partial Denture with a new partial, subject to the replacement conditions set forth below.

E. Replace an existing full Denture with a new Denture, subject to the replacement conditions set forth below.

F. Crowns, Inlays, Onlays or gold fillings to restore teeth, but only when:

   1. the tooth is fractured or has major decay; and

   2. the tooth cannot be restored with fillings such as Amalgam, plastic or Composite resin.

G. Replacement Conditions:

   1. The replacement is needed to replace teeth that are extracted while the Covered Person is covered under this Plan;

   2. The existing Denture or Bridgework is certified by the Dentist or Physician to be at least five (5) years old at the time of replacement and cannot be repaired; or

   3. The existing Denture is certified by the Dentist or Physician to be an immediate temporary full Denture that cannot be made permanent and is replaced with a permanent Denture within twelve (12) months of the date it was installed.

## 11.6 CLASS IV (ORTHODONTIC) – COVERED EXPENSES

Orthodontic services are covered for Dependent children, subject to the limitations listed in Section 2.12 and Section 2.13.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## 11.7 ALTERNATIVE BENEFIT PROVISION

There is often more than one service or supply that can be used to treat a dental problem or disease. In considering the benefits allowed on a claim or advance treatment review, these different methods of treatment will be limited to the Reasonable and Customary charge for the most economical service or material which meets broadly accepted standard of dental care.

## 11.8 PROOF OF DENTAL CLAIM

In order to determine the benefits payable under this Plan, diagnostic aids such as pre-operative x-rays and other supporting documentation will be required. If these aids are not sent or are not available, then it may be possible to provide a benefit for the claim, or a lesser benefit may be paid than would have been allowed if the required proof had been provided.

 Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE XII

## DESCRIPTION OF VISION BENEFITS

### 12.1 VISION BENEFITS

In order to be eligible for benefits under this Plan, charges actually incurred by a Covered Person must be administered or ordered by an Optometrist or ophthalmologist or dispensed by an optician. Vision expenses are also subject to the maximums listed in Section 2.16 and frequency limitations listed in Section 2.15.

Covered charges include the following:

A.  Vision examination - a comprehensive examination of the visual functions to determine the presence of visual problems or other abnormalities.

B.  Standard single vision or multifocal lenses in basic plastic or glass. The following extra items are covered only if obtained from a Participating Provider:

1.  Pink Tints #1;

2.  Pink Tints #2; and

3.  ground-in prisms.

C.  Frames.

D.  Cosmetic Contact Lenses. Benefits are provided, up to the limitations listed in Section 2.15 and Section 2.16, for Cosmetic Contact Lenses in lieu of any other benefits for professional services, lenses or frames during the same benefit period.

E.  Medically Necessary Contact Lenses. Benefits are provided, up to the limitations listed in Section 2.15 and Section 2.16, for Medically Necessary Contact Lenses in lieu of any other benefits for professional services, lenses or frames during the same benefit period.

### 12.2 PARTICIPATING PROVIDER CLAIMS

To obtain services from a Participating Provider under the Plan, first the Covered Person should obtain a list of such providers from the Plan Administrator or at the MedBen website at www.medben.com. The Covered Person then selects a Participating Provider from this list, and makes an appointment to have an eye examination. In addition, a Covered Person must obtain a pre-approved claim form by calling the Vision Benefit Manager at 1-800-252-3447 or through the website. The Vision Benefit Manager must have the social security number of the Participant in order to verify eligibility when the Covered Person calls. Upon verification of eligibility, the Vision Benefit Manager will mail a claim form to the Covered Person.

The pre-approved claim form should be presented to the Participating Provider at the time of the appointment. (Failure to present the Participating Provider with a pre-approved claim form at the time of the visit will result in reimbursement at the Non-Participating Provider level.) The Participating Provider will perform services and supply materials in accordance with the Plan benefits. The Participating Provider will bill the Covered Person for any excess amounts due for services above the scheduled amounts or for benefits not covered under the Plan.

Claims for services received from non-Participating Providers should be submitted in accordance with the claims procedures described in Section 4.1.

69

Park National Corporation Employee Health Benefit Plan Wellness Plan

## 12.3  LIMITATIONS ON CHARGES BY PARTICIPATING PROVIDERS FOR SERVICES AND SUPPLIES WHICH ARE NOT COVERED UNDER THIS PLAN

The following items are not covered under the Plan.  However, the contract made with the Participating Provider limits the amount such provider can charge on the most commonly selected extras listed below.  Because of this limitation, in most instances, the Participating Provider's charges on these non-covered extras will be at or below what the Covered Person would otherwise be required to pay for these materials.  The Covered Person will be responsible for the costs of these non-covered items. The cost of these items is not controlled if they are purchased from Non-Participating Providers.  The extras include:

A.  photochromics, (glass and plastic);

B.  scratch resistant coatings;

C.  solid, sun and gradient tints, except as specifically listed as covered under this Plan;

D.  color coating;

E.  oversize lenses (61mm and over);

F.  rimless;

G.  polycarbonate lenses;

H.  progressive or blended lenses;

I.  ultraviolet coating;

J.  anti-reflective coating;

K.  high index lenses; and

L.  roll and polish and edge coating.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE XIII

### BENEFIT EXCLUSIONS AND LIMITATIONS

**13.1 GENERAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS**

The following exclusions and limitations apply to expenses incurred by all Covered Persons and to all benefits provided by this Plan, with the exception of prescription drug benefits, which are listed in Section 10.3.   Any exclusion listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law.

A. Charges for an Injury arising from any employment or occupation.

B. Charges for an Illness covered by Workers' Compensation.

C. Charges for treatment of an Injury or Illness which is due to war, declared or undeclared.

D. Expenses incurred outside the United States or Canada, unless the Participant or Dependent is a resident of one or the other and the charges are incurred while traveling on business or for pleasure.

E. Charges for Experimental and/or Investigative services.

F. Charges for services or supplies not specifically listed as a Covered Expenses under this Plan.

G. Charges for services performed by a Close Relative.

H. Charges for education or training.

I. Charges for equipment or supplies made or used for physical fitness, athletic training or general health upkeep.

J. Charges for the treatment of an Injury or Illness which is due to active participation in any riot or violent disorder.

K. Charges for any services received from a medical department, clinic or any facility provided or furnished by the Company or any other employer of the Covered Person.

L. Charges in excess of the Reasonable and Customary charge for the service or supply in question.

M. Charges for treatment required as a result of the commission of any crime, criminal act, assault or other felonious behavior.

N. Charges for which the Covered Person is not legally obligated to pay or for which a charge would not ordinarily be made in the absence of this coverage.

O. Charges for services, supplies, care or treatment provided for the treatment of an Injury or Illness that occurred as a result of the Covered Person's illegal use of alcohol or any narcotic or hallucinogenic drug not administered on the advice of a Physician, including his or her driving while intoxicated or while under the influence of any narcotic or hallucinogenic drug not administered on the advice of a Physician shall be excluded under this Plan regardless of whether or not the operator is charged with operating the vehicle under the influence (or similar law) and regardless of whether the individual pleads guilty to a lesser included offense, if the Plan Administrator determines, by a preponderance of evidence, that the individual operated the vehicle under the influence of alcohol or illegal drugs.  Any blood alcohol testing device used by a policing agency, hospital, medical lab or other agency or medical provider authorized to determine blood alcohol content shall be deemed by the Plan

71

Park National Corporation Employee Health Benefit Plan Wellness Plan

Administrator as sufficient to determine that blood alcohol content is above the statutorily set maximum. This exclusion also includes treatment of any condition related to or resulting from the Covered Person's involvement in any of the following, without regard to whether or not the act itself was illegal:

1. the voluntary taking of drugs except those taken as prescribed by a Physician;

2. the voluntary taking of poisons;

3. the voluntary inhaling of gas; or

4. being under the influence of alcohol. A person will be considered under the influence of alcohol while the level of their blood alcohol exceeds the legal limit for operating a motor vehicle in the jurisdiction where the Injury occurred, regardless of whether the person was operating a motor vehicle when the Injury was sustained.

This exclusion shall not apply to the extent that the act in question was the result of an underlying health condition, such as depression.

## 13.2 MEDICAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations apply to all medical benefits provided by this Plan. General exclusions applicable to the medical benefits are listed in Section 13.1. Any exclusion listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law.

A. Charges for routine eye or hearing examinations, eye refractions, eye glasses, contact lens, hearing aids or any type of appliance used to improve visual or hearing acuity and their fittings, except as specifically provided as Covered Expenses under this Plan.

B. Charges for cosmetic surgery, except an operation necessary to repair disfigurement due to an accident performed within one (1) year of the date of the accident, and except for treatment of a congenital anomaly performed within one (1) year following birth. Surgery performed more than one (1) year following an accident or birth, as applicable, will be covered if the delay in treatment was due to the physical, medical or developmental condition of the Covered Person. All such surgeries performed more than one (1) year after the accident or birth, as applicable, must be precertified by the Utilization Review Service, as described in Article VI, even if performed on an Outpatient basis.

Covered Expenses include surgery due solely to surgical removal of all or part of the breast tissue because of an Injury or Illness of the breast, including:

1. Reconstruction of the breast on which the mastectomy was performed;

2. Surgery and reconstruction of the other breast to produce a symmetrical appearance;

3. Prostheses and physical complications of all stages of mastectomy, including lymphedemas; and

4. surgical bras, subject to the limitations listed in Section 2.8.

C. Charges for Custodial Care.

D. Charges for treatment or surgery to change gender or to improve or restore sexual function. This exclusion does not include any psychological counseling for gender identity disorders or sexual inadequacies.

E. Charges for procedures to reverse sterilization or birth control measures, other than sterilization.

F. Charges for treatment or surgery for obesity, weight reduction or weight control.

G. Charges for treatment of intentionally self-inflicted Injury or treatment of conditions resulting from or in any way related to that Injury, unless such act is the result of an underlying health condition, such as depression.

H. Charges for fertility testing and/or fertility treatment.

I. Charges for artificial insemination or in-vitro fertilization.

J. Charges for food supplements.

K. Charges for usual and normal home medical supplies or first aid items.

L. Charges for dental work or treatment, other than that included in the Plan as a Covered Dental Expense, including Hospital and/or professional charges in connection with:

　1. operation or treatment in connection with the fitting or wearing of Dentures;

　2. orthodontic care or treatment of Malocclusion; or

　3. dental care for any operation on, or treatment of or to, the teeth or the supporting tissues of the teeth, impacted or otherwise, except for:

　　a) removal of tumors; and

　　b) treatment of an Injury to sound natural teeth other than by eating or chewing, including their replacement, due to an accident for expenses incurred within one (1) year from the date of the accident. Expenses for treatment after one (1) year from the accident will be covered, subject to pre-approval by the Plan Administrator, if the delay in treatment is due to the medical, dental or physical condition of the Covered Person.

M. Charges for elective abortions.

N. Charges for services and supplies related to a Pre-Existing Condition during the period, which such charges would be excluded in accordance with the Pre-Existing Conditions limitations described in Article IX.

O. Charges for smoking cessation products and devices, including smoking patches, unless specifically listed as a Covered Expense under the prescription drug card program described in Section 10.3.

P. Charges for prescription drugs, except for drugs dispensed in a provider's office or through the drug program listed in Article X.

Q. Charges for a massage therapist, except as listed in Section 9.1.

R. Charges for treatment that is not Medically Necessary, except as specifically listed as a Covered Expense under this Plan.

S. Charges for vision therapy.

T. Charges for acupuncture.

U. Charges for marital counseling.

V. Charges for cochlear implants.

W. Charges for the treatment of medical complications of any procedure that is not a Covered Expense under this Plan, except as such complications are specifically listed as covered.

## 13.3 DENTAL PLAN BENEFIT EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations apply to all dental benefits provided by this Plan. General exclusions applicable to the medical benefits are listed in Section 13.1. Any exclusion

Park National Corporation Employee Health Benefit Plan Wellness Plan

listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law.

A. Charges for fixed Bridgework or Dentures to replace teeth that were missing prior to the date the Covered Person is covered under this Plan.

B. Charges for treatment from anyone other than a Dentist or Physician. (Routine cleaning of teeth and Fluoride application when performed by a licensed Dental Hygienist under the direct supervision of, and billed by, the Dentist or Physician will be covered.)

C. Charges for facings, veneers or similar material placed on molar Crowns or Pontics. (Teeth or spaces to the rear of the second bicuspid.)

D. Charges for services or supplies that are partially or wholly cosmetic in nature, or directed toward a cosmetic end.

E. Charges for replacing a lost, missing or stolen prosthetic Appliance.

F. Charges for a broken appointment.

G. Charges for any service that is not necessary or is not normally performed for proper dental care of the condition, or any service that is not approved by the attending Dentist.

H. Charges for services or supplies that do not meet accepted standards of dental practice including Experimental services or supplies.

I. Charges for services or supplies received as a result of dental disease, defect, or Injury due to an act of war, declared or undeclared.

J. Charges for any duplicate prosthetic Appliance, except as specifically provided under as a Covered Dental Expense under this Plan.

K. Charges for the completion of claim forms.

L. Charges for oral hygiene or dietary instruction, or plaque control programs.

M. Charges for any Implant.

N. Charges for wiring or bonding teeth or a Crown to act as a splint for any reason.

O. Charges for Appliances, Restorations, or any procedure to alter vertical dimension or restore Occlusion, except as specifically listed as a Covered Expense under this Plan.

P. Charges for any service or supply, which is covered, in whole or in part, by any other plan provided or sponsored by the Plan Administrator.

Q. Charges for services or supplies not specifically listed as a Covered Dental Expenses under the Plan.

R. Charges for any service, supply, surgery or Appliance in connection with orthodontic diagnostic procedures or treatment rendered to Participants or Participant's spouses.

S. Charges for replacing or repairing any orthodontic Appliance.

## 13.4 VISION BENEFIT EXCLUSIONS AND LIMITATIONS

The following exclusions and limitations apply to vision expenses incurred by all Covered Persons and to all vision benefits provided by this Plan. Any exclusion listed below shall not apply to the extent that coverage for the service or supply is specifically provided under this Plan, or that the exclusion is prohibited under any applicable law.

74

A.  Charges for services or supplies provided before a Covered Person's coverage begins or after it ends.

B.  Charges for services or materials provided as a result of any worker's compensation law or similar legislation, or obtained through or required by any governmental agency or program whether federal, state or any subdivision thereof.

C.  Charges for services or supplies, which are provided free by a clinic, which is operated by or for the Employer, union or similar group.

D.  Charges for which the Covered Person has no legal obligation to pay or for which no charge would be made if the Covered Person had no vision coverage.

E.  Charges for services or supplies to replace lenses or frames which are lost, stolen or broken except at the Covered Person's normal eligibility intervals.

F.  Charges for safety glasses or safety goggles.

G.  Charges for prescription drugs or any other medication.

H.  Charges for services or supplies resulting from the Covered Person's employment.

I.  Charges for medical or surgical treatment of the eyes.

J.  Charges for two (2) pairs of glasses in lieu of bifocals.

K.  Charges for a frame in excess of the Plan allowance listed in Section 2.15 or Section 2.16.

L.  Cosmetic Contact Lenses in excess of Plan allowances listed in Section 2.15 or Section 2.16.

M.  Charges for orthoptics or vision training; subnormal vision aids; or nonprescription lenses.

N.  Charges for services or supplies which are covered by some other contract.

O.  Charges for any services or supplies for which are not specifically listed as a Covered Expense under the vision coverage.

P.  Charges for any extra item listed in Section 12.3, which is not otherwise specifically listed as a Covered Expense under this Plan, or for any extra item listed under Section 12.1 B which is obtained from a non-Participating Provider.

Q.  Charges for sales tax.

R.  Charges for auxiliary testing not included as part of the normal service.

Park National Corporation Employee Health Benefit Plan Wellness Plan

# ARTICLE XIV
## GENERAL INFORMATION

### 14.1  COORDINATION OF BENEFITS

Coordination of benefits (COB) is a feature that prevents duplicate payment under this Plan and other health insurance or prepayment plans, including Medicare Part A or Part B or other types of insurance.  A Covered Person may have coverage under this Plan, some other health plan of coverage or other kind of insurance policy at the same time.  Other health plans of coverage include a group sickness and accident insurance policy or program, a group contract of a health maintenance organization, an individual sickness and accident insurance policy and an individual contract of a health maintenance organization.  Other kinds of insurance policies include your automobile insurance policy's medical payments and uninsured motorist's coverage.  For example, a person may be covered by an employer's group insurance program and also by the group program provided by a spouse's employer.  Or a person may be covered by an employer's group insurance and also have coverage under a parent's group plan.

If a Covered Person files a claim under this Plan for services or supplies that are also covered under another plan or insurance policy, for instance, one of the plans or policies listed in the first paragraph, payments will be "coordinated."  This means that this Plan will adjust its benefit payments so that combined payments under this and any other health plan(s) or insurance policy will be no more than the usual, Customary, and Reasonable fee payments.

Once a Covered Person has provided this Plan with information about other health benefits plans and health benefits under other insurance policies under which he or she has coverage, the Plan will handle the coordination.  This will be done according to the "Order of Benefit Determination."  The Order of Benefit Determination works as follows:

A.  The plan that pays first is called the primary plan.  Any other plan that covers the Covered Person is called the secondary plan.  A group or individual plan or policy that does not contain a COB feature is always primary.

B.  A plan that covers a person as the certificate holder or the contract holder is primary. In the two examples given, the coverage the person has through his or her employer would be primary.  The coverage through a spouse's or parent's employer would be secondary. The exception to this would be when the laws and regulations governing Medicare require that the plan covering the person as a Dependent pay its benefits as primary to Medicare, but such laws and regulations also provide that the plan covering them as the certificate holder/contract holder should pay its benefits as secondary to Medicare.  In such a case, the plan which is required to pay as primary to Medicare shall also pay as primary to the other coverage.

C.  If a person is covered as a Dependent child of two working parents, the plan of the parent whose birthday falls earliest in the year has primary responsibility for paying the claim.  The plan of the parent with the later birthday becomes the secondary plan.  If both parents have the same birthday, the parent whose coverage has been in effect the longest is primary.  The ages of the respective parents are not relevant.  This method of coordinating benefits is commonly referred to as the "birthday rule."  If divorced or separated parents (and/or their current spouses) each have group health care coverage that includes a Dependent, the order of benefit determination will be determined, as follows:

  1. the plan of the custodial parent, if any, shall pay its benefits first;

  2. the plan of the spouse of the custodial parent, if any, will pay next;

  3. the plan of the non-custodial parent, if any, will pay after the prior listed plans; and

  4. the plan of the spouse of the non-custodial parent, if any, shall pay it benefits last.

76

Park National Corporation Employee Health Benefit Plan Wellness Plan

However, if a court order establishes responsibility for payment of health care benefits with the parent who does not have custody of the Dependent and the entity that would be obligated to pay the benefits has actual knowledge of the court order's terms, the plan of such non-custodial parent shall pay its benefits before any of the other plans listed above. If the non-custodial parent named in the court order as responsible for the health care benefits does not have any health coverage, the plan of the non-custodial parent's spouse, if any, shall pay its benefits before any of the other plans listed above.

If the court order specifies that the parents have joint custody, and neither parent is named as the primary residential custodian, or the court order requires both parents to provide health care coverage, the "birthday rule" specified above shall apply.

D. A plan that covers a person as an active employee or as a Dependent of an active employee is primary to a plan that covers a person as an inactive employee, such as a laid-off or retired employee or as a Dependent of a laid-off or retired employee.

E. There are some situations in which none of these rules apply. Here the program that has been in effect longer is primary. An example would be when a person who works two jobs has health coverage through both employers.

F. A plan or policy that covers a specific event may be primary to a plan that provides general coverage. For example, if a person is injured in an automobile accident with an uninsured motorist, his or her automobile policy's uninsured motorist's coverage would be primary to a group health plan if both policies had similar provisions regarding other insurance.

If coverage under this Plan is primary, benefits will be paid as if the Covered Person had no other coverage. But if this coverage is secondary, this Plan's payments will be calculated by subtracting the primary plan's benefits for the services and supplies covered under this Plan from the usual, customary and reasonable allowance for the services and supplies. Of course, the Plan will not pay more when secondary than it would if primary. By accepting coverage under this Plan, a Covered Person agrees to do two things to enable the Plan to coordinate benefits. First, the Covered Person will supply the Plan with information about other coverage he or she has when asked. Second, if the Plan makes a payment and later finds out that the coverage under this Plan should not have been primary, the Covered Person will return the excess amount to the Plan. The Plan has the right to obtain information needed to coordinate benefits from others as well, i.e., insurance companies and other persons, for instance.

## 14.2    RIGHT OF RECOVERY

Immediately upon paying or providing any benefit under this Plan, the Plan shall be subrogated to all rights of recovery a Covered Person has against any party potentially responsible for making any payment to a Covered Person due to a Covered Person's injuries or illness, to the full extent of benefits provided or to be provided by this Plan.

In addition, if a Covered Person receives any payment from any potentially responsible party as a result of an injury or illness, the Plan has the right to recover from, and be reimbursed by, the Covered Person for all amounts this Plan has paid and will pay as a result of that injury or illness, up to and including the full amount the Covered Person receives from all potentially responsible parties. The Covered Person agrees that if he/she receives any payment from any potentially responsible party as a result of an injury or illness, he/she will serve as a constructive trustee over the funds. Failure to hold such funds in trust will be deemed a breach of the Covered Person's fiduciary duty to the Plan.

Further, the Plan will automatically have a lien, to the extent of benefits advanced, upon any recovery whether by settlement, judgment or otherwise, that a Covered Person receives from a third party, the third party's insurer or any other source as a result of the Covered Person's injuries. The lien is in the amount of benefits paid by this Plan for the treatment of the illness, injury or condition for which another party is responsible.

As used throughout this provision, the term "responsible party" means any party possibly responsible for making any payment to a Covered Person due to a Covered Person's injuries or illness or any insurance coverage including, but not limited to, uninsured motorist coverage, underinsured motorist coverages, personal umbrella coverage, medical payments coverages, workers compensation coverage, no-fault automobile insurance coverage, or any first party insurance coverage.

The Covered Person acknowledges that this Plan's recovery rights are a first priority claim against all potentially responsible parties and are to be paid to the Plan before any other claim for the Covered Person's damages. This Plan shall be entitled to full reimbursement first from any potential responsible party payments, even if such payment to the Plan will result in a recovery to the Covered Person that is insufficient to make the Covered Person whole or to compensate the Covered Person in part or in whole for the damages sustained. It is further agreed that the Plan is not required to participate in or pay court costs or attorney fees to the attorney hired by the Covered Person to pursue the Covered Person's damage claim.

The terms of this entire right of recovery provision shall apply and the Plan is entitled to full recovery regardless of whether any liability for payment is admitted by any potentially responsible party and regardless of whether the settlement or judgment received by the Covered Person identifies the medical benefits the Plan provided. The Plan is entitled to recover from *any* and *all* settlements or judgments, even those designated as pain and suffering or non-economic damages only.

The Covered Person shall fully cooperate with the Plan's efforts to recover its benefits paid. It is the duty of the Covered Person to notify the Plan Administrator within thirty (30) days of the date when any notice is given to any party, including an attorney, of the intention to pursue or investigate a claim to recover damages or obtain compensation due to injuries or illness sustained by the Covered Person. The Covered Person shall provide all information requested by the Plan Administrator, the Benefit Manager or the representative of either of these including, but not limited to, completing and submitting any applications or other forms or statements as the Plan may reasonably request. Failure to provide this information shall be deemed a breach of contract, and may result in the termination of health benefits or the instigation of legal action against the Covered Person.

The Covered Person shall do nothing to prejudice the Plan's recovery rights as herein set forth. This includes, but is not limited to, refraining from making any settlement or recovery that attempts to reduce or exclude the full cost of all benefits provided by the Plan.

In the event that any claim is made that any part of this right of recovery provision is ambiguous or questions arise as to the meaning or intent of any of its terms, the Covered Person and the Plan agree that the Plan Administrator shall have the sole authority and discretion to resolve all disputes regarding the interpretation of this provision.

The Covered Person agrees that any legal action or proceeding with respect to this provision may be brought in any court of competent jurisdiction as the Plan Administrator may elect. Upon receiving benefits under this Plan, the Covered Person hereby submits to such jurisdiction, waiving whatever rights may correspond to him/her by reason of his/her present or future domicile.

## 14.3 MEDICARE BENEFITS

This provision prevents duplication of benefits for Covered Expenses when Medical Care benefits are available from Medicare. Benefits under this Plan will be reduced to the extent that the Participant or his or her Dependents are reimbursed or entitled to reimbursement for those expenses by Medicare. Any individual at any time entitled to enroll in Medicare will be considered enrolled in Part A and Part B even if the individual did not enroll.

Under the Tax Equity and Fiscal Responsibility Act of 1982, as amended (TEFRA), active employees and/or their spouses who are 65 or over may choose to have the Company program as primary coverage, in which case Medicare may pay benefits on a secondary basis.

78



Otherwise, an employee may elect to drop out of the company program and choose Medicare as primary coverage. Employees in this category who are enrolled under this Plan will remain so enrolled with this Plan as primary coverage unless an option form is on file indicating otherwise.

The Plan may also pay its benefits as primary to Medicare's in other situations, as prescribed by applicable laws and regulations.

The Plan intends to comply with the federal Social Security Act, as amended, and other applicable laws, as such apply to Medicare benefits.

## 14.4   OTHER RIGHTS OF RECOVERY

If payments are made under the Plan that should not have been made, the Plan may recover that incorrect payment. The Plan may recover this payment from the person to whom it was made or from any other appropriate party. If any such incorrect payment is made to the Participant, the Plan may deduct it when making future payments directly to the Participant.

This Plan will comply with Sections 609(b)(1), (2) and (3) of the Employee Retirement Income Security Act with regard to Covered Persons eligible for Medicaid. An Employee's or Dependent's eligibility for, or participation in, Medicaid will not affect determination of whether or not payments should be made. Under state and federal law, should a Covered Person be entitled to payment of a claim under this Plan, and all or part of that claim has been paid by Medicaid, then the state is subrogated to the Covered Person's right to payment under this Plan to the extent of the amount paid by Medicaid, and reimbursement under this Plan will be made in that amount directly to the state.

## 14.5   FACILITY OF PAYMENT

Whenever a Covered Person or Provider to whom payments are directed to be made is mentally, physically, or legally incapable of receiving or acknowledging receipt of such payments, neither the Plan Administrator nor the Benefit Manager shall be under any obligation to see that a legal representative is appointed or to make payments to such legal representative, if appointed. A determination of payment made in good faith shall be conclusive on all persons. The Plan Administrator, Benefit Manager or any fiduciary shall not be liable to any person as a result of a payment made and shall be fully discharged from all future liability with respect to a payment made.

## 14.6   ADMINISTRATION OF THE PLAN

Except as otherwise specifically provided for in the Plan, the Plan Administrator shall have the exclusive authority to control and manage the operation and administration of the Plan and shall be Named Fiduciary of the Plan for purposes of ERISA. The Plan Administrator shall have all power necessary or convenient to enable it to exercise such authority. In connection therewith, the Plan Administrator may provide rules and regulations, not inconsistent with the provisions thereof, for the operation and management of the Plan, and may from time to time amend or rescind such rules or regulations. The Plan Administrator may accept service of legal process for the Plan and shall have the full discretion, power, and the duty to take all action necessary or proper to carry out the duties required under ERISA and all other applicable law.

The Plan Administrator may delegate duties involved in the administration of this Plan to such person or persons whose services are deemed necessary or convenient; provided however, that both the ultimate responsibility for the administration of this Plan and the authority to interpret this Plan shall remain with the Plan Administrator. The Employer shall indemnify any employee to whom duties are delegated by the Plan Administrator pursuant to this section from and against any liability that such employee may incur in the administration of the Plan, except for liabilities arising from the recklessness or willful misconduct of such employee.

The Plan Administrator shall be responsible for controlling and managing the operation and administration of this Plan, including, but not limited to, the power:

Park National Corporation Employee Health Benefit Plan Wellness Plan

A. to employ one (1) or more persons or entities to render advice with respect to any responsibility the Plan Administrator has under this Plan;

B. to construe and interpret this Plan;

C. to adopt such rules, regulations, forms and procedures as from time to time it deems advisable or appropriate in the proper administration of this Plan;

D. to decide all questions of eligibility and to determine the amount, manner and time of payment of any benefits hereunder;

E. to prescribe procedures to be followed by any person in applying for any benefits under this Plan and to designate the forms, documents, evidence or such other information as the Plan Administrator may reasonably deem necessary to support an application for any benefits under this Plan;

F. to authorize, in its discretion, payments of benefits properly payable pursuant to the provisions of this Plan;

G. to prepare and to distribute, in such manner as it deems appropriate, information explaining the Plan;

H. to apply consistently and uniformly to all Covered Persons in similar circumstances its rules, regulations, determinations and decisions;

I. to prepare and file such reports and to complete and to distribute such other documents as may be required to comply fully with the provisions of ERISA and all other applicable laws, and all regulations promulgated thereunder; and

J. to retain counsel (who may, but need not, be counsel to the Company), to employ agents and to provide for such clerical, medical, accounting, auditing and other services as it may require in carrying out the provisions of the Plan.

The Plan Administrator shall be the sole judge of the standards of proof required in any case. In the application and interpretation of this Plan document, the decision of the Plan Administrator shall be final and binding on the Participants, Dependents, and all other persons. The Plan Administrator shall have the full power and authority, in its sole discretion, to construe and interpret the provisions and terms of this Plan document and all other written documents. Any such determination and any such construction adopted by the Plan Administrator in good faith shall be binding upon all of the parties hereto and the beneficiaries thereof and may not be reversed by a court of competent jurisdiction unless the court finds the determination to be arbitrary and capricious.

## 14.7   NON-ALIENATION AND ASSIGNMENT

The Plan shall not be liable for any debt, liability, contract or tort of any employee or Covered Person. The Plan shall pay all benefits due and payable for Covered Expenses directly to the Covered Person who incurred the Covered Expenses, and no Plan benefits shall be subject to anticipation, sale, assignment, transfer, encumbrance, pledge, charge, attachment, garnishment, execution, alienation or any other voluntary or involuntary alienation or other legal or equitable process not transferable by operation of law; provided however, that a Covered Person to whom benefits are otherwise payable may assign benefits to a Hospital, Physician or other service provider; provided further, that any such assignment of benefits by a Covered Person to a Hospital, Physician or other service provider shall be binding on the Plan only if:

A. the Plan Administrator or Benefit Manager is notified of such assignment prior to payment of benefits;

B. the assignment is made on a form provided by, or approved by, the Plan Administrator or the Benefit Manager; and

C. the assignment contains such additional terms and conditions as may be required from time to time by the Plan Administrator or Benefit Manager.

80

## 14.8    FAILURE TO ENFORCE

Failure to enforce any provision of this Plan does not constitute a waiver or otherwise affect the Plan Administrator's right to enforce such a provision at another time, nor will such failure affect the right to enforce any other provision.

## 14.9    FIDUCIARY RESPONSIBILITIES

No fiduciary of the Plan shall be liable for any acts or omission in carrying out his, her or its responsibilities under the Plan, except as may be provided under ERISA and other applicable laws.  Each fiduciary under the Plan shall be responsible only for the specific duties assigned to such fiduciary under the Plan and shall not be directly or indirectly responsible for the duties assigned to another fiduciary, except as may be otherwise provided in ERISA and other applicable laws.

## 14.10   DISCLAIMER OF LIABILITY

The Plan is not responsible for the efficiency or integrity of any health care provider delivering services or supplies utilized by the Participant.  The Plan is not liable in any way for the effect of delivery of such services or supplies, the results of actions taken as a result of such services or supplies being limited or not covered by the Plan, nor any limitations imposed on the cost sharing responsibility of the Plan.

Nothing contained herein shall confer upon a Covered Person any claim, right or cause of action, either at law or at equity, against the Plan, Plan Administrator, Benefit Manager, or any Employer for the acts or omissions of any health care provider from whom a Covered Person receives care, or for the acts or omission of any Physician from whom the Covered Person receives care under the Plan, or for any acts or omissions of any provider of services or supplies under this Plan.  Neither the Plan, nor the Plan Administrator, nor the Benefit Manager have any responsibility for or control over the actions of any Preferred Provider networks offering services and/or supplies under the Plan.

## 14.11   ADMINISTRATIVE AND CLERICAL ERRORS

The benefits payable to or on behalf of a Participant or Dependent under this Plan will not be decreased nor increased due to administrative or clerical errors made by the Employer, the Plan Administrator, the Utilization Review Service or the Benefit Manager.  If written application for coverage for an eligible employee or Dependent is submitted by the employee/Participant within the applicable time frame specified in Article V, any subsequent administrative or clerical error made by the Employer, the Plan Administrator or the Benefit Manager shall not act to delay the effective date of such person's coverage beyond the date such coverage would otherwise become effective if such application was processed in a timely manner.  In addition, any such error made in claims processing, utilization review or other administrative functions shall not affect the benefits payable to or on behalf of a Covered Person under this Plan.  The Plan Administrator may require proof of an error described in this provision. The Plan Administrator shall have the sole responsibility to determine when an error is an "administrative or clerical" error and will be the sole judge of any proof required.

## 14.12 RESCISSION OF COVERAGE

A rescission of coverage means that the coverage may be legally voided all the way back to the day the Plan began to provide an individual with coverage, just as if he or she never had coverage under the Plan.  Such coverage can only be rescinded if the individual (or a person seeking coverage on an individual's behalf) perform an act, practice, or omission that constitutes fraud; or unless the individual (or a person seeking coverage on the individual's behalf) make an intentional misrepresentation of material fact, as prohibited by the terms of this Plan.  Coverage can also be rescinded due to such an act, practice, omission or intentional misrepresentation by an employer.

Park National Corporation Employee Health Benefit Plan Wellness Plan————————————————————

Such individual will be provided with thirty (30) calendar days advance notice before coverage is rescinded. Such individual has the right to request an internal appeal of a rescission of his or her coverage. Once the internal appeal process is exhausted, Such person has the additional right to request an independent external review.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE XV

## PRIVACY

### 15.1    PRIVACY OF HEALTH INFORMATION

This provision is intended to bring this Plan into compliance with the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations issued thereunder.    Such procedures will be in effect for this Plan for all transactions performed on or after April 14, 2004.    Health Information transmitted or maintained by the Plan will be subject to the provisions described in this article.

### 15.2    USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION

Protected Health Information will only be disclosed or used by the Plan under one of (1) the following conditions:

- A.  with the specific consent of the individual who is the subject of the Protected Health Information, provided that the Plan obtains any required authorization;
- B.  for payment of claims submitted to the Plan, or for utilization review activities as described in Article VI, including, but not limited to, the review of any grievances or appeals involved in such activities which are generated by the Covered Person or his or her authorized representatives;
- C.  for other reasonable purposes necessary to operate the Plan, to the extent that such Protected Health Information is required for such purposes, including:
  1.  quality assessment and improvement activities;
  2.  evaluation of Plan performance;
  3.  underwriting and premium rating and other activities relating to the procuring, renewal or replacement of stop loss or excess loss insurance;
     a)  conducting or arranging for medical review, legal services and auditing functions, including fraud and abuse detection and compliance programs;
     b)  business planning and development of the Plan;
     c)  business management and general administrative activities of the Plan, including, but not limited to, enrollments, billing, customer service and the resolution of internal grievances; and
     d)  other health care operations listed under 45 C.F.R. § 164.501.

No other use or disclosure of Protected Health Information is permitted by this Plan.

### 15.3    DISCLOSURES OF HEALTH INFORMATION TO THE COMPANY

The Plan Administrator will disclose, or permit the disclosure of, Health Information to the Company only as described below:

- A.  for any of the purposes and under the conditions described in Section 15.2;
- B.  as Summary Health Information, if requested by the Company for the following purposes:
  1.  obtaining premium bids from health plans for providing health insurance coverage under the Plan;  or
  2.  modifying, amending or terminating the Plan; or
- C.  for informational purposes regarding whether an individual is participating in the Plan, provided such information is only used by the Company for the purpose of performing Plan administrative functions.

Prior to any disclosure of Health Information to the Company, such entity must agree:

A.  not to use or further disclose the information other than as permitted or required by this section, or as required by law;

B.  that it will ensure that any agents, including subcontractors, employed by the Company or Plan Administrator for Plan administration or other Plan purposes to whom it provides Protected Health Information, including, but not limited to, the Benefit Manager, any Utilization Review Service or Pharmacy benefit manager, agree to the same restrictions and conditions that apply to the Company with respect to such information;

C.  not to use or disclose the Protected Health Information for employment-related actions and decisions, or in connection with any other benefit or employee benefit plan sponsored by the Company; and

D.  that it will report to the Plan Administrator any use or disclosure of the information that is inconsistent with the uses or disclosures provided for in this section of which it becomes aware;

E.  that it will make available Protected Health Information to the subject of such information, and allow amendment to such information as described in  Section 15.4 and Section 15.5;

F.  that it will provide an accounting in accordance with 45 C.F.R. § 164.528, upon the request of the subject of Protected Health Information, of the disclosure of such information by the Plan made within six (6) years of the request, except information exempted from such accounting under that section;

G.  that it will make available its internal practices, books, and records relating to the use and disclosure of protected health information received from the Plan to the Secretary of the United States Department of Health and Human Services for the purpose of determining compliance by the Plan with the privacy provisions of HIPAA;

H.  that it will, if feasible, return or destroy all Protected Health Information received from the Plan that the Company still maintains in any form, and that it will not retain any copies of such information when no longer needed for the purpose for which the disclosure was made.  If return or destruction is not feasible, that it will limit further uses and disclosures to those purposes which make the return or destruction of the information infeasible; and

I.  that it will provide for adequate separation between the Plan and the Plan Sponsor by implementing the following procedures:

   1.  access to Protected Health Information will only be provided to the Company's human resources associates who have been assigned specific job responsibilities involving Plan administration and have been so designated by the Plan Administrator;

   2.  that access to and use by such employees or other persons as described above will be limited to the plan administration functions that the Company performs for the Plan; and

   3.  any non-compliance by such named individuals with the privacy provisions of this Plan will be addressed in accordance with the Company's established employee discipline and termination procedures.

## 15.4   ACCESS OF COVERED PERSONS TO PROTECTED HEALTH INFORMATION

A Covered Person or other individual has the right of access to inspect and obtain a copy of Protected Health Information about such person as long as such information is maintained by the Plan, except for:

A.  psychotherapy notes;

84

—————————————————————— Park National Corporation Employee Health Benefit Plan Wellness Plan

    B.  information complied in reasonable anticipation, or for use in, a civil, criminal or administrative proceeding or action; or

    C.  as such information is otherwise exempted from disclosure under 45 C.F.R. § 164.524.

Any such request must be made to the Plan Administrator a writing signed by the Covered Person whose information is being requested. The Plan Administrator will notify the Covered Person, in writing, as to whether such request is approved or denied, and, if approved, will provide access to the information in accordance with 45 C.F.R. § 164.524(c), including the imposition of reasonable fees for the costs of providing such access.

## 15.5   AMENDMENT RIGHTS

A Covered Person or other individual has the right to have the Company amend Protected Health Information or other information about such individual as long as such information is maintained by the Plan.. The Plan Administrator will deny such a request if:

    A.  the information was not created by the Plan, unless the individual provides a reasonable basis to believe that the originator of the Protected Health Information is no longer available to act on the requested amendment;

    B.  the information is not currently maintained in any record by the Plan;

    C.  the information would not be available for inspection under the reasons cited in Section 15.4; or

    D.  the information in the Plan's records is accurate and complete.

Any request for amendment of Protected Health Information must be provided in writing to the Plan Administrator and signed by the Covered Person or individual who is the subject of the information with an explanation as to why such person believes the information is inaccurate, incomplete or incorrect. The Plan Administrator will notify the Covered Person, in writing, as to whether such request is approved or denied, and, if approved, will make the necessary corrections to the information in accordance with 45 C.F.R. § 164.526(c). The Plan Administrator will make reasonable efforts to inform all entities which it has knowledge of such entity's receipt of any information which has been corrected. If the request is denied, the individual may submit a written statement disagreeing with the denial which includes the basis of such disagreement. The Plan Administrator may prepare a written rebuttal of such statement. The statement of disagreement, and the rebuttal, if any, will be included in any future disclosure of the information. Even if no statement of disagreement is submitted, the individual may request that the request for amendment and denial be included with any future disclosures of the information.

## 15.6 SECURITY OF PROTECTED HEALTH INFORMATION

The Company will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic Protected Health Information that is created, received, maintained or transmitted on behalf of the Plan, including reasonable and appropriate security measures between the Company and the Plan to support the requirements of Section 15.3. The Company will further ensure that any agent, including a subcontractor, to whom it provides access to Protected Health Information agrees to implement reasonable and appropriate security measures to protect the information, and will report any security incident of which it becomes aware to the Plan Administrator.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## ARTICLE XVI

### STATEMENT OF ERISA RIGHTS
#### (Required by Federal Law and Regulations)

As a Participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan Participants shall be entitled to:

A. **Receive Information About Your Plan and Benefits:**

1. Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

2. Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description.  The administrator may make a reasonable charge for the copies.

3. Receive a copy of the Plan's annual financial report.  The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

B. **Continue Group Health Plan Coverage:**

1. Continue health care coverage for yourself, spouse or Dependents if there is a loss of coverage under the Plan as a result of a Qualifying Event.  You or your Dependents may have to pay for such coverage.  Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation rights.

2. Reduction or elimination of exclusionary periods of coverage for Pre-Existing Conditions under your group health plan, if you have Creditable Coverage from another plan.  You should be provided a certificate of Creditable Coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to twenty-four (24) months after losing coverage.  Without evidence of Creditable Coverage, you may be subject to a Pre-Existing Condition exclusion for twelve (12) months (eighteen (18) months for late enrollees) after your enrollment date in your coverage.

C. **Prudent Actions by Plan Fiduciaries:**

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries.  No one, including your Employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

D. **Enforce Your Rights:**

1. If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

86

2. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within thirty (30) days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to one hundred ten dollars ($110.00) a day until you received the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court. If it should happen that Plan Fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## E. Assistance with your questions:

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration (formerly Pension and Welfare Benefits Administration), U.S. Department of Labor, listed in your telephone directory or the Office of Participant Assistance and Communications, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

Park National Corporation Employee Health Benefit Plan Wellness Plan

## APPENDIX I
## NOTICE OF COBRA CONTINUATION COVERAGE RIGHTS

<u>Introduction</u>

You are receiving this notice because you have recently become covered under the Park National Corporation Employee Health Benefit Plan Wellness Plan (the Plan). This notice contains important information about your right to COBRA continuation coverage, which is a temporary extension of coverage under the Plan. The right to COBRA continuation coverage was created by a federal law, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). COBRA continuation coverage can become available to you and to other members of your family who are covered under the Plan when you would otherwise lose your group health coverage. **This notice generally explains COBRA continuation coverage, when it may become available to you and your family, and what you need to do to protect the right to receive it.** This notice give only a summary of your COBRA continuation coverage rights. For more information about your rights and obligation under the Plan and under federal law, you should either review the Plan's Summary Plan Description *or* get a copy of the Plan Document from the Plan Administrator.

The Plan Administrator is:

Park National Corporation
50 North Third Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

The Plan Administrator is responsible for administering COBRA continuation coverage.

<u>COBRA Continuation Coverage</u>

COBRA continuation coverage is a continuation of Plan coverage when coverage would otherwise end because of a life event known as a "qualifying event." Specific qualifying events are listed later in this notice. COBRA continuation coverage must be offered to each person who is a "qualified beneficiary." A qualified beneficiary is someone who will lose coverage under the Plan because of a qualifying event. Depending on the type of qualifying event, employees, spouses of employees, and dependent children of employees may be qualified beneficiaries. Under the Plan, qualified beneficiaries who elect COBRA continuation coverage must pay for COBRA continuation coverage.

If you are an employee, you will become a qualified beneficiary if you will lose your coverage under the Plan because either one of the following qualifying events happens:

(1) Your hours of employment are reduced; or
(2) Your employment ends for any reason other than your gross misconduct.

If you are the spouse of an employee, you will become a qualified beneficiary if you will lose your coverage under the Plan because any of the following qualifying events happens:

(1) Your spouse dies;
(2) Your spouse's hours of employment are reduced;
(3) Your spouse's employment ends for any reason other than his or her gross misconduct;
(4) Your spouse becomes enrolled in Medicare (Part A, Part B, or both); or
(5) You become divorced or legally separated from your spouse.

Your dependent children will become qualified beneficiaries if they will lose coverage under the Plan because any of the following qualifying events happens:

(1) The parent-employee dies;
(2) The parent-employee's hours of employment are reduced;

88

Park National Corporation Employee Health Benefit Plan Wellness Plan

(3) The parent-employee's employment ends for any reason other than his or her gross misconduct;

(4) The parent-employee becomes enrolled in Medicare (Part A, Part B, or both);

(5) The parents become divorced or legally separated; or

(6) The child stops being eligible for coverage under the plan as a "dependent child."

Sometimes, filing a proceeding in bankruptcy under title 11 of the United States Code can be a qualifying event.  If a proceeding in bankruptcy is filed with respect to Park National Corporation, and that bankruptcy results in the loss of coverage of any retired employee covered under the Plan, the retired employee is a qualified beneficiary with respect to the bankruptcy.  The retired employee's spouse, surviving spouse, and dependent children will also be qualified beneficiaries if bankruptcy result in the loss of their coverage under the Plan.

The Plan will offer COBRA continuation coverage to qualified beneficiaries only after the Plan Administrator has been notified that a qualifying event has occurred.  When the qualifying event is the end of employment or reduction of hours of employment, death of the employer, commencement of a proceeding in bankruptcy with respect to the employer, or enrollment of the employee in Medicare (Part A, Part B, or both), the employer must notify the Plan Administrator of the qualifying event within 30 days following the date coverage ends.

For other qualifying events (divorce or legal separation of the employee and spouse or a dependent child's losing eligibility for coverage as a dependent child), you must notify the Plan Administrator.  The Plan requires you to notify the Plan Administrator within 60 days after the qualifying event occurs.  You must send this notice to:

Human Resources
Park National Corporation
50 North Third Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

Once the Plan Administrator receives notice that a qualifying event has occurred, COBRA continuation coverage will be offered to each of the qualifying beneficiaries.  For each qualified beneficiary who elects COBRA continuation coverage, the COBRA continuation coverage will begin on that date that Plan coverage would otherwise have been lost.

COBRA continuation coverage is a temporary continuation of coverage.  When the qualifying event is the death of the employee, enrollment of the employee in Medicare (Part A, Part B, or both), your divorce or legal separation, or a dependent child losing eligibility as a dependent child, COBRA continuation coverage lasts for up to 36 months.

When the qualifying event is the end of employment or reduction of the employee's hours of employment, COBRA continuation coverage lasts for up to 18 months.  There are two ways in which this 18-month period of COBRA continuation coverage can be extended.

Disability extension of 18-month period of continuation coverage

If you or anyone in your family covered under the Plan is determined by the Social Security Administration to be disabled at any time during the first 60 days of COBRA continuation coverage and you notify the Plan Administrator in a timely fashion, you and your entire family can receive up to an additional 11 months of COBRA continuation coverage, for a total maximum of 29 months. You must make sure that the Plan Administrator is notified of the determination within 60 days of the date of the determination and before the end of the 18-month period of COBRA continuation coverage.  This notice should be sent to:

Park National Corporation Employee Health Benefit Plan Wellness Plan

Human Resources
Park National Corporation
50 North Third Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

## Second qualifying event extension of 18-month period of continuation coverage

If your family experiences another qualifying event while receiving COBRA continuation coverage, the spouse and dependent children in your family can get additional months of COBRA continuation coverage, up to a maximum of 36 months. This extension is available to the spouse and dependent children if the former employee dies, enrolls in Medicare (Part A, Part B, or both), or gets divorced or legally separated. The extension is also available to a dependent child when that child stops being eligible under the Plan as a dependent child. In all of these cases, you must make sure that the Plan Administrator is notified of the second qualifying event within 60 days of the second qualifying event. This notice must be sent to:

Human Resources
Park National Corporation
50 North Third Street
P. O. Box 3500
Newark, Ohio 43058-3500
(740) 349-3917

## If You Have Questions

If you have questions about your COBRA continuation coverage, you should contact the Plan Administrator or you may contact the nearest Regional or District Office of the U.S. Department of Labor's Employee Benefits Security Administration (EBSA). Addresses and phone numbers of Regional and District EBSA Offices are available through the EBSA's website at www.dol.gov/ebsa.

## Keep Your Plan Informed of Address Changes

In order to protect your family's rights, you should keep the Plan Administrator informed of any changes in the addresses of family members. You should also keep a copy, for your records, of any notices you send to the Plan Administrator.

Park National Corporation Employee Health Benefit Plan Wellness Plan

IN WITNESS WHEREOF, Park National Corporation Employee Health Benefit Plan – Wellness Plan is revised, by execution hereof, effective as of October 1, 2012 unless otherwise indicated.

By   _Jill Evans_

Park National Corporation

_1.23.13_

Date

_Lacee M Priest_

Witness

_1-23-13_

Date

**PARK NATIONAL CORPORATION**
**EMPLOYEE HEALTH BENEFIT PLAN - WELLNESS PLAN**

**AMENDMENT NO. 1**

Park National Corporation Employee Health Benefit Plan – Wellness Plan (hereinafter referred to as "Plan") is hereby amended and modified as set forth below.  Such amendments are effective as of the dates listed below

1)  Effective January 1, 2014, Section 2.5, entitled, "**MEDICAL COINSURANCE AND OUT-OF-POCKET LIMITS (EFFECTIVE JANUARY 1, 2013)**, as set forth in Article II of the Plan, is deleted and replaced with the following:

"**2.5 MEDICAL COINSURANCE AND OUT-OF-POCKET LIMITS**
**In-Network (Preferred Provider) Coinsurance**            20%

**Out-of-Network (Non-Preferred Provider) Coinsurance**     40%

See Section 2.7, Medical Copayment and Coinsurance Amounts, for Coinsurance amounts that vary from this standard.

Calendar Year Out-of-Pocket Limits
*(including Deductibles non-prescription drug Copayments)*

|  | In-Network | Out-of-Network |
|---|---|---|
| **COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Per Individual | $2,350.00 | $4,700.00 |
| Per Family | $4,700.00 | $9,400.00 |
| **NON-COMPLIANT WITH WELLNESS PROGRAM** *(See Section 10.4)* | | |
| Per Individual | 4,700.00 | $9,400.00 |
| Per Family | $9,400.00 | $18,800.00 |

All charges, except those paid at 100%, will be applied to the Out-of-Pocket maximum. Amounts applied to the In-Network Out-of-Pocket limits will be applied to the Out-of-Network Out-of-Pocket limits, and vice versa."

2)  Effective October 1, 2012, Section 2.9 entitled, "**SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**," as set forth in Article II of the Plan, is amended by adding thereto the following new item:

"**FDA      Approved      Oral      Contraceptives**
**Prescribed for Females**                     None"

3)  Effective April 1, 2013, Section 2.9 entitled, "**SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**," as set forth in Article II of the Plan and as amended above, is amended in its entirety, as follows:

"**2.9 SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**
The Plan has a prescription drug card program that covers prescriptions dispensed through a participating pharmacy. For a listing of the participating pharmacies, contact the Plan Administrator.  The Plan will cover up to a maximum of thirty-four (34) days per prescription. A ninety (90) day supply can also be obtained through the prescription drug program; however three (3) Copayments will apply.  Certain exclusions and limitations apply to the prescription drug card program.  These are described in Section 10.2 of the Plan.

Park National Corporation Employee Health Benefit Plan – Wellness Plan _____ Amendment No. 1

## COPAYMENTS

| | |
|---|---|
| **Bowel Kits in Connection with Colonoscopy** | None |
| **FDA Approved Oral and Injectable Contraceptives Prescribed for Females** | None |
| **Over-the-Counter Alavert, Claritin, Claritin D, Prilosec, Prevacid 24, Zyrtec, Zyrtec D, Abreva, Alaway, Zaditor, Slo-Niacin, and Omeprazole** | $5.00 |
| **Generic Equivalent Drug Copayment** | Lesser of $10.00 or the cost of the drug |
| **Brand Name Drug Copayment** | |
| Formulary/Preferred | 30% of the cost of the drug up to $100.00 maximum Copayment per prescription |
| Non – Formulary/ Non - Preferred | 30% of the cost of the drug plus $20.00 up to $100.00 maximum Copayment per prescription |
| **Specialty Copayments For Specific Conditions** | Certain drugs for specific health conditions may be available at a reduced Copayment. Please contact the Plan Administrator for a listing of qualifying drugs." |

4)   Effective January 1, 2014, Section 2.9 entitled, **"SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM,"** as set forth in Article II of the Plan and as amended above, is amended in its entirety, as follows:

**"2.9 SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**
The Plan has a prescription drug card program that covers prescriptions dispensed through a participating pharmacy. For a listing of the participating pharmacies, contact the Plan Administrator. The Plan will cover up to a maximum of thirty-four (34) days per prescription. A ninety (90) day supply can also be obtained through the prescription drug program; however three (3) Copayments will apply. Certain exclusions and limitations apply to the prescription drug card program. These are described in Section 10.2 of the Plan.

**The Plan has designated certain categories of brand name drugs as not covered, however such drugs may be available at a discounted rate through a special program ("discount program"). The categories of drugs that are included under this program are listed in Section 10.2. The discount program does not apply to generic drugs.  Any generic drug that is in one of the specified categories will be considered a Tier I drug and the Tier I Copayment will apply.**

## COPAYMENTS

| | |
|---|---|
| **Bowel Kits in Connection with Colonoscopy** | None |
| **FDA Approved Oral and Injectable Contraceptives Prescribed for Females** | None |

Park National Corporation Employee Health Benefit Plan – Wellness Plan _____ Amendment No. 1

| | |
|---|---|
| Over-the-Counter Alavert, Claritin D, Prilosec, Prevacid 24, Zyrtec, Zyrtec D, Abreva, Alaway, Zaditor, Slo-Niacin, and Omeprazole | $5.00 |
| Generic Equivalent Drug Copayment | Lesser of $10.00 or the cost of the drug |
| **Brand Name Drug Copayment** | |
| Formulary/Preferred | 30% of the cost of the drug up to $100.00 maximum Copayment per prescription |
| Non – Formulary/ Non - Preferred | 30% of the cost of the drug plus $20.00 up to $100.00 maximum Copayment per prescription |
| Specialty Copayments For Specific Conditions | Certain drugs for specific health conditions may be available at a reduced Copayment. Please contact the Plan Administrator for a listing of qualifying drugs. |

### PRESCRIPTION OUT-OF-POCKET MAXIMUM
*(per Calendar Year)*

| | |
|---|---|
| Per Individual | $6,350.00 |
| Per Family | $12,700.00" |

5) Effective January 1, 2014, the definitions of **"COPAYMENT"** and **"OUT-OF-POCKET,"** in Section 3.1 entitled, **"GENERAL AND MEDICAL PLAN DEFINITIONS,"** as set forth in Article III of the Plan, are amended in their entireties, as follows:

**"COPAYMENT"**
The term "Copayment" means a specific dollar amount (or percentage) of the Covered Expenses that the Covered Person must pay before the Plan pays benefits for a particular service or supply. The Copayment does not apply to any Deductible amount."

**"OUT-OF-POCKET"**
The term "Out-of-Pocket" means the amount of Covered Expenses that are the responsibility of the Covered Person and that accumulate towards the Plan's Out-of-Pocket maximum, not including amounts for:

   A. Copayments under the prescription program (separate Out-of-Pocket applies, as described in Section 2.9);

   B. other items specifically excluded from the Out-of-Pocket maximum listed in Section 2.5;

   C. expenses that are not covered under this Plan;

   D. in excess of the Reasonable and Customary charge for a service or supply;

   E. in excess of any maximum benefit listed in the Plan; or

   F. attributable to any penalty."

6) Effective April 1, 2013, Subsection L in the list of Covered Expenses in Section 10.3 entitled, **"SCHEDULE OF PRESCRIPTION DRUG CARD AND MAIL ORDER PRESCRIPTION PROGRAMS,** as set forth in Article X of the Plan, is amended in its enirety, as follows:

Park National Corporation Employee Health Benefit Plan – Wellness Plan _____ _____ _____ Amendment No. 1

"L.  FDA approved oral and injectable contraceptives prescribed for females;"

7)  Effective April 1, 2013, Subsection C in list of exclusions in Section 10.3 entitled, **"SCHEDULE OF PRESCRIPTION DRUG CARD AND MAIL ORDER PRESCRIPTION PROGRAMS,"** as set forth in Article X of the Plan, is amended in its entirety, as follows:

"C. contraceptives, including implants and devices, unless specifically listed as a Covered Expense in Section 10.3."

8)  Effective January 1, 2014, Section 10.3 entitled, **"SCHEDULE OF PRESCRIPTION DRUG CARD AND MAIL ORDER PRESCRIPTION PROGRAMS,"** as set forth in Article X of the Plan and as amended above, is amended by adding the following to the end of the section:

"The Plan Administrator has designated certain categories of brand name drugs as not covered through the drug card program, but eligible for the discount pharmacy program ("Discount Program"). The cost to the Covered Person will include any discount available through the pharmacy program. Generic drugs for these conditions are covered as described in Section 2.9. The brand name drug categories that apply to the Discount Program are:

A.  tetracyclines;
B.  androgens;
C.  estrogens;
D.  Nicotinic Acid;
E.  non-sedating antihistamines;
F.  antihistamines with decongestants;
G.  proton pump inhibitors;
H.  nasal inhaled medicines;
I.  drugs for erectile dysfunctions;
J.  drugs for benign prostatic hypertrophy (BPH);
K.  drugs for over active bladder;
L.  ophthalmic anti-allergy; and
M.  topical anti-virals."

9)  Effective January 1, 2014, the last paragraph in Section 10.5, entitled, **"COMPREHENSIVE CARE MANAGEMENT,"** as set forth in Aricle X of the Plan, is amended in its entirety, as follows:

"In addition, the Covered Person and his or her providers are considered important parts of this team. If selected for this program, the Covered Person will be contacted by a member of this team regarding his or her participation. Charges for services or supplies related to the above conditions will <u>not</u> be considered a Covered Expense under the Plan unless the Covered Person who has been selected for this program participates in such program. Participation in this program is mandatory, however the participation requirement shall be waived for a Covered Person who is enrolled in an additional health plan that pays benefits primary to this Plan. For additional information about this program, contact the Benefit Manager or the Utilization Review Service."

Park National Corporation Employee Health Benefit Plan – Wellness Plan _____ Amendment No  1

Park National Corporation hereby adopts the above amendments to the Park National Corporation Employee Health Benefit Plan – Wellness Plan effective on the dates listed above.

ADOPTED this ___twenty -first___ day of __Apr__, 2014.


PLAN ADMINISTRATOR FOR THE
PARK NATIONAL CORPORATION
EMPLOYEE HEALTH BENEFIT PLAN

PARK NATIONAL CORPORATION
EMPLOYEE HEALTH BENEFIT PLAN - WELLNESS PLAN

AMENDMENT NO. 2

Park National Corporation Employee Health Benefit Plan – Wellness Plan (hereinafter referred to as "Plan") is hereby amended and modified as set forth below.  Such amendments are effective as of the dates listed below:

1)  Effective July 1, 2014, the item named "**UTILIZATION REVIEW SERVICE**" as set forth in Article I of the Plan, is amended in its entirety, as follows:

"**UTILIZATION REVIEW SERVICE**
American Health Holding, Inc.
(888) 877-8084"

2)  Effective April 1, 2014, Section 2.9 entitled, "**SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**," as set forth in Article II of the Plan and as amended in Amendment No.1 is amended in its entirety, as follows:

"**2.9 SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**
The Plan has a prescription drug card program that covers prescriptions dispensed through a participating pharmacy. For a listing of the participating pharmacies, contact the Plan Administrator. The Plan will cover up to a maximum of thirty-four (34) days per prescription. A ninety (90) day supply can also be obtained through the prescription drug program; however, three (3) Copayments will apply. Certain exclusions and limitations apply to the prescription drug card program. These are described in Section 10.2 of the Plan.

**The Plan has designated certain categories of brand name drugs as not covered, however such drugs may be available at a discounted rate through a special program ("discount program"). The categories of drugs that are included under this program are listed in Section 10.2. The discount program does not apply to generic drugs. Any generic drug that is in one of the specified categories will be considered a Tier I drug and the Tier I Copayment will apply.**

COPAYMENTS

| | |
|---|---|
| Bowel Kits in Connection with Colonoscopy | None |
| Over-the-Counter Alavert, Allegra, Allegra-D, Claritin, Claritin D, Prilosec, Prevacid 24, Zyrtec, Zyrtec D, Abreva, Alaway, Zaditor, Slo-Niacin, and Omeprazole | $5.00 |
| Generic Equivalent Drug Copayment | Lesser of $10.00 or the cost of the drug |
| **Brand Name Drug Copayment** | |
| Formulary/Preferred | 30% of the cost of the drug up to $100.00 maximum Copayment per prescription |
| Non – Formulary/ Non - Preferred | 30% of the cost of the drug plus $20.00 up to $100.00 maximum Copayment per |

prescription

**Specialty Copayments For Specific Conditions**      Certain drugs for specific health conditions may be available at a reduced Copayment. Please contact the Plan Administrator for a listing of qualifying drugs.

### PRESCRIPTION OUT-OF-POCKET MAXIMUM
*(per Calendar Year)*

| | |
|---|---|
| **Per Individual** | $6,350.00 |
| **Per Family** | $12,700.00" |

3) Effective April 1, 2014, Item"M" in the list of Covered Expenses in Section 10.3 entitled, "**SCHEDULE OF PRESCRIPTION DRUG CARD AND MAIL ORDER PRESCRIPTION PROGRAMS,**" as set forth in Article X of the Plan, is amended in its entirety, as follows:

"M. over-the-counter Allegra, Allegra-D, Alavert, Claritin, Claritin-D., Prilosec, Prevacid 24, Zyrtec, Zyrtec-D., Abreva, Omeprazole, Alaway, Slo-Niacin and Zaditor, with a Physician's written prescription"

4) Effective January 1, 2014, Section 10.4 entitled, "**WELLNESS EDUCATION AND DISEASE MANAGEMENT PROGRAM,**" as set forth in Article X of the Plan, is amended in its entirety, as follows:

"**10.4  WELLNESS EDUCATION AND DISEASE MANAGEMENT PROGRAM**
The Plan includes a comprehensive Wellness Education and Disease Management Program (for purposes of this provision "Program") which provides wellness education for all Covered Persons and also identifies Covered Persons under the Plan who have been diagnosed with specific medical conditions, including, but not limited to, diabetes, asthma, hypertension, high cholesterol and coronary artery diseases.  All Covered Persons are automatically eligible and enrolled in the Program.  Covered Persons with specific medical conditions will be identified through information obtained through claims and other information submitted to the Plan, referrals by utilization review and case management and from other sources.  Covered Persons with chronic conditions will be contacted for wellness education and health counseling.  The goal of the Program is to help each Covered Person better manage his or her medical condition(s) by focusing on his or her lifestyle, and any barriers hindering the progression to a healthier lifestyle.

As part of the Program, Covered Persons will be required to obtain various preventive health screenings from the Covered Person's Physician, including, but not limited to, preventive wellness examination, Screening Mammography, PAP smear, cholesterol screening and colonoscopy.  Each screening will be performed based on a frequency recommended by the Program and/or the Company.

If a Participant or his or her spouse completes such testing by September 30th, the date specified by the Plan Administrator, the Covered Person under this Plan may be entitled to additional benefits for the following Calendar Year, such as premium reductions or other additional benefits.  Covered Persons who meet the program's requirements by September 30th will be enrolled in the Wellness plan option with lower Deductibles and Out-of-Pocket limitations, effective January 1st of the following year.  Covered Persons

who choose not to participate in the program will be enrolled in the Non-Compliant Plan option.

· The Plan Administrator will provide the required testing deadlines and the benefit enhancements for any Calendar Year to all interested persons.  Covered Persons may also be asked to complete a Medical Risk Questionnaire (MRQ).   In addition, the Covered Person may be placed on a telephone call schedule with an experienced nurse coordinator to discuss his or her health, to assess ongoing symptoms, to provide education in a variety of formats or to follow up on specific diagnostic requirements and tests."

5)   Effective July 1, 2014, Section 10.5 entitled, "**COMPREHENSIVE CARE MANAGEMENT.**" as set forth in Article X of the Plan, and as amended in Amendment No.1, is deleted in its entirety.

Park National Corporation hereby adopts the above amendments to the Park National Corporation Employee Health Benefit Plan – Wellness Plan effective on the dates listed above.

ADOPTED this _____ 1st _____ day of ___ July ___, 2014.


PLAN ADMINISTRATOR FOR THE
PARK      NATIONAL      CORPORATION
EMPLOYEE HEALTH BENEFIT PLAN

**PARK NATIONAL CORPORATION**
**EMPLOYEE HEALTH BENEFIT PLAN - WELLNESS PLAN**

**AMENDMENT NO. 3**

Park National Corporation Employee Health Benefit Plan – Wellness Plan (hereinafter referred to as "Plan") is hereby amended and modified as set forth below.  Such amendments are effective as of the dates listed below.

1)  Effective October 1, 2014, any references to Pre-Existing Condition limitations are deleted in their entireties for claims incurred on or after October 1, 2014, for any Covered Person.

2)  Effective January 1, 2015, Section 2.5, entitled, **"MEDICAL COINSURANCE AND OUT-OF-POCKET LIMITS,"** as set forth in Article II of the Plan and as amended in Amendment No.1, is amended in its entirety, as follows:

**"2.5 MEDICAL COINSURANCE AND OUT-OF-POCKET LIMITS**

**COMPLIANT WITH WELLNESS PROGRAM (See Section 10.4)**

| | |
|---|---|
| **In-Network (Preferred Provider) Coinsurance** | 20% |
| **Out-of-Network (Non-Preferred Provider) Coinsurance** | 40% |

See Section 2.7, Medical Copayment and Coinsurance Amounts, for Coinsurance amounts that vary from this standard.

Calendar Year Out-of-Pocket Limits
*(including Deductibles and non-prescription drug Copayments)*

| | In-Network | Out-of-Network |
|---|---|---|
| Per Individual | $2,350.00 | $50,000.00 |
| Per Family | $4,700.00 | *Not Applicable* |

**NON-COMPLIANT WITH WELLNESS PROGRAM (See Section 10.4)**

| | |
|---|---|
| **In-Network (Preferred Provider) Coinsurance** | 20% |
| **Out-of-Network (Non-Preferred Provider) Coinsurance** | 40% |

See Section 2.7, Medical Copayment and Coinsurance Amounts, for Coinsurance amounts that vary from this standard.

Calendar Year Out-of-Pocket Limits

| | In-Network *(including Deductibles, the Covered Person's share of Coinsurance and non-prescription drug Copayments)* | Out-of-Network *(including Deductibles and the Covered Person's share of Coinsurance)* |
|---|---|---|
| Per Individual | $4,700.00 | $50,000.00 |
| Per Family | $9,400.00 | *Not Applicable* |

All Out-of-Pocket charges for Covered Expenses will be applied to the Out-of-Pocket maximum.  Amounts applied to the In-Network Out-of-Pocket limits will be applied to the Out-of-Network Out-of-Pocket limits, and vice versa."

3) Effective January 1, 2015, Section 2.7, entitled, "**MEDICAL COINSURANCE AMOUNT,**" as set forth in Article II of the Plan is amended by adding thereto the following:

| | "Copayment | Deductible | Preferred Provider Coinsurance | Non-Preferred Provider Coinsurance" |
|---|---|---|---|---|
| "Smoking Cessation Counseling① | | | | |
| Preferred Provider | None | None | None | N/A |
| Non Preferred Provider | Applies | N/A | N/A | 40%" |

4) Effective January 1, 2015, Section 2.8, entitled, "**MEDICAL PLAN BENEFIT MAXIMUMS,**" as set forth in Article II of the Plan, is amended by adding thereto the following new item:

| "Smoking Cessation Counseling | Limited to two attempts per year with up to four sessions per attempt" |
|---|---|

5.) Effective January 1, 2015, Section 2.9 entitled, "**SCHEDULE OF PRESCRIPTION DRUG CARD PROGRAM**" as set forth in Article II of the Plan and as amended in Amendment No. 1 and No. 2, is amended by adding thereto the following:

| "FDA Approved Smoking Cessation Products, including Over-the-Counter | None" |
|---|---|

6.) Effective October 1, 2014, the definitions of "**PATIENT CARE SERVICES**" and "**QUALFIED CLINICAL TRIALS**" as set forth in Section 3.1 of the Plan are deleted, in their entireties.

7.) Effective October 1, 2014, the definition of "**EXPERIMENTAL OR INVESTIGATIONAL,**" in Section 3.1, entitled, "**GENERAL AND MEDICAL PLAN DEFINITIONS,**" as set forth in Article III of the Plan is amended in its entirety, as follows:

"**EXPERIMENTAL OR INVESTIGATIONAL**
The terms 'Experimental" or "Investigational" mean any one or more of the following is true of a treatment, procedure, device, drug or medicine:

    A.  it cannot be lawfully marketed without the U.S. Food and Drug Administration approval; and approval for marketing for the condition treated has not been given at the time the device, drug or medicine is furnished.

    B.  reliable evidence shows that to determine its maximum tolerated dose, toxicity, safety, efficacy (or efficacy as compared with the standard means of treatment or diagnosis):

        1.  it is undergoing phase I, II or III clinical trials or is under study; or

        2.  further clinic trials or studies are needed, according to the experts' consensus of opinion.

This does not exclude coverage for Routine Patient Costs provided as part of an Approved Clinical Trial for the treatment of cancer or another Life Threatening Condition or disease for a Qualified Individual. Services for Routine Patient Costs must be obtained through a Preferred Provider if such Approved Clinical Trial takes place within the Covered Person's state of residence.

Reliable evidence means only published reports and articles in the authoritative medical and scientific literature; or the written protocol or written informed consent used by the

2

treating facility (or by another facility studying substantially the same treatment, procedure, device, drug or medicine). The terms "Experimental" or "Investigational" shall also mean:

A. any treatments, services, supplies or related expenses that are educational or provided primarily for research; or

B. treatments, procedures, devices, drugs or medicines or other expenses relating to the transplant of non-human organs."

**"OUT-OF-POCKET**
The term "Out-of-Pocket" means the amount of Covered Expenses that are the responsibility of the Covered Person and that accumulate towards the Plan's Out-of-Pocket maximum, not including amounts for:

A. expenses that are not covered under this Plan;

B. in excess of the Reasonable and Customary charge for a service or supply;

C. in excess of any maximum benefit listed in the Plan; or

D. attributable to any penalty."

8.) Effective, October 1, 2014, Section 3.1, entitled, **"GENERAL AND MEDICAL PLAN DEFINITIONS,"** as set forth in Article III of the Plan and as amended in Amendment No. 1 and above, is amended by adding thereto the following new definitions:

**"APPROVED CLINICAL TRIAL**
The term "Approved Clinical Trial" means a phase I, phase II, phase III or phase IV clinical trial that is conducted in relation to the prevention, detection or treatment of cancer or other Life Threatening Condition and is one of the following:

A. it is a federally funded trial that is approved or funded, including in-kind contributions, by one or more of the following entities:

1. the Centers for Disease Control and Prevention;
2. the Agency for Health Care Research and Quality;
3. the Centers for Medicare & Medicaid Services;
4. the National Institutes of Health;
5. the United States Department of Defense;
6. the United States Department of Veterans' Affairs;
7. cooperative group or center of any of the above entities;
8. the United States Department of Energy; or
9. A qualified non-governmental research entity identified in the guidelines issued by the National Institutes of Health for center support grants; or

B. a clinical trial conducted under an FDA investigational new drug application; or

C. a drug trial that is exempt from the requirement of an FDA investigation new drug application."

**"ASSOCIATE**
The term "Associate" means an employee of Park National Corporation who is also a Participant under this Plan."

**"BANK**
The term "Bank" means Park National Corporation, the Plan sponsor."

3

**"FULL TIME EMPLOYEE"**

The term "Full-Time Employee" means an employee who, on the date of hire, is reasonably expected to work, on average, at least thirty (30) hours per week (or one hundred thirty (130) hours per month) on an annual basis. Such an employee shall start his or her waiting period, if any, on the date of hire."

**"LIFE THREATENING CONDITION"**

The term "Life Threatening Condition" means any disease or condition from which the likelihood of death is probable, unless the course of the disease or condition is interrupted."

**"MEASUREMENT PERIOD"**

The term "Measurement Period" means the look back period of time, as determined by the Plan Administrator, for use in determining whether Variable Hour Employees (and Full-Time Employees who have been employed for at least one (1) Measurement Period) are employed for an average of at least thirty (30) hours per week and are therefore eligible for coverage under the Plan during the next Stability Period.   The Employer sponsoring this Plan uses a twelve (12) month Measurement Period, starting on the date of hire for new employees (and ending one (1) year later), or on November 1st and ending October 31st of the next Calendar Year for employees who have been employed for at least one (1) Measurement Period.  The Employer shall also establish a preliminary Measurement Period used to measure the hours of applicable employees during the first year the Employer uses such a measurement method.

If an employee experiences a break in service during a Measurement Period, the existing Measurement Period will resume once he or she returns to active employment with the Employer if the break in service is less than the period of active employment prior to the break, and less than thirteen (13) weeks in length.  If the break in service is more than either the employee's total employment before the break, or thirteen (13) weeks, a new initial Measurement Period will commence once he or she resumes employment. Any such break in service that is attributable to FMLA, Service in the Uniformed Services, jury duty, or any other statutory continuation will be disregarded for the purposes of determining what the average number of hours of employment were during the entire Measurement Period.

The Employer will notify all Variable Hour Employees (and all Full-Time Employees who have been enrolled for at least one (1) standard Measurement Period) who become eligible for coverage under this Plan at the end of the initial Measurement Period, but prior to the beginning of the initial Stability Period. On-Going Employees will be notified by October 31st each year as to their eligibility during the next Stability Period."

**"ON-GOING EMPLOYEE"**

The term "On-Going Employee" means any employee of the Employer who has been employed for at least one full standard Measurement Period."

**"QUALIFIED INDIVIDUAL"**

The term "Qualified Individual" means an individual who is properly enrolled in the Plan and who is eligible to participate in an Approved Clinical Trial according to the trial protocol with respect to treatment of cancer or another Life Threatening Condition or disease.   To be a Qualified Individual, there is an additional requirement that a determination be made that the individual's participation in the Approved Clinical Trial is appropriate to treat the disease or condition.  That determination can be made based on the referring health care professional's conclusion or based on the provision of medical and scientific information by the individual."

4

**"ROUTINE PATIENT COSTS**

The term "Routine Patient Costs" means all items and services consistent with the coverage provided under the Plan that is typically covered for a Qualified Individual for treatment of cancer or another Life Threatening Condition or disease who is not enrolled in a clinical trial.  However, costs associated with the following are excluded from that definition, and the Plan is not required under federal law to pay for the following:

    A.  the cost of the investigational item, device or service;

    B.  the cost of items and services provided solely to satisfy data collection and analysis needs and that are not used in direct clinical management; or

    C.  the cost for a service that is clearly inconsistent with widely accepted and established standards of care for a particular diagnosis."

**"STABILITY PERIOD**

The term "Stability Period" means the period of time, as determined by the Plan Administrator, for which new Variable Hour Employees and On-Going Employees are eligible for coverage under the Plan, as determined during the latest prior Measurement Period. The Employer sponsoring this Plan uses a twelve (12) month Stability Period, starting one (1) year from the date of hire for new Variable Hour Employees (and ending one (1) year later), or on November 1st  and ending October 31st of the next Calendar Year for other employees.  If a Variable Hour Employee is determined to work an average of at least thirty (30) hours per week during his or her initial Measurement Period following his or her date of hire, he or she will continue to be eligible for coverage during the current ongoing Stability Period from the end of such employees initial Measurement Period to the end of the current Stability Period (provided he or she is still employed by the Employer during such Stability Period), even if determined to be ineligible during a subsequent overlapping Measurement Period.

If an employee becomes ineligible for coverage due to a break in service that occurs during a Stability Period for which coverage is being provided under this Plan, but returns to active employment with the Employer within thirteen (13) weeks and prior to the end of the same Stability Period, he or she will once again become eligible for coverage from the date he or she resumes active employment until the end of such Stability Period."

**"VARIABLE HOUR EMPLOYEE**

The term "Variable Hour Employee" means any employee who, as of his or her date of hire:

    A.  is expected to work less than thirty (30) hours a week as of their date of hire, on average; or

    B.  for whom, on the date of hire, it cannot reasonably be determined whether or not the employee will work at least thirty (30) hours per week (or one hundred thirty (130) hours per month) as his or her hours vary from week to week for an indefinite period of time.

Variable Hour Employees include employees whose hours routinely vary from week to week, or employees whose hours vary depending on the season or time of year."

    9.) Effective October 1, 2014, Section 4.4, entitled, **"ACCESS TO DOCUMENTS, RECORDS OR OTHER INFORMATION,"** as set forth in Article IV of the Plan, is amended in its entirety, as follows:

**"4.4 ACCESS TO DOCUMENTS, RECORDS OR OTHER INFORMATION**

A Covered Person is entitled to examine the claim file, and present testimony as part of the internal claims and review process. He or she will also receive, free of charge, copies of documents, records and other information that is relevant to his or her claim for benefits, including any new or additional information generated by the Plan Administrator that is received during the appeals process, and the rationale behind the Plan's adverse decision. Such information will be provided within sufficient time to respond prior to the final decision of the appeal by the Plan Administrator. Such information is considered to be relevant if it:

    A.  was relied upon by the Plan Administrator in making the benefit determination;

    B.  was submitted, considered or generated in the course of making the benefit determination;

    C.  demonstrates compliance with the administrative processes required by ERISA;

    D.  constitutes a statement of policy or guidance with respect to the Plan concerning the denial of a treatment option or benefit; or

    E.  involves the identity of medical or vocational experts whose advice was obtained in connection with the claim.

In addition, if an adverse benefit determination is based upon the Medical Necessity or Experimental nature of the service or supply, the Covered Person can request an explanation of the scientific or clinical judgment of the determination, free of charge."

10.) Effective October 1, 2014, Section 5.2, entitled, **"EMPLOYEE ELIGIBILITY,"** as set forth in Article V of the Plan, is amended in its entirety, as follows:

**"5.2 EMPLOYEE EGILIBILITY**

Employees of the Employer who meet the conditions of one of the following classes shall be deemed eligible for coverage as a Participant under the Plan:

    A.  A Full-Time Employee who:

        1.  has been employed by the Employer for less than one (1) standard Measurement Period; and

        2.  has satisfied a waiting period consisting of thirty (30) days of Active Work. If an employee is employed by the Employer for any or all of this thirty (30) day period prior to his or her entry into Service in the Uniformed Services, this period of previous employment shall be credited towards the partial or full satisfaction of any waiting period imposed under this Plan if the employee is re-employed by the Employer at the expiration of the term of Service in the Uniformed Services;

    B.  An employee who is employed by the Employer on a permanent, part-time basis for less than thirty (30) hours per week, but is employed for at least one thousand (1,000) hours per year and has satisfied a waiting period of one (1) year, commencing with his or her date of hire. If an employee is employed by the Employer for any or all of this waiting period prior to his or her entry into Service in the Uniformed Services, this period of previous employment shall be credited towards the partial or full satisfaction of any waiting period imposed under this Plan if the employee is re-employed by the Employer at the expiration of the term of Service in the Uniformed Services, provided such employee applies for reemployment within the applicable time frame listed in the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as described in Section 5.17.

6

Park National Corporation Employee Health Benefit Plan -- Wellness Plan _____ Amendment No. 3

C. An employee who is not eligible under A or B above and who is a Variable Hour Employee of the Employer, or an On-Going Employee who has been employed for at least one (1) standard Measurement Period, who has been determined during the most recent Measurement Period that is applicable to such employee to work an average of at least thirty (30) hours per week during such Measurement Period. Coverage for such employee will become effective (or be continued) as of the first day of the next Stability Period that applies to such employee, as long as such employee is still employed on that date.

A new Variable Hour Employee who has a Change in Employment Status during an initial Measurement Period will be treated as a Full-Time Employee as of the earlier of:

1. the date following thirty (30) days from the Change in Employment Status; or

2. the beginning of the initial Stability Period (provided the employee averaged more than thirty (30) hours of service per week during the initial Measurement Period).

A Change in Employment Status for an On-Going Employee does not change the employee's status as a Full-Time Employee or non Full-Time Employee during the Stability Period.

For purposes of this Plan, Change in Employment Status means a material change in the employee's position of employment or other employment status that, had the employee begun employment in the new position or status, the employee would have reasonably been expected to work thirty (30) or more hours of service per week.

Participants must agree to any applicable Participant Contribution for such coverage."

11.) Effective October 1, 2014, Section 5.10, entitled, **"PARTICIPANT TERMINATION,"** as set forth in Article V of the Plan, is amended in its entirety, as follows:

**"5.10 PARTICIPANT TERMINATION**

Participant coverage terminates immediately upon the earliest of the following dates:

A. if covered as a regular, Full-Time Employee under Section 5.2A or a part-time employee under Section 5.2B for less than one (1) full Measurement Period, as described as in Section 5.2A, the date the Participant is no longer paid for working the number of hours listed in such Sections, or otherwise fails to meet the eligibility requirements listed in such Sections;

B. if covered as a Variable Hour Employee or an On-Going Employee who has been employed for at least one (1) standard Measurement Period, as described in Section 5.2C, the earlier of the last day of the last Stability Period during which the employee was eligible if the employee failed to average thirty (30) hours per week during the latest Measurement Period that applies to such employee, or the date such employee's employment with the Employer is terminated. This will be considered to be a reduction in hours Qualifying Event for the purposes of this Plan's COBRA continuation provisions;

C. the date of termination of the Participant's employment;

D. the date the Participant fails to make any required Participant Contribution for coverage;

E. the date the Plan is terminated or, with respect to any benefit of the Plan, the date of termination of such benefit; or

7

F.  the date that is authorized by the Plan Administrator after the beginning of an approved leave of absence or temporary layoff, as described in Section 5.14 below.

Coverage will terminate as described above, unless COBRA continuation coverage is elected, and covered at the Participant's own cost, as described in Article VII. This Plan will also comply with the continuation provisions contained in the Uniformed Services Employment and Re-Employment Rights Act of 1994 (USERRA) as they apply to Participants entering Service in the Uniformed Services."

12.)Effective  October  1,  2014,  Article  V,  entitled,  **"COVERAGE  AND ELIGIBILITY,"** as set forth in the Plan and as amended above, is amended by adding thereto the following new section:

**"5.18 ADDITIONAL MEDICAL LEAVES OF ABSENCE**
A medical leave of absence may be granted at the sole discretion of the Bank for the Associate's own condition if he or she has been employed by the Bank for at least ninety (90) calendar days and is not eligible for Family and Medical Leave Act (FMLA).

A.  Up to six (6) weeks of leave may be granted upon presentation of satisfactory evidence of the need for leave and approval by Central HR and the applicable affiliate's Leadership Group.

B.  In all cases, an Associate must use available paid time off to which he or she is entitled during the leave. Any additional time off up to the six (6) week period, if granted, is unpaid.

C.  The Associate must submit a request for leave to his/her immediate supervisor as far in advance as possible for approval by Bank management.

D.  The Associate must make a reasonable effort to schedule the treatment so as to not unreasonably disrupt Bank operations. Additionally, the Associate must stay in contact with his/her supervisor during the leave and fully cooperate with Bank requests for information in order for the Bank to accommodate the leave.

E.  The Bank may require the Associate to transfer to an available alternative position, for which the Associate is qualified, to better accommodate the period of leave. Associates transferred in such circumstances will receive the pay, level and employment status corresponding to the transferred position. (For example, the employment status may be changed to part-time in order to accommodate the treatment schedule.)

F.  The Bank will require medical authorization before an Associate will be permitted to return to work following a leave of absence for medical reasons.

G.  The Associate must make all applicable benefit premium payments for the duration of the leave in order to continue participation in those benefit plans.

The Bank reserves the right to deny, modify, or stop the leave of absence and/or separate employment as needed."

13.)Effective October 1, 2014, Article VI, **"COST MANAGEMENT SERVICES,"** as set forth in the Plan is amended by adding thereto the following new subsection:

**"6.8 INDIVIDUAL BENEFITS MANAGEMENT**
Individual benefits management is designed to inform Covered Persons of more cost effective settings for treatment. On an exception basis and subject to approval, the Plan may provide benefits for settings not expressly provided for under the Plan, but which are not prohibited by law, rule or federal policy.

8

Services and Supplies provided in connection with individual benefits management must be:

    A.  for an acute level of care;

    B.  Medically Necessary; and

    C.  provided in a more cost effective setting.

Under Individual Benefits Management, the Plan Administrator may waive the Deductible or Coinsurance amount for certain services.

The Plan Administrator has the right to deny an extension of benefits under Individual Benefits Management. The Plan Administrator also has the right to administer benefits pursuant to the terms of the Plan, exclusive of this provision. If benefits are provided to a Covered Person, under this provision for individual benefits management, that are outside of the conditions, limitations and/or exclusions of this Plan, the Covered Person has no right to expect that the same or similar benefits (provided outside of the conditions, limitations and/or exclusions of this Plan) will be provided to that Covered Person in the future.

The Plan Administrator shall have full discretionary authority and responsibility with respect to all aspects of Plan administration, including utilization review. If a Utilization Review Service is designated by the Plan Administrator, the Utilization Review Service agrees to recognize the ultimate authority of the Plan Administrator."

14.)Effective October 1, 2014, Subsection AD in Section 9.1, entitled, "**MEDICAL BENEFITS-COVERED EXPENSES**," as set forth in Article IX of the Plan, is amended in its entirety, as follows:

"AD.  Charges for Medically Necessary human organ and tissue transplants are covered under the Plan, subject to the limitations set forth in this provision. Transplantation of non-human or artificial organs which is not considered as Experimental or Investigative is also covered under this Plan. All organ and tissue transplants must be pre-certified by the Utilization Review Service as described in Article VI. Covered Expenses include the following:

    1.  All Medically Necessary expenses related to the organ or tissue transplant, including, but not limited to, services and supplies which are otherwise listed as Covered Expenses under this Plan;

    2.  Expenses related to the acquisition of organs and tissue for transplantation. Acquisition means the acquisition, preparation, transportation and storage of an organ or tissue; and

    3.  Expenses incurred by a human organ or tissue donor who is a Covered Person under this Plan for Medically Necessary services and supplies which are otherwise covered under this Plan and are related to an organ or tissue transplant to a recipient who is also a Covered Person under this Plan will be covered as expenses of the donor. No other charges related to the donation of organs or tissue, including donor charges when the recipient is a Covered Person under this Plan and the donor is not, or when the donor is a Covered Person under this Plan and the recipient is not, will be considered as Covered Expenses under this Plan.

This Plan has contracted with a special transplant network, as described in Section 10.5, that provides transplant related services and supplies to Covered Persons under this plan at a cost that is less, for the most part, than services provided to other patients.

No coverage will be provided for any expenses for any transplant considered Experimental or Investigative."

15.) Effective January 1, 2015, Section 9.1, entitled, **"MEDICAL BENEFITS-COVERED EXPENSES,"** as set forth in Article IX of the Plan and as amended in Amendment No.3 and above, is amended by adding thereto the following new item:

"AH. Charges related to smoking cessation programs for any of the following:

1. the counseling services of a Physician for up to two (2) attempts to stop smoking per Calendar Year with up to four (4) counseling visits per attempt; and

2. any FDA approved smoking cessation products prescribed by a Physician in connection with such attempts that are not available through the prescription programs described in Article X."

16.) Effective January 1, 2015, Subsection P. in Section 10.2, entitled, **"COVERED EXPENSES AND LIMITATIONS UNDER THE PRESCRIPTION DRUG CARD PROGRAM,"** as set forth in Article X of the Plan, is amended in its entirety as follows:

"P. FDA approved tobacco cessation products, including over-the-counter products, limited to two (2) ninety (90) day supplies, per year."

17.) Effective October 1, 2014, Article X, entitled, **"OTHER BENEFITS,"** as set forth in the Plan, and as amended in Amendments No.1 and No. 2, is amended by adding thereto the following new section:

**"10.5 SPECIAL TRANSPLANT PROGRAM**
In addition to the standard transplant benefit described in Section 9.1, the following benefits may be available when a Covered Person participates in the Plan's special transplant program. This program is an enhancement to the standard transplant benefits and participation in the program is voluntary.

Additional covered benefits available through this program include:

A. access to transplant Centers of Excellence across the United States, as well as Outpatient peripheral stem cell facilities;

B. reimbursement for travel and lodging expenses incurred during the entire transplant (immediately before and after the transplant) up to a five thousand dollar ($5,000.00) maximum for the Covered Person and a companion. Travel and lodging discounts are also available through select airlines and hotels;

C. waiver of a Covered Person's Deductible and coinsurance expenses, up to a maximum of one thousand five hundred dollars ($1,500.00); and

D. services of a transplant facilitator, who will coordinate the cost savings.

These benefits are only available when a Covered Person fully participates in the special transplant program and meets all of the following requirements:

A. pre-notification of the upcoming transplant must be given by the Covered Person, his or her Physician or the Benefit Manager as soon as the Covered Person is identified as a potential transplant candidate. Pre-notification must be made to 1-888-4ORGANS;

B. pre-certification must be made through the Utilization Review Service as described in Article VI; and

C. all transplant services must be rendered at a transplant Center of Excellence facility in the preferred transplant network.

10

Park National Corporation Employee Health Benefit Plan – Wellness Plan_____Amendment No. 3

If these requirements are not met, special transplant program benefits may be reduced.
Early pre-certification to 1-888-4ORGANS must be made as soon as the Covered Person is identified as a potential transplant candidate. Once enrolled in the program, a transplant facilitator will be assigned and will coordinate the cost savings with the Covered Person and the Physician from Hospital selection to travel arrangements to prescription drug options. The transplant facilitator will contact the Benefit Manager for benefit information, as well as contact the Covered Person's referring Physician for additional information. Information about the program will be forwarded to the Covered Person regarding transplant network Hospitals and other relevant information. The transplant facilitator will work with the Covered Person, his or her Physician and the Benefit Manager throughout the process, pre-transplant to post-transplant, including organ harvest."

Park National Corporation hereby adopts the above amendments to the Park National Corporation Employee Health Benefit Plan – Wellness Plan effective on the dates listed above.
ADOPTED this __14th__ day of __November__, 2014

_____
PLAN ADMINISTRATOR FOR THE PARK NATIONAL CORPORATION EMPLOYEE HEALTH BENEFIT PLAN

11